UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA, MIAMI DIVISION

| | |
|---|---|
| PAUL AKEO and CHRISTY AKEO,<br><br>            Plaintiffs,<br><br>v.<br><br>PALACE RESORTS, LLC, a limited liability company; PALACE ELITE, a Mexican corporation; PR GLOBAL RESERVATIONS, LLC, a Florida limited liability company; PALACE ELITE RESORTS S.A. de C.V., a Mexican corporation; JOSÉ GIBRÁN CHAPUR DÁJER, an individual; PALACE COMPANY HOLDINGS,<br><br>            Defendants. | Case No: 1:25-cv-23733-RKA |

## PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION UNDER FED. R. CIV. PROC. 65 TO STAY ARBITRATION INITIATED BY DEFENDANTS

Plaintiffs, PAUL AKEO and CHRISTY AKEO (collectively, "Plaintiffs") by and through

undersigned counsel, move under Federal Rule of Civil Procedure 65 for entry of a Temporary

Restraining Order ("TRO") and Preliminary Injunction against Defendant PALACE ELITE, a

Mexican corporation; PR GLOBAL RESERVATIONS, LLC, a Florida limited liability

company; PALACE ELITE RESORTS S.A. de C.V., a Mexican corporation; JOSE GIBRAN

CHAPUR DEJAR, an individual; and PALACE COMPANY HOLDINGS (the "Defendants") to

stay the pending arbitration.  Plaintiffs had a pending emergency motion on the same subject

matter before Defendants' removal.

*Immediate relief is requested **by August 20, 2025**, as the emergency arbitrator is*

*requiring Plaintiffs to respond to emergency requests sought by Palace Elite Resorts in the*

parallel arbitration by that date and has set a hearing for August 26, 2025 **under a contract that was not formed under common law principles.**  This TRO and injunction is necessary to protect the Court's exclusive jurisdiction to "determine threshold issues regarding the enforceability and validity of the Arbitration and Delegation Provisions," including a challenge that "applies 'equally' to the whole contract and to an arbitration provision."  *Osterer v. BAM Trading Servs. Inc.,* 753 F. Supp. 3d 1289, 1294 (S.D. Fla. 2024) (quoting *Coinbase, Inc. v. Suski*, 602 U.S. 143, 144 (2024)).  "[A] court must address that challenge," not an arbitrator.  *Id.*  A TRO relief is necessary to preserve the status quo to permit this Court to exercise its exclusive jurisdiction in this area; Defendants have been pressing for the emergency arbitrator to usurp this Court's jurisdiction.

## I.      INTRODUCTION

On March 3, 2025, the Akeos were detained at the Cancun International Airport and then transferred to Mexico maximum security prison.  Their "crime"?  The Akeos had successfully persuaded *four* separate credit card companies that Palace Elite Resorts S.A. de C.V. ("Palace Resorts") did not render timeshare commitments it made under applicable contracts, resulting in a refund of over $116,000 to the Akeos.  But that is not what Palace Resorts had told the Mexico public prosecutors' office in their retaliatory criminal complaint.  Palace Resorts falsely accused the Akeos of claiming the charges were "desconocidas," i.e. "unknown" charges, as though the Akeos sought to defraud Palace Resorts.  (*See* Compl. ¶ 8).

After the Akeos languished in Mexico maximum security prison next to cartel members, murders, and drug dealers under a six-month detention order, on April 3, 2025, Palace Resorts exacted their pound of flesh.  Palace Resorts coerced the Akeos under duress to affix their signatures on a Mutual Settlement and Nondisparagement Agreement (the "Alleged Agreement")

as part of a Reparatory Agreement to resolve the false Mexico criminal charges.

Palace Elite now claims that because the Akeos gave into their threat of continued imprisonment and criminal prosecution under false accusations, they have traded away their right to hold Palace Elite accountable for its false accusations in court and in the press, and must instead be forced into a secret arbitration 2,500 miles away in Vancouver, Canada.  There is one problem with this tactic: "Arbitration is a matter of consent, not coercion." *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 681 (2010).  "[I]f there be compulsion, there is no actual consent, and moral compulsion, such as that produced by threats to take life or to inflict great bodily harm, *as well as that produced by imprisonment*, is *everywhere* regarded as sufficient, in law, to destroy free agency, without which there can be no contract, because, in that state of the case, there is no consent."  *Brown v. Pierce*, 74 U.S. 205, 214 (1868) (emphasis added).

No case in modern arbitration law tests this bedrock principle of arbitration so squarely as the Akeos': (i) Shackled in handcuffs (removed only to sign), (ii) in the custody of a Mexico maximum security prison under a minimum six-month detention order, (iii) having survived thirty days next to drug dealers, cartel members, and murderers, in constant fear for their personal safety and security, (iv) next to men carrying machine guns, and (v) under threat of criminal prosecution that could lock them up for up to six years, Plaintiffs were forced under duress by Defendants to affix their signature on the Alleged Agreement.  Below is a photo taken by U.S. Representative Tom Barrett of the Akeos' shackles



being removed to allow them to affix their signature on the Agreement, (Decl. of Paul Akeo "Paul Decl." ¶ 20).  While Palace Resorts claims there was diplomatic assistance from Congressmember Barrett and others, this text message between Congressmember Barrett and the Akeos' U.S. counsel shows the terms under which Palace Resorts coerced their signature at the time of signing:



(Decl. John Manly, Ex. 1).

