UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA, MIAMI DIVISION

PAUL AKEO and CHRISTY AKEO,

        Plaintiffs,

v.

PALACE RESORTS, LLC, a limited liability company; PALACE ELITE, a Mexican corporation; PR GLOBAL RESERVATIONS, LLC, a Florida limited liability company; PALACE ELITE RESORTS S.A. de C.V., a Mexican corporation; JOSÉ GIBRÁN CHAPUR DÁJER, an individual; PALACE COMPANY HOLDINGS,

        Defendants.

Action No.:  1:25-cv-23733-RKA

**DECLARATION OF PAUL AKEO IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION UNDER FED. R. CIV. PROC. 65 TO STAY ARBITRATION INITIATED BY DEFENDANTS**

I, Paul Akeo, declare as follows:

1.      I am a party in the above-entitled action.  I have personal knowledge of the facts set forth herein, except as to those stated on information and belief and, as to those, I am informed and believe them to be true.  If called as a witness, I could and would competently testify to the matters stated herein.

2.      I am currently an employee for the Michigan State Police Department.  I served in the United States Navy for 23 years and was honorably discharged.  I was a Navy Senior Chief at the time of my discharge.

3.      On March 4, 2025, I was arrested while seeking to pass Mexican immigration authorities en route to a vacation in Cancun.  I was then forced to spend a month in detention in a

maximum security prison in Quintana Roo, Mexico separate and apart from my wife, sleeping alongside drug dealers and violent criminals.

4.      I describe the relevant facts related to the circumstances resulting in my signature on a Mutual Release and Nondisparagement Agreement, attached as Exhibit A.  After being arrested, I was held in what I understood to be maximum security Mexico prison based on the false accusations that we had disputed credit card charges with our credit card companies on the basis that the charges were "unknown."  We did no such thing.  I was placed in a jail cell with roughly 35 other guys.  On the first night, the guards had pepper sprayed the fan in my room to calm down agitated prisoners.  I did not have a shower that worked.  I had to take a shower from a bucket and splash the water over my body.  The toilet did not work and was not flushable, so I had to get water in the bowl to go down via gravity.

5.      On March 5, I approached a corporate representative of the Palace Resorts at a court hearing to say I was sorry this went as far as it did.  The corporate representative of Palace Resorts told me that Palace Resorts had spoken to the American consulate and told the American consulate Palace Resorts was willing to drop the criminal charges only in exchange for a settlement agreement.  The corporate representative told me that the settlement agreement proposed by Palace Resorts was "not about the money [at issue in the criminal complaint], it was about the Facebook group."  I do not know the name of the corporative representative, but have met him before at the Palace Resorts and know what he looks like.  The corporative representative had laughed at us, humiliating us, when we walked into the courtroom in shackles.

6.      On March 10, we were told by Mexico authorities through our lawyers that we were going to be held for at minimum six months to enable Palace Resorts to gather more information on the case and, if found guilty, up to three to six years.

7.     I was transferred to different jail cells for my safety.  In the first two weeksI Paul was in the general lock up cell next to individuals who were there for drug dealing, armed robbery, and murder.  In the next cell, I learned that I was with individuals who had been detained for two or three years.  In the final cell I was transferred to, I learned that I was with individuals who were members of the Mexico cartel and had killed people or committed armed robbery, rape, or stealing (each of the foregoing were separate individuals).  I feared for my personal security and safety the entire time in prison.  I understood that nobody spoke English. Inmates had told me they recognized me "from the TV," referring to the media coverage of me being arrested by Mexican authorities.  I was afraid the inmates knew I worked for law enforcement, the Michigan State Police.  During the first week, I pulled drywall screws from the wall and slept with them for protection.  Each night, up to ten new people would be placed in the holding cell with me.  I was sleeping shoulder-to-shoulder with other inmates on the floor.

8.     On Friday, April 3, at approximately 12:30 PM, guards at the prison came to the my cell and asked me to come out. I had no idea what was happening.   I was escorted down to the prison garage in shackles where I met my wife, also in shackles.

9.     The warden, Gustavo, then appeared and told us we were going to the courthouse for a hearing to get some "good news."

10.    We arrived at the courthouse at about 1:00 PM for what we were told was a 2:00 PM hearing. I was placed in a separate, filthy basement holding cell — in shackles — and could not see my wife.