On August 13, 2025, after notifying Palace Resorts of their contention that the Alleged Agreement was unenforceable and their intent to file suit, Plaintiffs received notice that Palace Resorts initiated an arbitration under the International Court of Arbitration (the "ICA") under the Alleged Agreement.

Rather than permit a court to decide the gateway arbitrability question, Palace Resorts is moving swiftly to persuade the ICA to usurp the Court's role in this regard.  On August 15, 2025, Plaintiffs received a notification from the ICA that PALACE ELITE RESORTS S.A. de C.V. had filed an emergency application to decide the enforceability of the Alleged Agreement and required Plaintiffs – who are without counsel in the ICA and continue to work with their insurer and legal clinics to search for defense counsel – to respond by August 20, 2025. Accordingly, Plaintiffs respectfully request temporary relief on or before August 20, 2025 to protect this Court's clear jurisdiction to decide whether any contract was formed.

Plaintiffs seek a TRO and injunction (i) to restrain Defendants from seeking to enforce the Alleged Agreement (including its arbitration and delegation clauses, to the extent therein)

that Palace Elite unlawfully procured through duress and (ii) to stay the pending arbitration proceeding Defendants have requested under the Alleged Agreement in the International Court of Arbitration ("ICA") in Vancouver, Canada.  This TRO and preliminary injunction would permit this Court to retain its clear jurisdiction to decide gateway arbitration issues regarding whether the FAA applies and whether a contract (including any separable agreement for delegation and arbitration) was ever formed.

## II.   VERIFIED FACTS SUPPORTING RELIEF

Paul and Christy Akeo are a married couple living in Michigan.[1]  Paul served in the United States Navy for 23 years and was honorably discharged.  (Paul Decl. ¶ 2).  He was a Navy Senior Chief at the time of his discharge.  (*Id.*).  On March 4, 2025, Plaintiffs Paul and Christy Akeo were arrested while seeking to pass Mexican immigration authorities en route to a vacation in Cancun.  (Paul Decl. ¶ 3; Christy Decl. ¶ 2).  They were then forced to spend a month in detention in a maximum security prison in Quintana Roo, Mexico separate and apart from each other, sleeping alongside drug dealers and violent criminals.  (Paul Decl. ¶ 3).

The charges: Palace Resorts had falsely accused the Akeos of fraudulently disputing credit card transactions as "desconocidas," i.e. not recognized or unknown.  In reality, after a long-running dispute described in the complaint, the Akeos had successfully disputed the charges with the credit card companies based on the fact that the charges were for "services or products not received."  (Paul Decl. ¶ 38; Christy Decl. ¶ 3).  The credit card companies received information from both sides and ultimately sided with the Akeos, refunding them approximately $116,000.  (Christy Decl. ¶ 3).

While the allegations are lengthy in the complaint, for purposes of this temporary

---

[1] This motion refers to the Akeos by their first name to avoid confusion.

restraining order, the relevant facts relate to the circumstances resulting in the Akeos' signing the Alleged Agreement.  After being arrested, the Akeos were held in maximum security Mexico prison based on the false accusations.  (Paul Decl. ¶ 4; Christy Decl. ¶ 4).  Christy was placed in a holding cell for two weeks with a non-flushable toilet.  (Christy Decl. ¶ 4).  Paul was placed in a jail cell with roughly 35 other guys.  (Paul Decl. ¶ 4).  On the first night, the guards had pepper sprayed the fan in Paul's room to calm down agitated prisoners.  (*Id.*).  The conditions were terrible, including no working shower and no flushable toilet.  (Paul Decl. ¶ 4).

On March 5, Paul approached a corporate representative of the Palace Resorts at a court hearing to say he was sorry this went as far as it did.  (Paul Decl. ¶ 5; Christy Decl. ¶ 5).  The corporate representative of Palace Resorts told Paul that Palace Resorts was willing to drop the criminal charges only in exchange for a private settlement agreement.  (Paul Decl. ¶ 5; Christy Decl. ¶ 5).  He told the Akeos that the settlement agreement was "not about the money, it was about the Facebook group."  (Paul Decl. ¶ 5; Christy Decl. ¶ 5).  The Akeos do not know the name of the corporative representative, but have met him before at the Palace Resorts and know what he looks like.  (Paul Decl. ¶ 5; Christy Decl. ¶ 5).  The corporative representative had laughed at the Akeos when the Akeos walked into the courtroom in shackles.  (Paul Decl. ¶ 5; Christy Decl. ¶ 5).