11.    I was the only one in these separate holding cells, and I was left there for hours. We could talk to each other by shouting back and forth, but could not see one another.

12.    As time passed, I became increasingly anxious. The hearing time came and went.

3

13.     By this point, we had been waiting for over three hours — two hours past our scheduled hearing time. The repeated delays made me fear something had gone wrong and that we would not be going home that day. I kept asking for my lawyers and for Congressman Tom Barrett,  the U.S. House of Representative for the Akeos' daughter's district, but no one could help me or even understand my requests. It was open air, so it was very hot down there.

14.     Finally, around 4:00 PM, guards came to take me and my wife to the hearing. We were escorted by three armed guards carrying machine guns.

15.     Inside the courtroom were: (a) U.S. Congressman Tom Barrett, (b) Kyle VonEnde, Chief of Staff to Congressman Barrett, (c) Consul General Justen Thomas, U.S. Embassy in Merida, (d) Wyatt Duea, Chief of American Citizen Services, U.S. Embassy in Merida, (e) Justen Thomas' bodyguard (name unknown), (f) the Akeos' attorney, Jaime Cherem, (g) the Akeos' attorney, Alonso Brigas, (h) Kevin (an attorney for Palace), (h) the same corporative representative who told the Akeos they needed to settle their civil claims to get out of prison, and (i) a woman from Palace, believed to be Palace lawyer Jordans Astid Lorenzo Rodriguez, who glared at Christy throughout the proceeding.

16.     There was an interpreter sent for us, but she could not speak English well enough.

17.     Two or three additional armed guards with machine guns were present next to us.

18.     Once seated, Congressman Barrett told us that we needed to sign paperwork to be free from prison and had no choice to sign unless we wished to remain in prison and subject to criminal prosecution.  All we wanted to do was sign and leave prison where I feared for my life and personal security and have the criminal charges (which could lead to up to six years in prison) dropped.  We were so scared as to what was happening and why it was delayed for so long.

19.     We learned from our lawyers that we needed to sign the Mutual Release and Nondisparagement Agreement in favor of Palace Elite to be released from these terrible circumstances. Below is a photograph taken by Rep. Barrett, which shows our shackles being removed to allow them to affix our signatures on the Agreement.



20.     We signed the Agreement where we were told to by our lawyers.  While signing the Agreement, Palace lawyer Kevin was standing over us glaring at us in an intimidating manner.

21.     This was the first time we ever saw the Agreement.  At the time I was required to

sign to be free of prison and criminal prosecution, to my understanding, based on statements made by Palace Resorts' own CEO and lawyers, Palace Resorts continued to threaten us with imprisonment (where our physical safety and security were jeopardized) and criminal prosecution if we did not sign the Agreement.

22.     We left the courthouse to return to the prison.  Based on statements made to us, everybody around us distrusted Palace Resorts and were afraid that we were not going to be released from prison.  As a result, Congressmember Barrett, the Consular General, and members of their staff followed in their own armored vehicle the Mexican authority's armored guard vehicle transporting us back to prison.  We believed our safety and security remained in jeopardy as we were told that Palace Resorts may file additional criminal charges to detain us before our departure from Mexico.  This threat was so real and imminent that we were told our lawyers filed a case with a court seeking an injunction.

23.     After we were released from Mexico maximum security prison, Congressmember Barrett and the Consular General transported us with police escorts bearing machine guns to the airport.  Congressmember Barrett and the Consular General told us that they were so concerned for our physical safety and security as a result of the Palace Resorts' conduct that they were going to wait until our plane actually took off.  We were also provided a private jet to prevent any opportunity for detention at a commercial airport.  I feared for my personal safety and security the entire time until we left Mexico airspace.

24.     Throughout the signing process, we were threatened with imprisonment and criminal prosecution, scared, confused, intimidated and humiliated. The armed guards with machine guns, the Palace lawyers' stalking and assaulting behavior at the signature time, the hours of unexplained delays, and the previous thirty-days of constant fear for our personal safety

and security next to drug dealers and murders added to our fear and anxiety.

25.     We had no reasonable choice but to sign the Agreement if we wanted to be released from prison and to be free from the constant fear for our personal safety and security. We truly believed that if we did not sign immediately, we would remain in prison indefinitely. We asked for copies of what we signed, but were told we could not have copies at the time of signature but would be sent copies later.  We left without any paperwork from court.