On March 10, Christy and Paul understood that Mexico authorities were going to hold them for at minimum six months to enable Palace Resorts to gather more information on the case and, if found guilty, up to three to six years.  (Paul Decl. ¶ 6; Christy Decl. ¶ 7).

After two weeks in the holding cell, Christy was placed into general population at the maximum security prison in a room with five other women.  (Christy Decl. ¶ 8).  Christy learned that three of the women were there for murder and two were there for drug-related charges.  (*Id.*)

Paul was transferred to different jail cells for his safety.  (Paul Decl. ¶ 7).  In the first two weeks, Paul was in the general lock up cell next to individuals who were there for drug dealing, armed robbery, and murder.  (*Id.*). In the next cell, Paul learned that he was with individuals who had been detained for two or three years.  (*Id.*).  In the final cell he was transferred to, Paul learned that he was with individuals who were members of the Mexico cartel and had killed people, committed armed robbery, rape, or stealing (each of the foregoing were separate individuals).  (*Id.*).  Both Akeos feared for their personal security and safety the entire time in prison.  (*Id.*).  The Akeos understood that nobody spoke English.  (*Id.*).  Inmates had told Paul they recognized him "from the TV."  (*Id.*).  Paul was afraid the inmates knew he worked for the Michigan State Police.  (*Id.*).  During the first week, Paul pulled drywall screws from the wall and slept with them for protection.  (*Id.*).  Each night, up to ten new people would be placed in the holding cell with him.  (*Id.*).  Paul was sleeping shoulder-to-shoulder with other inmates on the floor.  (*Id.*).

On Friday, April 3, at approximately 12:30 PM, guards at the prison came to the Akeos' cells and asked the Akeos to come out. (*Id.* ¶ 8; Christy Decl. ¶ 9).  The Akeos had no idea what was happening.  (Paul Decl. ¶ 8; Christy Decl. ¶ 9).  Christy asked where she was going, but the guard did not speak English and gave no explanation. (Christy Decl. ¶ 9).  Christy was escorted down to the prison garage in shackles. (*Id.*).  Shortly after, Paul arrived, also shackled.  (Paul Decl. ¶ 8).  The Akeos arrived at the courthouse at about 1:00 PM for what they were told was a 2:00 PM hearing. (Paul Decl. ¶ 10; Christy Decl. ¶ 11).  The Akeos were placed in separate, filthy basement holding cells — each in shackles — and could not see one another. (Paul Decl. ¶ 10; Christy Decl. ¶ 11).  There was no water in Christy's cell and the toilet, out in the open, was not working.  (Christy Decl. ¶ 11).

The Akeos were the only ones in these separate holding cells, and they were left there for hours. (Paul Decl. ¶ 11; Christy Decl. ¶ 12).  The Akeos could talk to each other by shouting back and forth, but could not see one another.  (Paul Decl. ¶ 11; Christy Decl. ¶ 12).  As time passed, the Akeos became increasingly anxious. (Paul Decl. ¶ 12; ; Christy Decl. ¶ 13). The hearing time came and went. (Paul Decl. ¶ 12; Christy Decl. ¶ 13).  At around 3:00 PM, Christy asked one of the guards why they had not yet been taken to the hearing, but the guard did not speak English. (Christy Decl. ¶ 13).  None of the other guards could understand Christy either. (Christy Decl. ¶ 13).

By this point, the Akeos had been waiting for over three hours — two hours past our scheduled hearing time. (Paul Decl. ¶ 13; Christy Decl. ¶ 14).  The repeated delays made the Akeos fear something had gone wrong and that they would not be going home that day. (Paul Decl. ¶ 13; Christy Decl. ¶ 14).  The Akeos kept asking for their lawyers and for Congressman Tom Barrett,  the U.S. House of Representative for the Akeos' daughter's district, but no one could help the Akeos or even understand their requests. (Paul Decl. ¶ 13; ; Christy Decl. ¶ 14). Christy was also growing more anxious because of the lack of water and the unusable toilet in the open in my cell.  (Christy Decl. ¶ 14).  It was open air, so it was very hot down there.  (Paul Decl. ¶ 13; Christy Decl. ¶ 14).  Finally, around 4:00 PM, guards came to take the Akeos to the hearing. (Paul Decl. ¶ 14; Christy Decl. ¶ 15).  The Akeos were escorted by three armed guards carrying machine guns.  (Paul Decl. ¶ 14; Christy Decl. ¶ 15).

Inside the courtroom were a number of Palace Resort representations, Congressman Tom Barrett, members of the Consul General staff, and the Akeos' Mexico defense attorneys.  (Paul Decl. ¶ 15; Christy Decl. ¶ 16).  There was an interpreter sent for the Akeos, but she could not speak English well enough to translate.  (Paul Decl. ¶ 16; Christy Decl. ¶ 17). Two or three

additional armed guards with machine guns were present next to the Akeos.  (Paul Decl. ¶ 17; Christy Decl. ¶ 18).