26.     On July 22, 2025, our counsel sent a letter to Palace Resorts' counsel indicating their intention to file suit on or before August 1, 2025 in Florida Circuit Court.  Our lawyers asked if Palace Resorts wished to resolve the lawsuit before suit was filed.  No demand for money was made by our lawyers.  Our lawyers asked for a response by July 28, 2025.

27.     On July 31, 2025, our lawyers received a letter from Palace Resorts asking for "an additional five (5) business days" to "conduct a thorough internal assessment and prepare a more considered response" to the Akeos' communication.  Palace Resorts, said: "We appreciate your cooperation, and we will be in touch no later than Thursday August 7, 2025 with our response." The letter was signed by Isaac Carrasco.  (See Exhibit B).

28.     Palace Resorts did not respond to our lawyers' communication as it had promised in the letter.  On August 11, 2025, the International Court of Arbitration sent a Request for Arbitration dated August 6, 2025.  I felt deceived yet again by Palace Resorts, including its own general counsel, in their statements and conduct by asking us to wait to file our lawsuit with a promise to respond to our letter and then choosing not to respond at all.

29.     On August 15, I received a notification that Palace Elite was requesting "emergency orders" with respect to the Alleged Agreement it obtained through duress.  On the same day, the emergency arbitrator wrote to us that we were required to respond by August 18 to

7

give availability for a hearing and disclose counsel and by August 20 to respond to Palace Elite's request for emergency orders.

30.     I am currently unrepresented in the ICA Arbitration.  Promptly after receiving notice of the arbitration request, I tendered the defense to my insurer and am waiting for a final response.  I have also made requests to veteran legal clinics and other legal aid organizations to assist us in our defense in the ICA Arbitration.

31.     I will be emotionally traumatized if I am forced to arbitrate my disputes with the ICA, as the Agreement was procured by threats, fear, and force at the hands of Palace Resorts.

32.     I understand the Agreement provides that "All disputes arising out of or in connection with this Agreement shall be finally settled under the Rules of Arbitration of the International Chamber of Commerce by one or more arbitrators appointed in accordance with the said rules.  The seat of arbitration shall be Vancouver, Canada."  My signature with respect to this provision was procured through duress.  Specifically, Defendants insisted that we sign this clause as a condition to being released from Mexico maximum security prison, be free of the threat of criminal prosecution and further imprisonment, and be free from the fear for my personal safety and security that brings.  Congressmember Barrett told us when we saw him on the date we signed that the only way we leave prison is if we sign these agreements in the form demanded by Palace Resorts without negotiation.

33.     I was deprived of the ability to exercise free will or make a voluntary, knowing choice regarding this provision in the Agreement.

34.     I never agreed out of my own free will to allow an arbitrator to decide any disputes, particularly any dispute regarding the formation, validity and enforceability of the Agreement.  The way I think about this is Palace Resorts procured our arrest based on false

accusations, coerced this provision in the Agreement out of us under threat of criminal prosecution and imprisonment, and then seeks to exploit the coerced provision against us.

35.     I did not voluntarily and willingly consent to permit any arbitrator to decide the enforceability of the Alleged Agreement or any provision contained therein – particularly an arbitration requested by the very party who procured the Agreement through duress.

36.     I understand the provision references the Rules of Arbitration of the International Chamber of Commerce.  The notion that I consented to those rules is a joke.  I did not and could not have access to the Rules of Arbitration of the International Chamber of Commerce at any time prior to or at signing, as I was in Mexico prison.  Mexico security forces restricted and barred access by the Akeos to any outside literature, to any Internet, to any computer, or to any resource that could possibly contain these rules, effectively depriving me of any and all access to these Rules.

37.     I was physically coerced into agreeing to the Rules of Arbitration of the International Chamber of Commerce as I was under the custody of Mexico maximum security prison, was in shackles at all times except to sign the Agreement, had survived one month in maximum security Mexico prison, was under fear for my personal safety and security, and understood that my signature assenting to such Rules was a condition to being released from Mexico prison, freed from the threat of criminal prosecution and further imprisonment imposed by Palace Resorts, and freed from the threats to my personal safety and security.

38.     Had I not been actually imprisoned in Mexico and had I not been actually threatened with further imprisonment and criminal prosecution and had I not been under constant fear for my personal safety and security, I would not have agreed to any provision requiring arbitration of any dispute.  We had successfully persuaded four credit card companies of the

merits of our contract dispute with Palace Resorts.