Once seated, Congressman Barrett told the Akeos that the Akeos needed to sign paperwork to be free from prison and had no choice to sign unless they wished to remain in prison and subject to criminal prosecution.  (Paul Decl. ¶ 18; Christy Decl. ¶ 19).  All the Akeos wanted to do was sign and leave.  (Paul Decl. ¶ 18; Christy Decl. ¶ 19).  The Akeos were just so scared as to what was happening and why it was delayed for so long.  (Paul Decl. ¶ 18; Christy Decl. ¶ 19).  The Akeos' lawyers also told the Akeos they needed to sign the Alleged Agreement in favor of Palace Elite to be released.  (Paul Decl. ¶ 19; Christy Decl. ¶ 20).

The Akeos signed the Agreement where they were told to by their lawyers.  (Paul Decl. ¶ 20; Christy Decl. ¶ 21).  While signing the Agreement, Palace lawyer Kevin was standing over the Akeos glaring at them in an intimidating manner.  (Paul Decl. ¶ 20; Christy Decl. ¶ 21).

This was the first the Akeos ever saw the Agreement.  (Paul Decl. ¶ 21; Christy Decl. ¶ 22).  At the time of signature, to the Akeos' understanding, Palace Resorts continued to threaten the Akeos with imprisonment (where their physical safety and security were jeopardized) and criminal prosecution if they did not sign the Agreements.  (Paul Decl. ¶ 21; Christy Decl. ¶ 22).

The Akeos left the courthouse to return to the prison.  (Paul Decl. ¶ 22; Christy Decl. ¶ 23).  Based on statements made to the Akeos, everybody around them distrusted Palace Resorts and were afraid that the Akeos were not going to be released from prison.  (Paul Decl. ¶ 22; Christy Decl. ¶ 23).  As a result, Congressmember Barrett, the Consular General, and members of their staff followed in their own armored vehicle the Mexican authority's armored guard vehicle transporting the Akeos back to prison.  (Paul Decl. ¶ 22; Christy Decl. ¶ 23).  The Akeos believed their safety and security remained in jeopardy as they were told that Palace Resorts may

file additional criminal charges to detain them before their departure from Mexico.  (Paul Decl. ¶ 22; Christy Decl. ¶ 23).  This threat was so real and imminent that they were told their lawyers filed a case with a court seeking an injunction.  ((Paul Decl. ¶ 22; Christy Decl. ¶ 23).

After they were released from Mexico maximum security prison, Congressmember Barrett and the Consular General transported the  Akeos with police escorts bearing machine guns to the airport.  (Paul Decl. ¶ 23; Christy Decl. ¶ 24).  Congressmember Barrett and the Consular General told the Akeos that they were so concerned for their physical safety and security as a result of the Palace Resorts' conduct that they were going to wait until their plane actually took off.  (Paul Decl. ¶ 23; Christy Decl. ¶ 24).  The Akeos were also procured a private jet to prevent any opportunity for detention at a commercial airport.  (Paul Decl. ¶ 23; Christy Decl. ¶ 24).

Throughout the signing process, the Akeos were threatened with imprisonment and criminal prosecution, scared, confused, intimidated and humiliated. (Paul Decl. ¶ 24; Christy Decl. ¶ 25).  The armed guards with machine guns, the Palace lawyers' stalking and assaulting behavior at the signature time, the hours of unexplained delays, and the previous thirty-days of constant fear for their personal safety and security next to drug dealers and murders added to the Akeos' anxiety.  (Paul Decl. ¶ 24; Christy Decl. ¶ 25).

The Akeos had no choice but to sign the Agreement if they wanted to be released from prison.  (Paul Decl. ¶ 25; Christy Decl. ¶ 26).  The Akeos believed that if they did not sign immediately, they would remain in prison indefinitely.  (Paul Decl. ¶ 25; Christy Decl. ¶ 26).  The Akeos were asked for copies of what they signed, but were told their lawyers would have to send copies.  (Paul Decl. ¶ 25; Christy Decl. ¶ 26).  The Akeos left without any paperwork from court.  (Paul Decl. ¶ 25; Christy Decl. ¶ 26).

On July 22, 2025, the Akeos through their counsel sent a letter to Palace Resorts' counsel indicating their intention to file suit on or before August 1, 2025 in Florida Circuit Court.  (Paul Decl. ¶ 26; Christy Decl. ¶ 27).  The Akeos asked if Palace Resorts wished to resolve the lawsuit before suit was filed.  (Paul Decl. ¶ 26; Christy Decl. ¶ 27).  The Akeos asked for a response by July 28, 2025.  (Paul Decl. ¶ 26; Christy Decl. ¶ 27).