39.     I work for the Michigan State Police Department earning roughly $98,000 a year and Christy Akeo does not have a job.

40.     On August 18, 2025, we requested additional time to respond to Palace Elite's request for emergency orders.  On August 19, 2025, the emergency arbitrator Nicholas Wiegand denied the request, requiring us to respond the next day, unless Palace Elite agrees to an extension.  The emergency arbitrator also set an online hearing for a maximum of two hours to be convened on Tuesday, August 26, 2025 at 8 am Vancouver time.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 19th day of August, 2025, at Spring Arbor, Michigan.

Paul K. Akeo
Paul Akeo

# EXHIBIT A

## MUTUAL RELEASE AND NON-DISPARAGEMENT AGREEMENT

This MUTUAL RELEASE AND NON-DISPARAGEMENT AGREEMENT (this "Agreement") is entered into as of the 3d   day of   April   , 2025 (the "Effective Date"), by and among CHRISTY LIN AKEO and PAUL K. AKEO, on one hand, and PALACE ELITE RESORTS, S.A. DE C.V. ("PALACE ELITE"), on the other hand.

WHEREAS, PALACE ELITE and CHRISTY LIN AKEO and PAUL K. AKEO have had a long-standing commercial relationship since at least February 1, 2016 pursuant to a series of contracts and ancillary agreements entered into on or about February 1, 2016, February 3, 2016, April 28, 2016, May 19, 2016, September 25, 2016, November 22, 2016, May 6, 2017, July 26, 2017, January 4, 2018, September 21, 2018, December 21, 2018, February 17, 2019, April 27, 2019, September 29, 2019, July 4, 2020, October 25, 2020, February 12, 2021, May 24, 2021, and November 21, 2021 (collectively, the "Membership Agreements").

WHEREAS, PALACE ELITE has asserted that CHRISTY LIN AKEO and PAUL K. AKEO have acted wrongfully in their dealings with PALACE ELITE (the "Palace Elite Claims").

WHEREAS, CHRISTY LIN AKEO and PAUL K. AKEO have asserted that PALACE ELITE has acted wrongfully in its dealings with CHRISTY LIN AKEO and PAUL K. AKEO (the "Akeo Claims").

WHEREAS, PALACE ELITE, CHRISTY LIN AKEO, and PAUL K. AKEO each agree that they have had a full, reasonable, fair, and adequate opportunity to investigate the Palace Elite Claims and the Akeo Claims; to consult with and seek the advice of legal counsel of their choosing, in the United States and in Mexico, with respect to the Palace Elite Claims, the Akeo Claims, and this Agreement; and to consider and reflect on the terms and substance of this Agreement.

WHEREAS, in order to avoid the hassle and expense of litigation, PALACE ELITE and CHRISTY LIN AKEO and PAUL K. AKEO wish to resolve and any and all existing or potential disputes between PALACE ELITE, on one hand, and CHRISTY LIN AKEO and/or PAUL K. AKEO, on the other hand, known or unknown, whether sounding in statute, common law, equity, or other source of authority, whether under the laws of Mexico or any state or other constituent jurisdiction thereof, or under the laws of the United States or any state or other constituent jurisdiction thereof, or any other jurisdiction, including but not limited to (1) the Palace Elite Claims and any and all claims or causes of action arising out of or related to the assertion or pursuit of the Palace Elite Claims by PALACE ELITE, or by its ownership, managers, shareholders, attorneys, employees, agents, directors, officers, servants, subsidiaries, affiliates, related entities, parent corporations, stockholders or stockholding entities, insurers, reinsurers, successors, assigns, third party administrators, or legal representatives, (2) the Akeo Claims and any and all claims or causes of action arising out of or related to the assertion or pursuit of the Akeo Claims by CHRISTY LIN AKEO and/or PAUL K. AKEO, or their

1

respective agents, representatives, legal guardians, heirs, executors, administrators, successors, and assigns, (3) any and all claims or causes of action arising out of or relating to the Membership Agreements, and (4) any and all claims or causes of action arising out of or related to any acts or omissions occurring on or prior to the Effective Date of this Agreement (collectively, the "Released Claims").