On July 31, 2025, Palace Resorts responded by asking for "an additional five (5) business days" to "conduct a thorough internal assessment and prepare a more considered response" to the Akeos' communication.  (Paul Decl. ¶ 27; Christy Decl. ¶ 28).  Palace Resorts said: "We appreciate your cooperation, and we will be in touch no later than Thursday August 7, 2025 with our response."  (Paul Decl. ¶ 27; Christy Decl. ¶ 28).  The letter was signed by Isaac Carrasco. (See Exhibit B to Decl. of Paul Akeo).  (Paul Decl. ¶ 27; Christy Decl. ¶ 28).

Palace Resorts never responded to Plaintiffs' communication as it had promised in the letter.  (Paul Decl. ¶ 28; Christy Decl. ¶ 29).  Rather, on August 11, 2025, the International Court of Arbitration sent a Request for Arbitration dated August 6, 2025.  (Paul Decl. ¶ 28; Christy Decl. ¶ 29).  The Akeos feel deceived yet again by Palace Resorts, including its own general counsel, in their statements and conduct.  (Paul Decl. ¶ 28; Christy Decl. ¶ 29).

On August 15, the Akeos received a notification that Palace Elite was requesting "emergency orders" with respect to the Alleged Agreement it obtained through duress.  (Paul Decl. ¶ 29).  On the same day, the emergency arbitrator wrote to the Akeos that they were required to respond by August 18 to give availability for a hearing and disclose counsel and by August 20 to respond to Palace Elite's request for emergency orders. (*Id.*).

The Akeos are currently unrepresented in the ICA Arbitration.  (Paul Decl. ¶ 30). Promptly after receiving notice of the arbitration request, the Akeos tendered the defense to their

insurer and are waiting for a final response.  (Paul Decl. ¶ 30).  Paul has also made requests to veteran legal clinics and other legal aid organizations to assist the Akeos in their defense in the ICA Arbitration.  (Paul Decl. ¶ 30).

On August 18, 2025, the Akeos requested additional time to respond to Palace Elite's request for emergency orders.  (Paul Decl. ¶ 40).  On August 19, 2025, the emergency arbitrator Nicholas Wiegand denied the request, requiring the Akeos to respond by tomorrow, unless Palace Elite agrees to an extension.  (*Id.*).  The emergency arbitrator also set an online hearing for a maximum of two hours to be convened on Tuesday, August 26, 2025 at 8 am Vancouver time.  (*Id.*).

The Akeos will be emotionally traumatized if they are forced to arbitrate their disputes with the ICA, as the Agreement was procured by threats and force at the hands of Palace Resorts. (Paul Decl. ¶ 31; Christy Decl. ¶ 30).

The Akeos' signature on the arbitration agreement and delegation clause were procured through duress.  (Paul Decl. ¶ 32; Christy Decl. ¶ 31).  Specifically, Defendants insisted that the Akeos sign the arbitration agreement and delegation clause in order to be freed from prison, criminal prosecution, and fear for their personal safety.  (Paul Decl. ¶ 32; Christy Decl. ¶ 31).

The Akeos were thereby deprived of the ability to exercise free will or make a voluntary, knowing choice regarding the delegation of authority to an arbitrator.  (Paul Decl. ¶ 33; Christy Decl. ¶ 32).  Because duress tainted Plaintiffs' assent to the delegation clause itself, Plaintiffs never agreed out of their own free will to arbitral determination of arbitrability.  (Christy Decl. ¶ 33).

Plaintiffs did not voluntarily and willingly agree to permit the arbitrator to decide the enforceability of the Alleged Agreement or any provision contained therein – particularly an

arbitration requested by the very party who procured the Agreement through duress.  (Paul Decl. ¶ 35; Christy Decl. ¶ 34).

The Alleged Agreement references the Rules of Arbitration of the International Chamber of Commerce.   (Paul Decl., Ex. A ¶ 15).  The Akeos did not and could not have access to the Rules of Arbitration of the International Chamber of Commerce at any time prior to or at signing.  (Paul Decl. ¶ 36; Christy Decl. ¶ 35).  Mexico security forces completely restricted and barred access by the Akeos to any outside literature, to any Internet, to any computer, or to any resource that could possibly contain these rules, effectively deprive the Akeos of any and all access to the aforementioned Rules.  (Paul Decl. ¶ 36; Christy Decl. ¶ 35).

The Akeos were physically coerced into agreeing to the Rules of Arbitration of the International Chamber of Commerce as they were under the custody of Mexico maximum security prison, were in shackles at all times except to sign the Agreement, had survived six months in maximum security Mexico prison, and under agreement to such Rules was a condition to their release from Mexico prison and the threat of criminal prosecution imposed by Palace Resorts.  (Paul Decl. ¶ 37; Christy Decl. ¶ 36).  Congressmember Barrett, who negotiated directly with the CEO of Palace Resorts and Defendant, Gibran Chapur, told the Akeos and their representatives that they must sign the Agreement in the form demanded by Palace Resorts in order to be freed from Mexico prison.  (Paul Decl. ¶ 38; Christy Decl. ¶ 37; Manly Decl., Ex. 1).