1.   Mutual Releases.

    a. PALACE ELITE, on behalf of itself and its ownership, managers, shareholders, attorneys, employees, agents, directors, officers, servants, subsidiaries, affiliates, related entities, parent corporations, stockholders or stockholding entities, insurers, reinsurers, successors, assigns, third party administrators, or legal representatives, hereby forever releases CHRISTY LIN AKEO and PAUL K. AKEO, as well as their respective agents, representatives, legal guardians, heirs, executors, administrators, successors, and assigns, of and from the Released Claims. Provided, however, that claims and causes of action arising out of or relating to an alleged breach of this Agreement, or to enforce the terms of this Agreement, are not waived or released.

    b. CHRISTY LIN AKEO, on behalf of herself as well as her respective agents, representatives, legal guardians, heirs, executors, administrators, successors, and assigns, hereby forever releases Palace Elite, as well as its ownership, managers, shareholders, attorneys, employees, agents, directors, officers, servants, subsidiaries, affiliates, related entities, parent corporations, stockholders or stockholding entities, insurers, reinsurers, successors, assigns, third party administrators, or legal representatives, of and from the Released Claims. Provided, however, that claims and causes of action arising out of or relating to an alleged breach of this Agreement, or to enforce the terms of this Agreement, are not waived or released.

    c. PAUL K. AKEO, on behalf of himself as well as his respective agents, representatives, legal guardians, heirs, executors, administrators, successors, and assigns, hereby forever releases Palace Elite, as well as its ownership, managers, shareholders, attorneys, employees, agents, directors, officers, servants, subsidiaries, affiliates, related entities, parent corporations, stockholders or stockholding entities, insurers, reinsurers, successors, assigns, third party administrators, or legal representatives, of and from the Released Claims. Provided, however, that claims and causes of action arising out of or relating to an alleged breach of this Agreement, or to enforce the terms of this Agreement, are not waived or released.

2

2. <u>Mutual Covenants Not to Sue</u>. Other than the Released Claims, PALACE ELITE does not know of any claims that PALACE ELITE might have against either CHRISTY LIN AKEO or PAUL K. AKEO. PALACE ELITE, on behalf of itself and its ownership, managers, shareholders, attorneys, employees, agents, directors, officers, servants, subsidiaries, affiliates, related entities, parent corporations, stockholders or stockholding entities, insurers, reinsurers, successors, assigns, third party administrators, or legal representatives, covenants and agrees that it will not bring any lawsuit, arbitration, or other proceeding, in Mexico or any state or other constituent jurisdiction thereof, in the United States or any state or other constituent jurisdiction thereof, or in any other jurisdiction, against CHRISTY LIN AKEO and PAUL K. AKEO, or their respective agents, representatives, legal guardians, heirs, executors, administrators, successors, and assigns, on account of the Released Claims.

Other than the Released Claims, CHRISTY LIN AKEO does not know of any claims that CHRISTY LIN AKEO might have against Palace Elite or its ownership, managers, shareholders, attorneys, employees, agents, directors, officers, servants, subsidiaries, affiliates, related entities, parent corporations, stockholders or stockholding entities, insurers, reinsurers, successors, assigns, third party administrators, or legal representatives. CHRISTY LIN AKEO, on behalf of herself as well as her respective agents, representatives, legal guardians, heirs, executors, administrators, successors, and assigns, covenants and agrees that she will not bring any lawsuit, arbitration, or other proceeding, in Mexico or any state or other constituent jurisdiction thereof, in the United States or any state or other constituent jurisdiction thereof, or in any other jurisdiction, against Palace Elite or its ownership, managers, shareholders, attorneys, employees, agents, directors, officers, servants, subsidiaries, affiliates, related entities, parent corporations, stockholders or stockholding entities, insurers, reinsurers, successors, assigns, third party administrators, or legal representatives, on account of the Released Claims.

Other than the Released Claims, PAUL K. AKEO does not know of any claims that PAUL K. AKEO might have against Palace Elite or its ownership, managers, shareholders, attorneys, employees, agents, directors, officers, servants, subsidiaries, affiliates, related entities, parent corporations, stockholders or stockholding entities, insurers, reinsurers, successors, assigns, third party administrators, or legal representatives. PAUL K. AKEO , on behalf of himself as well as his respective agents, representatives, legal guardians, heirs, executors, administrators, successors, and assigns, covenants and agrees that he will not bring any lawsuit, arbitration, or other proceeding, in Mexico or any state or other constituent jurisdiction thereof, in the United States or any state or other constituent jurisdiction thereof, or in any other jurisdiction, against Palace Elite or its ownership, managers, shareholders, attorneys, employees, agents, directors, officers, servants, subsidiaries, affiliates, related entities, parent corporations, stockholders or stockholding entities, insurers, reinsurers, successors, assigns, third party administrators, or legal representatives, on account of the Released Claims.