Had the Akeos not been actually imprisoned in Mexico, had they not been actually threatened with further imprisonment and criminal prosecution, and had they not feared for their personal safety and security, they would not have agreed to the Rules of International Arbitration.  (Paul Decl. ¶ 39; Christy Decl. ¶ 38).

**III.     PLAINTIFFS ARE ENTITLED TO A TRO AND PRELIMINARY INJUNCTION STAYING THE ICA ARBITRATION TO PERMIT THIS COURT TO**

**DETERMINE THE VALIDITY AND ENFORCEABILITY OF THE DELEGATION CLAUSE AND ARBITRATION CLAUSE**

To obtain a preliminary injunction, Plaintiffs must demonstrate "(1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest. *Four Seasons Hotels And Resorts, B.V. v. Consorcio Barr, S.A.*, 320 F.3d 1205, 1210 (11th Cir. 2003). The standards for a temporary restraining order are the same, except that notice to the defendants is not required. *See Ingram v. Ault*, 50 F.3d 898, 899-900 (11th Cir. 1995).

**A.** **Plaintiffs Will Likely Succeed on the Merits that No Agreement Was Formed as to the Delegation Clause, Arbitration Clause, and Alleged Agreement as Plaintiffs Were Under Physical Duress**

This case puts to the test the core foundation of arbitration law: "that arbitration is a matter of consent, not coercion." *Lamps Plus, Inc. v. Varela*, 587 U.S. 176, 184 (2019).

Plaintiffs will likely succeed on the merits of their duress defense. As an initial matter, the Federal Arbitration Act does not apply to any agreements to arbitrate (including the delegation clause) in the Alleged Agreement. The FAA applies only to a "contract evidencing a transaction involving commerce." 9 U.S.C. § 2. Here, the Alleged Agreement was procured as part of the supposed resolution of a criminal prosecution for fraud, based on a false accusation (as alleged in the complaint), that could carry up to six years in jail. "We agree with the district court that Congress never intended the FAA to apply to agreements between citizens and prosecutors resolving an individual's potential criminal liability." *Breazeale v. Victim Servs., Inc.*, 878 F.3d 759, 767 (9th Cir. 2017). Here, the Alleged Agreement purported to be an agreement between the Akeos and Palace Resorts as a condition to dismissal of a criminal fraud

14

charge by Palace Resorts and, Palace Resorts claims, part of a "state-sanctioned" reparatory agreement.  "[I]t is apparent that Congress never contemplated that the FAA would apply to agreements between prosecutors and citizens resolving alleged violations of a state's criminal law*." Id.* at 768–69.  For the same reasons, neither the New York Convention nor the Panama Convention apply, as both apply solely to "commercial" contracts or relationships which the Alleged Agreement is, for the same reasons, not.  9 U.S.C. § 202 (relationship must be considered as "commercial" and references FAA's definition of "agreement in commerce"); 9 U.S.C. § 302 (incorporating 9 U.S.C. § 202).[2]

In the absence of the FAA, this Court applies Florida law in deciding the gateway issues. *Breazeale*, 878 F.3d at 768-69.  Under Florida law, "The court shall decide whether an agreement to arbitrate exists or a controversy is subject to an agreement to arbitrate." Fla. Stats. § 682.02(2).  "[I]t is for the court, not the arbitrator, to decide whether a *valid* written agreement to arbitrate exists," including "whether an arbitration agreement violates public policy." *Shotts v. OP Winter Haven, Inc.*, 86 So. 3d 456, 465 (Fla. 2011) (emphasis in original).

Even if the FAA or the international conventions applied, Plaintiff is likely to prevail on her challenge to the delegation clause itself.[3]  The Agreement contains the following arbitration provision: "All disputes arising out of or in connection with this Agreement shall be finally settled under the Rules of Arbitration of the International Chamber of Commerce by one or more arbitrators appointed in accordance with the said rules." (Paul Decl., Ex. A ¶ 15).  This specific provision was procured by physical duress and duress in the form of threats by Palace Elite.

---

[2] Plaintiffs reserve their objection to the Court's subject matter jurisdiction under the New York Convention, as invoked by the Defendants in their notice of removal.

[3] While this motion is for a TRO and preliminary injunction, to the extent the FAA applies, Plaintiffs demand a jury trial on the defense of duress to the delegation clause, the arbitration clause, and the Alleged Agreement under 9 U.S.C. § 4.

Florida defines duress as "a condition of mind produced by an improper external pressure or influence that destroys the free agency of a party and causes him to do an act or make a contract not of his own volition." *City of Miami v. Kory*, 394 So.2d 494, 498 (Fla. 3d DCA 1981). "[T]here are in essence two factors which must coexist in order to establish duress one which deals with the party allegedly under duress; the other, with the party allegedly imposing it. It must be shown (a) that the act sought to be set aside was effected involuntarily and thus not as an exercise of free choice or will and (b) that this condition of mind was caused by some improper and coercive conduct of the opposite side." *Id.* at 497.