3

3.    Consideration

a.    CHRISTY LIN AKEO and PAUL K. AKEO expressly acknowledge and agree that PALACE ELITE's promises and covenants set forth herein, including but not limited to as set forth in Paragraphs 1 and 3, are good, valuable, and sufficient consideration for the promises, covenants, and terms contained herein, including but not limited to the terms of Paragraphs 4 through 7 of this Agreement. .

b.    PALACE ELITE expressly acknowledges and agrees that CHRISTY LIN AKEO's and PAUL K. AKEO's promises and covenants set forth herein, including but not limited to as set forth in Paragraph 2, are good, valuable, and sufficient consideration for the promises, covenants, and terms contained herein, including but not limited to the terms of Paragraphs 4 through 7 of this Agreement.

4.    Non-Disparagement.

a.    CHRISTY LIN AKEO represents and warrants, on behalf of herself and her agents, representatives, legal guardians, heirs, executors, administrators, successors, and assigns, that she shall refrain from making or publishing, in writing or verbally, directly or indirectly, by word, statement, or gesture, any disparaging, derogatory, or negative statements about PALACE ELITE or its ownership, managers, shareholders, attorneys, employees, agents, directors, officers, servants, subsidiaries, affiliates, related entities, parent corporations, stockholders or stockholding entities, insurers, reinsurers, successors, assigns, third party administrators, or legal representatives, including, but not limited to, in or on websites, interviews, press releases, news releases, media releases, press statements, video releases, articles, commentaries, written, audio or visual means (e.g., YouTube, Facebook, Instagram, X, Threads, advertising or marketing materials, blogs, chat-rooms, etc.) (each and any of the foregoing, "Disparaging Statements"). CHRISTY LIN AKEO further covenants and agrees that any and all Disparaging Statements currently posted on any website, webpage, weblog, and/or otherwise accessible on the internet and made by or on behalf of CHRISTY LIN AKEO, shall be removed within seven (7) days of the Effective Date, and CHRISTY LIN AKEO shall provide written confirmation and proof of such removal to PALACE ELITE upon request

4

b.    PAUL K. AKEO represents and warrants, on behalf of himself and his agents, representatives, legal guardians, heirs, executors, administrators, successors, and assigns, that he shall refrain from making or publishing, in writing or verbally, directly or indirectly, by word, statement, or gesture, any Disparaging Statements as defined in Paragraph 3(a) of this Agreement. PAUL K. AKEO further covenants and agrees that any and all Disparaging Statements currently posted on any website, webpage, weblog and/or otherwise accessible on the internet and made by or on behalf of PAUL K. AKEO, shall be removed within seven (7) days of the Effective Date, and PAUL K. AKEO shall provide written confirmation and proof of such removal to PALACE ELITE upon request.

c.    PALACE ELITE represents and warrants, on behalf of itself and its agents, representatives, ownership, managers, shareholders, attorneys, employees, agents, directors, officers, servants, subsidiaries, affiliates, related entities, parent corporations, stockholders or stockholding entities, insurers, reinsurers, successors, assigns, third party administrators, or legal representatives, and assigns, that it shall refrain from making or publishing, in writing or verbally, directly or indirectly, by word, statement, or gesture, any disparaging, derogatory, or negative statements about CHRISTY LIN AKEO and PAUL K. AKEO or their agents, representatives, legal guardians, heirs, executors, administrators, successors, and assigns, including, but not limited to, in or on websites, interviews, press releases, news releases, media releases, press statements, video releases, articles, commentaries, written, audio or visual means (e.g., YouTube, Facebook, Instagram, X, Threads, advertising or marketing materials, blogs, chat-rooms, etc.).

5. Non-Inducement. From and after the Effective Date, each of CHRISTY LIN AKEO, PAUL K. AKEO, and PALACE ELITE represent and warrant that they shall not, whether directly or indirectly, induce or attempt to induce or encourage others to induce or attempt to induce, any person to use fraudulent means under applicable law or any means whatsoever to terminate any agreement or relationship with Palace Elite.