Florida courts have held that demanding a signature on an agreement under threat of "life-altering consequences" is duress. *Ziegler v. Natera*, 279 So. 3d 1240, 1243 (Fla. Dist. Ct. 4App. 2019). Here, Palace Resorts demanded the Akeos sign the Agreement under threat of criminal prosecution, under threat of continued imprisonment  for six months to six years where their security and safety were imperiled, under physical threat of Palace Resorts' own attorney, without any time to review the Agreement, without any access to the Rules of Arbitration of the International Chamber of Commerce, and without any relation to the actual criminal charges which were dismissed via a separate and distinct Reparation Agreement.

Virtually every single authority is in accord that imprisonment constitutes physical duress and the threat of criminal prosecution constitutes duress by improper threat.  The Restatement (Second) of Contracts has two forms of duress.  The first form of duress is physical duress where the "conduct that appears to be a manifestation of assent by a party who does not intend to engage in that conduct is physically compelled by duress"; if physical duress is present, the "conduct is not effective as a manifestation of assent" and ***no contract is formed***, period.  Rest. 2d. Contracts § 174.  While considered a rare form of duress, this extraordinary case fits the bill.

As explained by *U.S. for Use of Trane Co. v. Bond*, it "indeed was Blackstone's view where the contract was coerced by ***actual imprisonment*** or fear of loss of life or limb," it is duress.  *U.S. for Use of Trane Co. v. Bond*, 322 Md. 170, 178, 586 A.2d 734, 738 (1991).  As the United States Supreme Court explained as early as 1868:

> Actual violence is not necessary to constitute duress, even at common law, as understood in the parent country, because consent is the very essence of a contract, and, if there be compulsion, there is no actual consent, and moral compulsion, such as that produced by threats to take life or to inflict great bodily harm, as well as that produced by imprisonment, is ***everywhere*** regarded as sufficient, in law, to destroy free agency, without which ***there can be no contract***, because, in that state of the case, there is no consent.

*Brown v. Pierce*, 74 U.S. 205, 214 (1868) (emphasis added).  Here, no contract to arbitrate any issue, including any agreement to be bound by the Rules of Arbitration was formed because the Akeos were under physical duress in the form of actual imprisonment.

The second form of duress is duress by threat of criminal prosecution or imprisonment. Restatement (Second) of Contracts provides, "If a party's manifestation of assent is induced by an improper threat by the other party that leaves the victim no reasonable alternative, the contract is voidable by the victim."  Restatement (Second) of Contracts § 175 (1981).  An improper threat includes: "what is threatened is a criminal prosecution." *Id.* § 176.  This type of duress happens when a party makes a threat of criminal prosecution and incarceration in order to procure the other party's assent.  To be clear, because the Akeos were actually in prison and subject to criminal prosecution and their signatures to the private agreement with the Palace Resorts was a condition to their freedom, physical duress is more appropriate, rendering the contract vo*id*.  But even duress by improper threat of imprisonment and prosecution applies, as the threat of ***continued*** imprisonment and prosecution remained absent the Akeos' signature on the Agreement purporting to assent to the (inaccessible) Rules of Arbitration.  *See Germantown Mfg.*

*Co. v. Rawlinson*, 341 Pa. Super. 42, 51, 491 A.2d 138, 143 (1985) ("A threat to instigate criminal prosecution has generally been regarded as an improper means of inducing the victim of the threat to make a contract. . .  The impropriety lies in the use for 'private benefit ... of the criminal process of the court provided for the prosecution of the crime and the protection of the public.' On this ground, the threat is improper even if the person who makes it honestly believes that the one whose prosecution is threatened is guilty and even if in fact that person is guilty," quoting E. Allan Farnsworth as Reporter of the Restatement).  In *Germantown*, the party threatened criminal prosecution to induce the other party to enter into an agreement, and the Court invalidated the agreement under duress.  *Id.* at 144-45.

In perhaps one of the handful of cases dealing with arbitration agreements, in *Bayscene Resident Negotiators v. Bayscene Mobilehome Park*, 15 Cal.App.4th 119 (1993), the Court held that an arbitration agreement "obtained under threat of criminal prosecution and that [plaintiff] would not have signed the agreement absent such threat" is invalid. *Id.*  "The threat was particularly abhorrent in that it was issued by a government agent.  The city attorney's threats constituted menace destructive of free consent."  *Id.* at 128-29.  The fact that the arbitration agreement was procured under these threats "implicate[d] strong public policy considerations." *Id.*; *Brown v. Best Prods., Inc.*, 479 N.E.2d 852, 855 (Ohio 1985) ("One reason releases executed between private parties which offer as consideration the suppression of criminal prosecution are void is that courts have recognized that duress is inherent in the execution of such releases.").

### B.   Plaintiffs Will Suffer Irreparably Injury by Having the Arbitrator Decide the Validity of the Delegation Clause Unless the Injunction Issues

Courts hold a plaintiff will suffer irreparable injury where the court abdicates its responsibility to determine the validity of a delegation clause and arbitration clause, forcing the plaintiff to arbitrate a dispute the plaintiff never agreed to arbitrate.  *Martucci v. LKE LLC*, No.