6. Liquidated Damages. In the event of a breach of this Agreement, CHRISTY LIN AKEO, PAUL K. AKEO, and PALACE ELITE agree that should any of them breach this Agreement, the breaching party shall immediately pay individually as fixed and



5

liquidated damages a sum of $50,000.00 U.S. Dollars per breach to the other party, as well as $1,000 U.S. Dollars per breach, per calendar day, until each and every breach is cured. Such liquidated damages in the amount of $50,000.00 U.S. Dollars are not intended to be a penalty and are solely intended to compensate the non-breaching party or parties. The payment of such liquidated damages will not affect the continued enforcement of this Agreement.

7. Injunctive Relief. In the event of a breach or a threatened breach by CHRISTY LIN AKEO, PAUL K. AKEO, or PALACE ELITE of any provisions contained in this Agreement, any party will be entitled to seek an injunction restraining the party that has breached or is threatening a breach from such breach or threatened breach (without the necessity of proving the inadequacy as a remedy of money damages or the posting of bond, and CHRISTY LIN AKEO, PAUL K. AKEO, and PALACE ELITE hereby waive any defense or objection to such injunctive relief (if permitted under applicable law)); provided, however, that the right to injunctive relief will not be construed as prohibiting CHRISTY LIN AKEO, PAUL K. AKEO, or PALACE ELITE from pursuing any other available remedies, whether at law or in equity, for such breach or threatened breach.

8. Enforcement of this Agreement. Each party shall pay their own respective attorneys' fees and costs relating to this Agreement. In the event of a legal action or other proceeding arising out of an alleged breach of this Agreement or to enforce this Agreement, the prevailing party shall be entitled to recover their reasonable attorneys' fees and costs, whether incurred before suit, during suit, or at the appellate level. The prevailing party also shall be entitled to recover any attorneys' fees and costs incurred in litigating the entitlement to attorneys' fees and costs, as well as in determining or quantifying the amount of recoverable attorneys' fees and costs. The reasonable costs to which the prevailing party is entitled shall include costs that are taxable under any applicable statute, rule, or guideline, as well as non-taxable costs, including but not limited to costs of investigation, copying costs, electronic discovery costs, mailing and delivery charges, information technology support charges, consultant and expert witness fees, travel expenses, court reporter fees, and mediator fees, regardless of whether such costs are otherwise taxable.

9. Capacity to Execute. Each signatory to this Agreement represents and warrants that they are of appropriate legal, physical, and mental capacity, are not under duress or undue influence, has read this Agreement thoroughly and had an opportunity to have this Agreement fully explained by independent counsel and other advisor(s) of their choosing, and are legally authorized to execute this Agreement. In entering into the Agreement, each party to this Agreement relies wholly upon their own judgment, belief, and knowledge of their respective obligations related to the terms, considerations, covenants, and promises contained herein, and does not rely upon any statement or representation of any other party or any other party's representatives.

10. Severability. Should any provision of this Agreement be invalid or unenforceable for any reason, the remaining provisions hereof shall remain in full force and effect. The parties agree that any tribunal may modify any invalid or unenforceable

6

provision to the maximum extent permitted by law while preserving the intended effect of such provision.

11. Contract. The terms of this Agreement are contractual and the parties to this Agreement represent and warrant that they intend to be bound by them.

12. Construction. Any rule of construction to the effect that ambiguities are resolved against the drafting party will not apply to the interpretation and construction of this Agreement.

13. Headings. The paragraph headings in this Agreement are intended solely for reference and shall not by themselves determine the construction or interpretation of this Agreement.

14. Governing Law. This Agreement shall be governed by and construed in accordance with the internal law of the State of Michigan, without giving effect to any choice of law or conflict of law provisions or rules.

15. Arbitration.



All disputes arising out of or in connection with this Agreement shall be finally settled under the Rules of Arbitration of the International Chamber of Commerce by one or more arbitrators appointed in accordance with the said rules. The seat of the arbitration shall be Vancouver, Canada. The language of the arbitration shall be English. Except as may be required by law, neither a party nor its representatives may disclose the existence, content, or results of any arbitration hereunder without the prior written consent of all parties. No award or order made in the arbitration shall be published.

This arbitration agreement shall be governed by the laws of the State of New York, including United States federal law as applied by United States federal courts seated in New York, New York.

16. Counterparts. This Agreement may be executed in counterparts, each of which will be deemed an original, and such counterparts will together constitute a single Agreement. Faxed, e-mailed, or electronic signatures will be deemed originals.