24-22299-CV, 2024 WL 4003726, at *3 (S.D. Fla. July 23, 2024) ("Numerous federal courts have found irreparable harm where a party is compelled to arbitrate without having agreed to arbitration because that party is forced to expend time and resources arbitrating an issue that is not arbitrable."); *UBS Fin. Servs., Inc. v. Bounty Gain Enters., Inc.*, No. 14-81603-CIV, 2016 WL 1541438, at *6 (S.D. Fla. Apr. 11, 2016) (plaintiff "will still suffer irreparable injury, by being forced to arbitrate with [defendant], unless the injunction continues," citing cases).[4] Moreover, Plaintiffs here are being forced to respond to an emergency arbitration proceeding ***by tomorrow***, set thousands of miles away from their home, absent any form of representation in the ICA arbitration which denied their request for extension despite demanding a response with only days' notice, and insufficient time for the Akeos to procure defense counsel. Requiring such response with only days' notice, in a foreign country, while the Akeos are unrepresented constitutes further irreparable injury that this Court must swiftly move to prevent.

### C.      The Injury to Plaintiffs Outweighs any Damage to the Defendants

Defendants will suffer no damage if a TRO is granted.  Because this Court's function is to decide whether a contract was formed (including the specific sentence at issue), then there is no damage to Defendants in permitting this Court to exercise its function.  To the extent the Court determines it is the arbitrator's function to decide any gateway issues, then the damage to Defendants is a short delay.  *See Martucci*, 2024 WL 4003726, at *3 (finding balance of harms

---

[4] *See also PaineWebber Inc. v. Hartmann*, 921 F.2d 507, 515 (3d Cir. 1990) ("In light of this policy, we think it obvious that the harm to a party would be *per se* irreparable if a court were to abdicate its responsibility to determine the scope of an arbitrator's jurisdiction and, instead, were to compel the party, who has not agreed to do so, to submit to an arbitrator's own determination of his authority."), *overruled on other grounds in Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 82 (2002); *Merrill Lynch Inv. Managers v. Optibase, Ltd.*, 337 F.3d 125, 129 (2d Cir. 2003) (relying on *Maryland Casualty Co. v. Realty Advisory Board on Labor Relations*, 107 F.3d 979 (2d Cir.1997) to hold it is irreparable harm for a party to be forced to arbitrate the making of a contract or a dispute it hasn't actually agreed to);

favors party resisting arbitration where only harm to defendant is delay).

    **D.**    <u>**Public Interest Favors the TRO and Preliminary Injunction**</u>

"Finally, public interest weighs in favor of [the Akeos]. Where a party has not agreed to submit a dispute to arbitration, the public has an interest in ensuring that the arbitration does not proceed." *Martucci*, No. 24-22299-CV, 2024 WL 4003726, at \*3 (quoting *Morgan Keegan & Co. v. Shadburn*, 829 F. Supp. 2d 1141, 1153-54 (M.D. Ala. 2011)).

    **E.**    <u>**A Nominal Bond Should Be Required**</u>

As for the amount of the bond, Plaintiffs believe that a nominal bond is appropriate. "When a district court sets an injunction bond pursuant to Federal Rule of Civil Procedure 65(c), '[t]he amount of [the] injunction bond'—and the choice of whether to set a bond at all—'is within the sound discretion of the district court.'" *Baldwin v. Express Oil Change, LLC*, 87 F.4th 1292, 1301 (11th Cir. 2023).  A bond is "not required when the party seeking the injunction has a high probability of succeeding in the merits of its claim." *Hi-Tech Pharms., Inc. v. Nutrition Res. Servs., Inc.*, No. 1:23-CV-5536-TCB, 2024 WL 2158708, at \*6 (N.D. Ga. Apr. 12, 2024).  Here, because of Plaintiffs' high probability of succeeding in the merits and because the only potential harm to Defendants is delay, then the need for security is unnecessary, justifying a nominal bond.

**IV.**    **CONCLUSION**

For the reasons stated above, Plaintiffs respectfully seek a temporary injunction under Rule 65 of the Federal Rules of Civil Procedure (i) enjoining the Defendants and any officers, employees, agents, and affiliates from enforcing the Delegation Clause, the Arbitration Clause, and the Alleged Agreement in any respect and (ii) staying the arbitration pending a determination of the validity and existence of any arbitration agreements and a stay of the pending arbitration.

Dated: August 19, 2025

/s/ Peter Kaufman

Peter Kaufman (Bar No. 548421)
pkaufman@panish.law
Jesse Creed (pro hac vice pending)
jcreed@panish.law
Hunter Norton (pro hac vice pending)
hnorton@panish.law
PANISH | SHEA | RAVIPUDI LLP
11111 Santa Monica Boulevard, Suite 700
Los Angeles, California 90025
310.477.1700

*Attorneys for Plaintiffs*