[SIGNATURE PAGES FOLLOW]

THE PERSON SIGNING THIS AGREEMENT REPRESENTS AND WARRANTS AS FOLLOWS: (i) HE/SHE HAS READ THE AGREEMENT IN ITS ENTIRETY, (ii) FULLY UNDERSTANDS AND ACCEPTS ALL TERMS OF THE AGREEMENT, (iii) HAS CONSULTED WITH INDEPENDENT LEGAL COUNSEL REGARDING THE MEANING AND CONSEQUENCES OF THE AGREEMENT OR VOLUNTARILY WAIVED SUCH RIGHT, (iv) ACKNOWLEDGES THAT THIS AGREEMENT IS BINDING AND ENFORCEABLE.

_____
CHRISTY LIN AKEO

4/3/25
_____
Date


[INSERT NOTARY TEMPLATE]

8

THE PERSON SIGNING THIS AGREEMENT REPRESENTS AND WARRANTS AS FOLLOWS: (i) HE/SHE HAS READ THE AGREEMENT IN ITS ENTIRETY, (ii) FULLY UNDERSTANDS AND ACCEPTS ALL TERMS OF THE AGREEMENT, (iii) HAS CONSULTED WITH INDEPENDENT LEGAL COUNSEL REGARDING THE MEANING AND CONSEQUENCES OF THE AGREEMENT OR VOLUNTARILY WAIVED SUCH RIGHT, (iv) ACKNOWLEDGES THAT THIS AGREEMENT IS BINDING AND ENFORCEABLE.

_____
PAUL K. AKEO

4/3/25
_____
Date

[INSERT NOTARY TEMPLATE]

9

THE PERSON SIGNING THIS AGREEMENT REPRESENTS AND WARRANTS AS FOLLOWS: (i) HE/SHE HAS READ THE AGREEMENT IN ITS ENTIRETY, (ii) FULLY UNDERSTANDS AND ACCEPTS ALL TERMS OF THE AGREEMENT, (iii) HAS CONSULTED WITH INDEPENDENT LEGAL COUNSEL REGARDING THE MEANING AND CONSEQUENCES OF THE AGREEMENT OR VOLUNTARILY WAIVED SUCH RIGHT, (iv) ACKNOWLEDGES THAT THIS AGREEMENT IS BINDING AND ENFORCEABLE.

PALACE ELITE RESORTS, S.A. DE C.V.

By:   Jordans Astid lorenzo Rodriguez
[INSERT NAME OF SIGNATORY] Its:
[INSERT TITLE OF SIGNATORY]

4 | 3 | 2025

Date

[INSERT NOTARY TEMPLATE]

10

# EXHIBIT B

THE PALACE COMPANY®

THEPALACECOMPANY.COM

Mr. Jesse Creed
Panish Shea Ravipudi LLP
11111 Santa Monica Boulevard, Suite 700
Los Angeles, California 90025
jcreed@panish.law

Mr. John Manly
Manly, Stewart & Finaldi
19100 Von Karman Avenue, Suite 800
Irvine, California, 92612
jmanly@manlystewart.com

*via e-mail*

July 31, 2025

Dear Messrs. Creed and Manly,

I am writing on behalf of Palace Elite Resorts, S.A. de C.V. ("Palace Elite") in response to your letter dated July 22, 2025, which included a draft complaint and outlined certain claims and demands related to the Mutual Release and Non-Disparagement Agreement (the "Agreement") signed by your clients, Mr. Paul and Ms. Christy Akeo, and Palace Elite, on April 3, 2025.

Palace Elite notes that the contemplated claims in your letter appear to be in direct conflict with the terms of the Agreement between Palace Elite and Mr. Paul and Ms. Christy Akeo, which includes, in Sections 1 and 15, a mutual release of claims and a submission of any disputes related to the Agreement to arbitration.

THE PALACE COMPANY®

THEPALACECOMPANY.COM

In order to conduct a thorough internal assessment and prepare a more considered response, Palace Elite respectfully requests an additional five (5) business days, as of the date of this letter, to respond to further your communication.

We appreciate your cooperation, and we will be in touch no later than Thursday August 7, 2025 with our response. Palace Elite reserves all rights and remedies.

Sincerely,

Isaac Carrasco
Palace Elite Resorts, S.A. de C.V.

THE PALACE COMPANY®