UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA, MIAMI DIVISION

| | |
|---|---|
| PAUL AKEO and CHRISTY AKEO,<br><br>        Plaintiffs,<br><br>v.<br><br>PALACE ELITE RESORTS S.A. de C.V., a Mexican corporation; PR GLOBAL RESERVATIONS, LLC, a Florida limited liability company; JOSÉ GIBRÁN CHAPUR DÁJER, an individual; CHDB HOLDING, S.A. de C.V., a Mexican corporation; and CONTROLADORA IHC, S.A.P.I. de C.V., a Mexican corporation; and OPERADORA PALACE RESORTS JA LTD., a Jamaican corporation,<br><br>        Defendants. | Case No.: 1:25-cv-23733-RKA |

**PLAINTIFFS' FIRST AMENDED COMPLAINT**

**COMPLAINT**

Plaintiffs, PAUL AKEO and CHRISTY AKEO (collectively, "Plaintiffs") by and through undersigned counsel, file this complaint against PR GLOBAL RESERVATIONS, LLC, a Florida limited liability company; PALACE ELITE RESORTS S.A. de C.V., a Mexican corporation; JOSÉ GIBRÁN CHAPUR DÁJER, an individual; and CHDB Holding, S.A. de C.V., a Mexican corporation, and allege as follows:

**PARTIES, JURISDICTION, AND VENUE**

1.     Plaintiffs Paul and Christy Akeo are a married couple residing in the State of Michigan.

2.     Defendant PR Global Reservations LLC is a Florida limited liability company authorized to conduct business in Florida, with its headquarters in Miami-Dade County.

Defendant PR Global Reservations LLC is the entity whom the Plaintiffs made reservations related to the Palace Elite Resorts membership rights described herein.  Jurisdiction is proper over PR Global Reservations LLC because Defendant PR Global Reservations LLC (2) operated, conducted, engaged in, or carried on a business in this State by marketing, promoting, selling, reserving, and booking hotel rooms for Palace Resort hotels in this State, (2) had an office in this State, (3) committed a tortious act within this State, including making defamatory statements and continuing malicious prosecution referenced herein through its agents in this State, and (4) was engaged in substantial and not isolated activity within this State.  For this reason, PR Global Reservations operates, conducts, engages in, and carries on a business or business venture in Florida and has have offices or agencies in Florida, and that Plaintiffs' cause of action arose from these business activities.

3.      Palace Elite Resorts S.A. de C.V. ("Palace Elite") is a Mexican company headquartered in Cancun, Mexico.  Jurisdiction is proper over Palace Elite because Defendant Palace Elite Resorts S.A. de C.V. (1) operated, conducted, engaged in, or carried on a business in this State by marketing, promoting, selling, reserving, and booking hotel rooms for Palace Resort hotels in this State through its agents, (2) had an agency in this State, (3) committed a tortious act within this State, including making defamatory statements and continuing malicious prosecution referenced herein through its agents in this State, and (4) was engaged in substantial and not isolated activity within this State through the continuous and systematic marketing, promotion, and sales of Palace Elite membership rights and bookings for Palace Elite members in this State.

a.      Palace Elite Resorts S.A. de C.V. designated PR Global Reservations, LLC as its an agent in Florida to market and sell hotel rooms at the Palace Resorts, including through and on behalf of Palace Elite members like the Akeos.

b.      The Akeos exercised their affiliation rights in and with Palace Elite by booking  hotel rooms at Palace Resort hotels through the agent PR Global Reservations, including emailing and contacting PR Global Reservations, LLC in Florida.

c.      PR Global Reservations, LLC is the owner of the Palace Resorts

trademark and is the owner and operator of the Palace Resorts website for United States customers.

d.     Palace Elite has authorized PR Global Reservations, LLC to quote and contract room rates and other services for Palace Elite's customers through its website, call center, and reservations team.

e.     The sole manager of PR Global Reservations is Jose Gibran Chapur Dejar. PR Global is the primary marketer of room nights and integrated hotel services at The Palace Group hotels, both in the United States and elsewhere, selling nights through various commercial segments, such as tour operators, online travel agencies, other groups, websites, and Palace Elite affiliates, through which guests can book stays at Palace entity-operated hotels.

f.     PR Global also recognizes Palace Elite memberships and sells stays at the applicable discounted rates to members.

g.     Palace Elite retained Florida attorneys to represent it in the U.S. in connection with the criminal proceedings brought against the Akeos and to represent it in the disputes with the Akeos leading up to the criminal proceedings, including sending letters to the Akeos from Florida.

h.     Palace Elite uses PR Global Reservations, LLC as its U.S.-based agent for marketing and sale of hotel rooms for Palace Elite members, including to the Akeos.

i.     The Mexican criminal proceedings at issue in this civil action arise out of or relate to Palace Elite and PR Global Reservations' business contacts in Florida.

j.     For this reason, Palace Elite operates, conducts, engages in, and carries on a business or business venture in Florida and has have offices or agencies in Florida, and that Plaintiffs' cause of action arose from these business activities.

4.     Defendant José Gibrán Chapur Dájer is an individual with a permanent residence and domicile in the State of Florida.  Mr. Chapur was at all relevant times the chief executive officer of The Palace Company, and currently serves as the Chairman of the Board of Controladora IHC, the majority shareholder of Palace Elite, and a director of CHDB Holding, a

minority shareholder of Palace Elite.  Mr. Chapur is also the manager of PR Global Reservations, LLC, rendering him also a business agent of Palace Elite and PR Global Reservations, LLC. Jurisdiction is proper over Mr. Chapur because he (1) operated, conducted, engaged in, or carried on a business in this State by continuing the captivity of the Akeos in Mexican jail while located in this State as well as conducting operations of the Palace Resorts in this State, (2) had an office in this State, (3) committed a tortious acts within this State, including making or authorizing the making of defamatory statements and instituting, continuing or authorizing the institution or continuation of the malicious prosecution referenced herein while physically located in this State, and (4) was engaged in substantial and not isolated activity within this State through the continuous and systematic conduct of business in this State, ownership of property in this State, and residence and domiciliary in this State.  For this reason, Chapur operates, conducts, engages in, and carries on a business or business venture in Florida and has offices or agencies in Florida, and Plaintiffs' cause of action arose from these business activities.  Chapur was acting as the employee or agent of Palace Elite, Palace Resorts OpCo, and Palace Holding Company at all relevant times.

5.      CHDB Holding, S.A. de C.V. is a Mexican corporation.  CHDB Holding is the sole or majority shareholder for various sub-entities with The Palace Company Group.  CHDB Holding is the successor-in-interest to Palace Resorts, S.A. de C.V. through a merger in 2020, the operating company of Palace Elite and PR Global Reservations.  Palace Resorts S.A. was the operating company for Palace Company hotels until no earlier than 2021 and potentially longer. Where Palace Resorts OpCo references conduct or transactions during this time period, it references CHDB Holding, S.A. de C.V.  Palace Resorts OpCo operated, conducted, engaged in, and carried on a business or business venture in Florida and had offices or agencies in Florida (including directors and officers), and Plaintiffs' cause of action arose from these business activities.

6.      Controladora IHC, S.A.P.I. de C.V. ("Palace Holding Company") is a Mexican corporation. Controladora IHC is the sole or majority shareholder for various Palace Company

Group sub-entities and also markets room nights and integrated hotel services at The Palace Company Group hotels in specific markets. It is also the majority shareholder of Palace Elite. Jurisdiction is proper over Palace Holding Company because it authorized or approved the defamatory statements contained herein related to the Akeos during their captivity, which were disseminated by Palace Company throughout national news outlets in the United States, including Florida.  Its chairman is Defendant Chapur and Chapur was acting as an agent of Palace Holding Company at all relevant times.

7. Operadora Palace Resorts (JA) Ltd., a Jamaican corporation, ("Palace Resorts OpCo") is the operating company for Palace Company hotels, including the ones near Cancun, and the owner of the trademark for Palace Company and Palace Resorts.  Upon information and belief, Palace Resorts OpCo is the operating company and employer of all employees of the Palace Company, including Jose Gibran and the employees who filed the accusations with the Mexico criminal authorities.  Jurisdiction is proper over Palace Resorts OpCo because it (1) operated, conducted, engaged in, or carried on a business in this State by conducting operations of the Palace Resorts and the Palace Company in this State, (2) committed a tortious acts within this State, including making or authorizing the making of defamatory statements in the United States which were disseminated in this State, and (4) was engaged in substantial and not isolated activity within this State through the continuous and systematic conduct of business in this State.

a. As operators of the Palace Resort hotels, Palace Resorts OpCo was legally obligated to honor the reservations made by Palace Elite members, including the Akeos;

b. When the Akeos exercised their affiliation rights in and with Palace Elite to book hotel rooms at Palace Resort hotels, the bookings were made at hotels operated by Palace Resorts OpCo and consummated in Florida through PR Global Reservations LLC – in other words, Akeos contacted PR Global Reservations who honored their preferential-rate affiliation with Palace Elite by booking rooms at hotels operated by Palace Resorts OpCo;

c. Palace Resorts OpCo  is the owner of the Palace Resorts and Palace Company trademark and markets bookings at its hotels directly and through its resident agent PR

Global Reservations in the United States, including in Florida, under those trademarks.

   d. Palace Resorts OpCo  has authorized PR Global Reservations, LLC to quote and contract room rates and other services for Palace Elite's customers through its website, call center, and reservations team.

   e. Palace Resorts OpCo is the employer of the individuals who made the false accusations against the Akeos, as more fully described herein.

   f. Palace Resorts OpCo made the defamatory statements under Palace Company letterhead during the Akeos' detention as more fully described herein.

   g. Palace Resorts OpCo uses PR Global Reservations, LLC as its U.S.-based agent for marketing and sale of hotel rooms for Palace Elite members, including to the Akeos.

   h. The Mexican criminal proceedings at issue in this civil action arise out of or relate to Palace Resorts OpCo's business contacts in Florida.

   i. Palace Resorts OpCo has designated PR Global Reservations, LLC as its resident agent in the State of Florida to book rooms at hotels operated by it, the Akeos' bookings were at those hotels, Palace Resorts OpCo refused to honor the Akeos' Palace Elite affiliation, and the claims relate to such conduct.

   j. For this reason, Palace Resorts OpCo operates, conducts, engages in, and carries on a business or business venture in Florida and has have offices or agencies in Florida, and Plaintiffs' cause of action arose from these business activities.

  8. Venue is proper as this district is where at least one defendant resides and because defendants' removed to this district.

  9. Plaintiffs contest the basis of this Court's subject matter jurisdiction set forth in Defendants' notice of removal as the Agreement on which it was based did not arise out of a commercial transaction, but, rather, a criminal prosecution.  *See Breazeale v. Victim Services, Inc.*, 878 F.3d 759 (2017).

## GENERAL ALLEGATIONS

10.     On March 4, 2025, Plaintiffs Paul and Christy Akeo were arrested while seeking to pass Mexican immigration authorities en route to a vacation in Cancun.  They were then forced to spend a month in detention in a maximum security prison in Cancun Mexico separate and apart from each other, sleeping alongside drug dealers and violent criminals.

11.     The charges: Palace Elite had falsely accused the Akeos of fraudulently disputing credit card transactions as "desconocidas," i.e. not recognized or unknown.[1]  Palace Elite had waged a secret lawfare campaign against the Akeos in Mexico in retaliation for the Akeos' success in persuading four separate American credit card companies that Palace Elite breached its agreements with the Akeos.  Those credit card companies sided with the Akeos and refunded them over a hundred thousand dollars.

12.     The arrest came as a complete surprise to the Akeos.  Sitting in Mexican jail, separated from each other, under the control of a foreign and notoriously corrupt judicial system, the Akeos languished for a month without knowing if they would spend the next decade or lifetime in Mexico prison.  Worse, the Mexican prison CERESCO is one of the most dangerous prisons in Mexico, notable for its inhumane conditions, violence, and crime.  Paul and Christy Akeo were hardworking Americans with a family.  Paul Akeo was a 23-year Navy senior chief who was honorably discharged.  He continued his public service after discharge by working for the Michigan State Police.

13.     How the Akeos landed in Mexico jail is a long, twisted saga going back nearly a decade.  The Akeos have entered into six separate membership interest agreements with Palace Resorts beginning in February 2016.  Palace Elite and Palace Resorts OpCo expressly considered

---

[1] The employees who made the false accusations on behalf of Palace Elite all publicly hold themselves out as employees of the "Palace Company," which is a trademark owned by Palace Resorts OpCo.  Upon information and belief, based on publicly available records, including other lawsuits, and customs in the hotel industry, the employees of the Palace Company are all employees of Palace Resorts OpCo as the company that performs management and operation services of the hotel conglomerate.

and described the Akeos as "socios mayoristas" and "membresia mayorista" – "wholesale customers" and "wholesale members."  Palace Elite sold the Akeos membership interest agreements at exorbitant prices with huge wholesaler volumes knowing that the Akeos would resell bookings to third parties, as long as the Akeos did not do so through third-party booking agencies.  The most recent contract, for example, dated November 21, 2021 was for 1,217 bookings for $1,369,850.  Obviously, that enormous capacity of bookings – amounting to 23 years of stays at the all-inclusive hotels – far exceeds the volume of hotel bookings any single family could ever make.  And Palace Elite was blatantly honest about the fact that the Akeos were wholesalers of bookings.  The highest level executive for Palace Elite memberships, Juan Carlos Zahoul of the "Palace Company," approved this specific contract to upgrade the membership status of "socios mayoristas Akeo" (i.e. wholesale customers Akeo) in an internal private text message.  Furthermore, Palace Elite incentivized wholesalers like the Akeos by giving them bonus stays through its Referral Program Plus.  The more "referrals" the Akeos made of guests staying at the hotel, Palace Resorts was required to grant the Akeos "bonus stays" – even more weeks than originally granted.

14.     Indeed, Palace Elite gave the Akeos "special authorization" for addenda to the standard referral program that was required to be kept "confidential."  These "special authorizations" created incentives for the Akeos to "refer" guests in mass quantities by selling as a wholesaler those bookings.

15.     When the Akeos made bookings with PR Global Reservations, LLC and Palace Resorts OpCo for their referrals, the bookings were made in the name of the guests and under the guests' credit card numbers.

16.     The financial benefit to Palace Elite and Palace Resorts OpCo was that the Akeos paid it millions of dollars in downpayments and regular monthly payments over a six year period.  In addition to that sum, the Palace Resorts reaped over $4 million in bookings that were paid to Palace Elite and Palace Resorts OpCo directly as a result of the Akeos' membership.

17.     After selling an upgrade to the "socios mayoristas Akeo" (i.e. wholesale

customers Akeo) on November 21, 2021, the Akeos did what Palace Elite knew and encouraged them to do: continued to wholesale the bookings it paid upfront for to third parties.  Palace Elite sold the Akeos the upgrade and took their money, but then sought to renege on the agreement within months.

18.     On March 10, 2022, Palace Resorts OpCo and Palace Elite's general counsel, Isaac Carrasco Martinez, sent the Akeos a "cease and desist letter" in the United States.  In the letter, Mr. Martinez claimed that the Akeos had breached their membership agreement by publishing with the intent to profit the rates and benefits offered to the Akeos.  Mr. Martinez also claimed that the Akeos used the trademarks, logos, typography, and commercial brand of the Palace Resorts OpCo hotels without authorization.  Of course, Palace not only knew, but encouraged and intended for the Akeos to use the massive volume of weeks sold to them in this way as "socios mayoristas."  Mr. Martinez ignored these facts in his letter, as well as the clear express provision in the Referral Program Plus that "rewards nights are transferable" to other people.

19.     Mr. Martinez also ignored that the Akeos had been told at multiple "sales update meetings" with Palace Resort OpCo and Palace Elite where employees expressly told the Akeos they can use Facebook to advertise to help offset monthly payments to Palace Elite.  Other people were told by Palace as well that this was a way to help finance the membership.

20.     Mr. Martinez claimed to have given "formal notice" that "Palace Elite has proceeded to definitely, immediately and irrevocably terminate the following benefits: (i) Unlimited Referral Program, (ii) Regular Referral Program and; (iii) Bonus weeks, which were part of the Agreement."  In other words, Mr. Martinez unilaterally cancelled benefits that Palace Resorts gave Plaintiffs to induce them to upgrade their "wholesale" membership back in November 2021.

21.     The Akeos had outstanding reservations for their referrals at the time.  The Akeos told the Palace Resorts that they had done nothing wrong to breach the contract but felt that the Palace had given them no other option but to sign a waiver of benefits.  To protect those

bookings for their guests, the Akeos requested that all outstanding bookings be honored.

22.     On April 7, 2022, Palace Elite and Palace Resort OpCo promised to honor the outstanding reservations of the guests under the referral program.

23.     On April 8, 2022, having extended their benefits to guests and referrals, the Akeos were coerced into signing a "waiver of benefits" that waived all unlimited referral and regular referral benefits as well as any bonus weeks.  But in exchange, Palace Elite and Palace Resort OpCo promised to "respect and honor all Bonus Weeks that were already generated by the use of the aforementioned Referral Programs that, as of this date, have already been booked."

24.     After receiving the Akeos' signature, on April 16, 2022, Palace Elite and Palace Resorts OpCo began breaching the initial agreement and the coerced second addendum.  Palace gave notice to the Akeos that it will revoke the promise to honor the outstanding bookings by unilaterally deciding to downgrade all the reservations without the benefits the Akeos had paid for and were promised.

25.     Then, six weeks later, Palace Resorts OpCo, Palace Elite, and/or PR Global Reservations LLC simply cancelled the outstanding bookings entirely, without notice or justification.

26.     On June 2, Christy called Palace to inquire and was told to contact the legal department.  The legal department told Christy it could not help her and she should contact member services.  Member services refused to permit Christy to speak to a supervisor and referred her back again to legal.  The legal department stopped responding to Christy.  On June 6, a supervisor at member services told Christy that the legal department instructed member services to cancel all rooms on June 1, including those promised to be honored.

27.     On August 23, 2022, the Akeos, through counsel they had to retain, made a request for a refund from Palace Elite given its breach of the agreement.  The Akeos received no response.

28.     After receiving no response to these inquiries, the Akeos were left with no choice but to dispute the charges with the credit card companies on the basis that the Akeos paid for a

service that Palace Elite had not provided.

29.      The Akeos disputed the charges the basis that the goods and services were not provided.  The Akeos never told the credit companies that they did not recognize the charges or that the charges were fraudulent.  Below is a screenshot of the copy of an exemplar credit card dispute form completed by the Akeos:



30.      As described above, the express basis of the dispute was that the "product or service had not been received," and the Akeos clearly stated this was not a "fraud" case, i.e. charges fraudulently made by a third party.

31.      Upon information and belief, the credit card companies provided copies of the credit card disputes made by the Akeos to Palace Elite or otherwise notified Palace Elite that the Akeos challenged the charges by Palace Elite on the basis that the services were not provided as agreed-upon.  Upon information and belief, the credit card companies gave Palace Elite an opportunity to respond to the Akeos' claims in the dispute resolution process.

32.      At no time did the Akeos ever claim that they did not recognize these charges, as though some third-party fraudulently made the charges.  Upon information and belief, at no time did the credit card companies ever tell Palace Resorts that the basis of the Akeos' dispute of the charges was that they did not recognize the charges.

33.     Upon information and belief, Palace Elite and Palace Resorts OpCo sent responses to the credit card companies.

34.     After completing the formal dispute resolution process, in or around October 2022, the credit companies sided with Akeos and refunded the Akeos $116,587.84 they previously paid Palace Elite.  These credit card companies sided with two individuals who make personal charges over, upon information and belief, a giant, multi-billion dollar corporation that conducts hundreds of millions of dollars in credit card transactions with the credit card companies every year.  That says a lot.

35.     Of note, these payments all relate to the November 2021 membership agreement, which is the ones that Akeos claimed Palace Elite did not honor.  The Akeos did not dispute charges related to payments under other membership agreements.

36.     In response to the chargebacks, the Palace Elite, Palace Resorts OpCo, and Palace Holding Company began a secret lawfare campaign based on defamatory and malicious accusations against the Akeos.

37.     In or around March 2023, Palace Resorts filed a false accusation against Plaintiffs with the public prosecutor.  Palace Resorts falsely accused the Akeos of fraud on the basis that

QUINTO: Ahora, entre el 31 de agosto y el 4 de noviembre de 2022 se hizo del conocimiento de mi representada por medio de la Institución Financiera American Express, la notificación de 13 contracargos respecto 13 pagos realizados a mi representada, los cuales fueron realizados en razón de 13 disputas presentadas por el investigado Paul K Akeo ante American Express, mediante los cuales desconoce 13 pagos realizados con una tarjeta de la referida institución de la cual es titular el investigado y pagos que fueron autorizados a favor de mi representada, contracargos denominados en dólares americanos (moneda de curso legal de los Estados Unidos de América) que se describen a continuación:

the Plaintiffs disputed the credit card charges as "unrecognized":[2]

38.     In the criminal complaint, Palace Resorts acknowledged the difference between civil and criminal fraud, specifically that criminal fraud requires intentional deception for the public at large.  In support of its accusation of intentional deception necessary to support the crime of fraud, Palace Elite falsely alleged that "[O]nce the benefits were received, [Paul Akeo] later notified American Express that they were **unaware** of the charge and, under the pretense of non-compliance, filed a dispute with American Express."  That statement is maliciously false.

39.     At the same time, the Palace Elite began to slander the Akeos to guests of the hotel.  On May 17, 2023, the Akeos, through their legal representative, sent a cease and desist letter to Palace Resorts, demanding that they cease slandering the Akeos.  The Akeos explained that if Palace Resorts continues to slander the Akeos to guests, the Akeos would have no choice but to publicly defend themselves by presenting their side of the story.

40.     Palace did not respond to the letter.

41.     In or around the beginning of 2023, Christy Akeo joined a private Facebook group to learn from others what Palace Resorts was doing to others.  At the time she joined it, there were approximately 200-300 members.  The founder of the Facebook group asked Christy to become an administrator of the group.  The Facebook group rapidly attracted thousands of similar victims of the Palace Resorts' coercive and aggressive timeshare tactics.  Christy was transparent about the purpose of the group: If members were happy with their contracts, great, but if members were unhappy with their contracts, Christy's goal was to tell her side of the story and help others facing coercive and aggressive timeshare tactics by Palace Elite.

---

[2] Roughly translated to: "FIFTH: Now, between August 31 and November 4, 2022, my client was notified by American Express Financial Institution of 13 chargebacks regarding payments made to my client, which were made due to disputes filed by American Express, of 13 chargebacks regarding 13 payments made to my client, which were made due to 13 disputes filed by the investigated party, Paul K Akeo, with American Express, through which he **did not recognize** 13 payments made with a card from the aforementioned institution of which he is the holder and payments that were authorized in favor of my client, chargebacks denominated in US dollars (legal tender of the United States of America) which are described below:

42.     Palace Elite was rattled by the success of Christy's Facebook group and began a lawfare campaign to retaliate against the Akeos.

43.     Upon information and belief, shortly after Christy Akeo's Facebook group and after nearly a year of making its criminal complaint, Palace Elite and Palace Resorts OpCo pressured the Public Prosecutor to obtain an arrest warrant for the arrest of the Akeos in retaliation for her transparency and disclosure efforts.  In fact, on the very first day that the Akeos were in Mexico court on March 5, 2025, a Palace Resorts official said to the Akeos that all the Akeos needed to do to avoid criminal charges was to remove the Facebook group Palace Resorts detested so much.

44.     On March 24, 2024, Mexican authorities issued a warrant for the arrest of the Akeos.

45.     On September 5, 2024, Palace Elite sent a cease and desist letter from its location in Florida to the Akeos in Michigan.  In the letter to the Akeos, Palace Elite was aware of the criminal complaint it made and the arrest warrant that was issued against the Akeos, both based on false accusations, but concealed those facts from the Akeos in its letter.  Upon information and belief, Palace Elite's purpose in concealing that information was to lure the Akeos down to Mexico, procure their unlawful arrest, and then extract revenge and retribution against them.

46.     On March 3, 2025, Interpol published a red notice for the arrest of Paul Akeo at the request of Mexican authorities.  An Interpol notice is required to summarize the facts of the case, including a succinct and clear description of the criminal activities of the wanted person, including the time and location of the alleged criminal activity.  The Interpol notice repeated Palace Resorts' false accusation, namely that Akeo fraudulently cancelled American Express charges for his Palace membership as "desconocidas" (i.e. "unknown") to Akeo.  No other justification for the warrant was published.

47.     On March 4, 2025, as the Akeos were passing through Mexican immigration, they were apprehended by Mexico authorities and thrown in jail – all on the basis of Palace Elite's and Palace OpCo's false accusations of credit card fraud.

48.     To keep them in jail, the public prosecutor then relied upon Palace's false

accusations as the basis of bringing the charges against, arresting, and detaining the Akeos.

Specifically, the public prosecutor based the fraud charges on Palace Resorts' false allegation

that Paul Akeo disputed the charges as "desconocidas por el titular de la cuenta" (i.e. the charges

were unknown to the owner of the credit card).  The Public Prosecutor publicly repeated this

allegation as the core basis of the criminal charges, accusing the Akeos of fraud for "stating that

said charges were unknown" (which is false), or they were "unaware of the charges" (which is

also false), or that the Akeos "noted that these [charges] were not recognized by the cardholder"

of the American Express (which is also false).

49.     There was a media firestorm in the United States after news of Palace Resorts'

efforts to jail the Akeos became public.

50.     The Akeos languished in maximum security prison in Cancun, Mexico, separate

and apart from each other, unable to speak with each other or console one another.  The prison

conditions were horrific.  The walls were rubbled and run down, the prison was overcrowded

with violent criminals, the toilets didn't flush, and the food was untouchable.  Worse, they were

scared, terrified, and frightened that they may never go home again.  They were terrified they

would never be repatriated to the United States or see their children again.

51.     President Donald J. Trump assigned his Special Envoy for Hostage Affairs Adam

Boehler to work to obtain the release of the Akeos from their unlawful detention.

Congressmember Tom Barrett of Michigan flew down to Cancun to assist with the Akeos'

release from Mexico prison after their deteriorating physical condition.  Congressmember Barrett

spoke out publicly about the unlawful detention of the Akeos, describing the claims by Palace

Resorts as a "contract dispute over a timeshare."

52.     But Palace had weaponized the Cancun judiciary against the Akeos based on a

knowingly false accusation.  Place's false accusations against the Akeos were voluntarily made

to the Public Prosecutor prior to the institution of any criminal charges.  At the time Palace

Resorts made the false accusations, there were no judicial proceedings at all, nor was there even

a criminal investigation pending against the Akeos.

53.     In response to the firestorm, Palace Resorts OpCo, Palace Elite, and Palace Palace Holding Company defamed the Akeos in media outlets throughout the United States.  These entities began to repeat its false accusation under "Palace Company" letterhead, telling American media outlets that the Akeos had "fraudulently disputed legitimate credit card charges" and had undertaken "fraudulent actions that included unjustifiably disputing credit card payments." Palace Resorts knew full well that the credit card companies had sided with the Akeos in their dispute and that the basis of the criminal accusation was false.  Mexican authorities also repeated the falsehood to the American media, saying that the credit card disputes were done "maliciously by [claiming] not recognizing the charges" – which is false.

54.     After being jailed for 30 days in Mexico maximum security prison, the Akeos were released after dismissal of criminal charges.  As a condition to agreeing to drop its false accusations against the Akeos, Palace Resorts coerced the Akeos to affix their signature to an invalid agreement requiring the Akeos to make a payment to Palace Resorts' foundation and to keep what happened secret.  The agreement is clearly invalid, as it was entered into by the Akeos – American citizens in maximum security prison in a foreign country whose native language is not English who were induced to sign this agreement to procure their freedom – under clear textbook duress.

55.     José Gibrán Chapur Dájer, who describes himself as CEO of the Palace Company, was directly responsible for all aspects of the negotiation for the release of the Akeos.  Chapur negotiated the conditions for the release of the Akeos directly with United States government officials, essentially holding the Akeos hostage in exchange for his pound of flesh.

56.     Chapur made clear to U.S. government officials that he would not consent to the release of the Akeos absent a agreement with the Akeos to remove the Facebook group and posts and agree to nondisparagement and confidentiality.  Chapur also personally negotiated the amount the Akeos would be required to repay as a condition to their release from Mexico jail. These negotiations were not in the public interest, but were corrupt, solely for the direct private

benefit of Palace and Chapur.  Palace Elite sought a release from the Akeos knowing that it had falsely accused them of a crime.

57.     After the Akeos' daughter persuaded the administrator of the Facebook group to delete it to save the Akeos, their daughter started a Facebook group called "Free the Akeos" to advocate for the release of her parents.  Over 8,000 people joined that Facebook group in 10 days.  Palace Resorts insisted as a condition to their release from Mexico maximum security prison that the Akeos' daughter permanently disband the "Free the Akeos" Facebook group.

58.     This agreement between the Akeos and Palace Resorts was not a plea agreement, admission of guilt, or any plea for mercy.  The Akeos expressly maintained their innocence in the agreement.  The Akeos signed the agreement under duress to escape prison and criminal prosecution.

59.     The agreement was the product of Palace Resorts' malicious efforts to weaponize the Mexican criminal prosecution system against the Akeos – based entirely on false accusations – for retaliation and private gain.  It was a private contract signed by the Akeos under duress, literally while they were in a foreign maximum security prison, after being released of handcuffs solely to sign, by a Mexican federal police officer with a gun by his side.  Palace Resorts told the Akeos that their signature on the private contract between Palace Resorts and the Akeos was an express condition to be free from jail.

60.     After securing this private agreement in favor of a wealthy and powerful Mexican business, the public prosecutor formally abandoned the criminal proceedings against the Akeos and the charges were dismissed.

## FIRST CLAIM FOR RELIEF

### (DEFAMATION)

61.     Plaintiffs reallege and incorporate all allegations into this claim for relief.

62.     Palace Elite, Palace Resorts OpCo, Palace Company Holdings, and PR Global Reservations LLC published false statements of fact concerning Plaintiffs to one or more third parties, specifically:

a.      Palace falsely accused Plaintiffs of disputing the credit card charges placed by Palace Resorts on the basis that such charges were "not recognized."

b.      Palace falsely accused Plaintiffs of disputing the credit card charges without justification or unjustifiably.

63.     These statements were published and repeated on numerous occasions, specifically:

a.      Palace's criminal complaint with the Public Prosecutor's Office

b.      Palace's witness interviews by Public Prosecutor's Office

c.      The Interpol Red Notice

d.      Press releases by the "Palace Company" distributed to the media during the unlawful detention of the Akeos

e.      Direct statements or comments to media outlets nationwide by the "Palace Company" during and subsequent to the unlawful detention of the Akeos.

64.     These statements are actually false as the Akeos never disputed credit card charges on the basis that such charges were not recognized.  In addition, the gist of the public statements made by Palace entities in March 2022 that the credit card disputes were without justification or unjustifiably were false as the gist of those statements conveyed a materially different meaning than the truth, specifically that the Akeos disputed the charges through legitimate means, Palace responded, and the credit card companies sided with the Akeos, determining the disputes were justified and reversing the charges.

65.     These statements were not privileged and were published with actual malice. Specifically, Palace Elite and Palace Resorts OpCo maliciously made a criminal complaint with the Public Prosecutor to institute a criminal proceeding against the Akeos for the primary purpose of injuring and retaliating against the Akeos.  In doing so, these Palace entities also acted recklessly and without regard for whether the proceeding was justified on the basis that these Palace entities concocted and fabricated a criminal fraud claim by alleging that the Akeos disputed the credit card transactions on the basis of not recognizing the charges.  These Palace

entities knew this allegation was false based on documents it had received from the credit card companies.  These Palace entities  lacked probable cause to institute or continue the proceedings because Palace knew it had lied to the Public Prosecutor in order to initiate and continue criminal proceedings.  Palace's complaint also acknowledged that the factor that singlehandedly distinguished civil fraud from criminal fraud with respect to the Akeos' conduct was the false accusation that the Akeos did not recognize the charges, making them seem like they are con-artists and fraudsters who pose a danger to the general public.  Palace sought to retaliate against the Akeos for legitimately disputing the credit card charges placed by Palace Elite.  The statements made by Palace Elite, Palace Resorts OpCo, Palace Company Holdings, and PR Global Reservations LLC  to the press after the arrest of the Akeos were also made with malice and/or negligently.

66.      The false statements were defamatory per se.  The false statements also tended to subject Plaintiffs to contempt, ridicule, and disgrace and otherwise injure Plaintiffs' reputation. The defamatory statements harmed Plaintiffs' reputation and caused actual damages, including emotional distress, out-of-pocket losses for attorney's fees and other similar expenses, mental anguish and suffering, personal humiliation, physical suffering, and other compensable damages.

67.      Plaintiffs also seek an award of punitive damages for the malicious defamatory statements, costs, and all other relief the Court deems just and proper.

## SECOND CLAIM FOR RELIEF
### (MALICIOUS PROSECUTION)

68.      Plaintiffs reallege and incorporate all allegations into this claim for relief.

69.      Palace Elite and Palace Resorts OpCo acted with malice and without probable cause in making a criminal complaint against Plaintiffs with the Public Prosecutor's office and continuing the accusations against Plaintiffs.

70.      Palace Elite and Palace Resorts OpCo filed and, along with Chapur, continued the complaint against the Plaintiffs for the primary purpose of injuring the Plaintiffs and recklessly and without regard to whether the proceeding was justified.  In fact, these accusations were

demonstrably false and were made with the intent of bringing the full weight of the Mexican criminal justice system down on the Plaintiffs as punishment, retaliation, and retribution for Plaintiffs' success in their credit card disputes.

71.     At the time Palace Elite and Palace Resorts OpCo made the criminal complaint and all relevant times they, along with Chapur, continued the criminal complaint against the Akeos, they all did not have knowledge of facts or circumstances sufficiently strong to support a reasonable belief that the Akeos had committed a criminal offense.  In fact, Palace Elite and Palace Resorts OpCo had to concoct and fabricate a lie about the conduct of the Akeos in order to support the claim that a crime had occurred.

72.     Palace Elite and Palace Resorts OpCo instituted and continued the criminal proceedings against the Akeos because such criminal proceedings resulted directly and in the natural and continuous sequence from its actions, so that it reasonably can be said that, but for his or her actions, the proceeding would not have been instituted or continued.

73.     The criminal proceedings terminated in favor of Plaintiffs, as the Public Prosecutor formally abandoned the claims without a conviction or a sentence and Plaintiffs never admitted to any crime.

74.     The malicious institution and continuation of criminal proceedings directly and in natural and continuous sequence produced or contributed substantially to producing loss, injury, or damage, specifically emotional distress, out-of-pocket losses for attorney's fees and other similar expenses, mental anguish and suffering, personal humiliation, physical suffering, and other compensable damages.

75.     Plaintiffs also seek an award of punitive damages for the malicious prosecution, costs, and all other relief the Court deems just and proper.

### **THIRD CLAIM FOR RELIEF**

### **(ABUSE OF PROCESS)**

76.     Plaintiffs reallege and incorporate all allegations into this claim for relief.

77.     Palace Elite, Palace Resorts OpCo., and Chapur made an illegal, improper, or

perverted use of process against the Plaintiffs by making false accusations against the Plaintiffs in order to procure their arrest and detention and then conditioning their freedom and release from detention on Plaintiffs' agreement to an agreement without any regard to the actual charges that benefit Palace Resorts.  For example, Palace conditioned the release and freedom of Plaintiffs from maximum security prison on Plaintiffs' agreement (1) to keep confidential the criminal proceedings against the Plaintiffs, (2) not to make or publish any statements regarding Palace Resorts, essentially conditioning their freedom on a complete gag order, (3) release all claims against Palace Resorts of any kind, and (4) to remove any statements Plaintiffs ever made regarding Palace Resorts from any website, webpage, blog or other website.  These agreements had absolutely nothing to do with the criminal fraud claim Palace Resorts instituted and continued against the Akeos, which rested on the false premise that the Akeos disputed credit card charges on the basis of not recognizing those charges.  The criminal complaint did not involve criminal defamation (if such a thing exists) or any civil disputes between the parties. Palace Elite, Palace Resorts OpCo., and Chapur insisted that Plaintiffs remove Facebook posts, delete a Facebook group for Palace Resort members, and remove members from the Facebook group as a condition to their freedom from maximum security prison.

78.     Palace Elite, Palace Resorts OpCo., and Chapur had an ulterior motive or purpose in exercising the illegal, improper, or perverted process by seeking to institute and continue the criminal process in order to extract private gain and financial benefits and to suppress negative statements the Akeos had a right to make about the company.  The ulterior motive or purpose is clear from the fact that Palace Elite, Palace Resorts OpCo., and Chapur extracted a private gain or benefit as a condition to Plaintiffs' freedom from maximum security Cancun prison.

79.     As a result of Defendant's clearly improper, illegal, and perverted actions, Plaintiffs suffered injury and damage, including emotional distress, out-of-pocket losses for attorney's fees and other similar expenses, mental anguish and suffering, personal humiliation, physical suffering, and other compensable damages.

80.     Plaintiffs also seek an award of punitive damages for the malicious prosecution,

costs, and all other relief the Court deems just and proper.

## FOURTH CLAIM FOR RELIEF

### (INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS)

81.     Plaintiffs reallege and incorporate all allegations into this claim for relief.

82.     All Defendants acted extremely and outrageously in:

a.      Making false accusations against Plaintiffs as described herein to the Mexico prosecutor;

b.      Continuing to press the criminal charges against Plaintiffs knowing that the basis of the Interpol Notice and the criminal charges was false;

c.      Insisting that Plaintiffs affix their signatures on the Agreement under physical duress as a condition to their release from Mexico prison;

d.      Inflicting emotional distress on the Plaintiffs by continuing to press the criminal charges, knowing that doing so keeps Plaintiffs imprisoned, in order to extract private benefits and personal gain; and

e.      Seeking to enforce the Agreement knowing that Plaintiffs' signatures were procured by physical duress.

83.     The aforementioned conduct goes beyond all possible bounds of decency and is regarded as shocking, atrocious, and utterly intolerable in a civilized community.

84.     As a result of Defendants' conduct, Plaintiffs have suffered severe emotional distress, having survived 30-days in maximum security prison in a foreign country next to drug dealers and violent criminals.

85.     As a result of Defendant's clearly improper, illegal, and perverted actions, Plaintiffs suffered injury and damage, including emotional distress, out-of-pocket losses for attorney's fees and other similar expenses, mental anguish and suffering, personal humiliation, physical suffering, and other compensable damages.

86.     Plaintiffs also seek an award of punitive damages for intentional infliction of

emotional distress, costs, and all other relief the Court deems just and proper.

## FIFTH CLAIM FOR RELIEF

### (DURESS)

87.     Plaintiffs reallege and incorporate all allegations into this claim for relief.

88.     On April 4, 2024, Plaintiffs were imprisoned in Mexico.  An officer with a gun carried Plaintiffs to a room.  Plaintiffs understood that Palace Resorts threatened Plaintiffs with criminal prosecution unless Plaintiffs sign each and every provision of a Mutual Release and Settlement Agreement.  Neither Mexico nor any subdivision thereof was a party to this Agreement.  Neither Mexico or any subdivision thereof, or the Mexican public, received any benefit from the Agreement.  The sole party to receive a benefit from the Agreement was Palace Elite and its affiliates.

89.     Palace Elite, Palace Resorts OpCo., and Chapur had wrongfully threatened Plaintiffs with continuing and maintaining their criminal prosecution based on their false accusations in order to obtain Plaintiffs' signature on the Agreement.  Palace Elite, Palace Resorts OpCo., and Chapur said that unless Plaintiffs affix their signature on the Agreement, Palace Elite, Palace Resorts OpCo., and Chapur will continue to pursue their false accusations against Plaintiffs.

90.     Plaintiffs were physically forced to affix their signature to the Agreement.  At the time of signing, Plaintiffs were in handcuffs and escorted in custody by an officer with a gun to a room in the prison.  Plaintiffs were told that they must sign the Agreement in order to be released from prison.  The officer took off the handcuffs to enable Plaintiffs to affix their signature. Plaintiffs were told that they would return to their Mexico jail cell if they did not sign the Agreement.  Plaintiffs affixed their signature without actually manifesting their consent out of their own free will.

91.     In addition, Plaintiffs were improperly threatened by Palace Elite, Palace Resorts OpCo., and Chapur in order to induce their manifestation of assent.  Palace Elite, Palace Resorts OpCo., and Chapur expressly insisted that Plaintiffs sign the Agreement as a condition to their

release from Mexico prison.  Plaintiffs had no reasonable alternative but to manifest their assent to each and every provision of the Agreement.  If Plaintiffs did not affix their signature on the Agreement that was put in front of Plaintiffs, Palace Elite, Palace Resorts OpCo., and Chapur threatened Plaintiffs with criminal prosecution and with remaining in Mexico prison – a foreign non-English-speaking country away from their home and family.  Palace Elite, Palace Resorts OpCo., and Chapur told Plaintiffs and their representatives, as well as officials of the United States, that their signature on the Agreement was a condition to being released from Mexico prison.

92.     Palace Elite, Palace Resorts OpCo., and Chapur's threats to maintain the criminal prosecution unless the Akeos sign the Agreement were the misuse, for personal gain, of power intended for public benefit.

93.     At the time Plaintiffs put their signature on the Agreement, they were in Mexico jail, in custody of a Mexico officer carrying a gun on his leg, in handcuffs, and under threat of criminal prosecution.  Plaintiffs were told that if they sign the Agreement, the criminal prosecution will be dropped, they will be released from prison and be free to leave Mexico and return home.

94.     In addition, the Agreement is void for public policy on the grounds that part of the consideration given to the Akeos was the suppression of criminal prosecution.

95.     Further, the Agreement is duress because each of the Plaintiffs was experiencing duress due to the threat of imprisonment and criminal prosecution of the other.

96.     As a result of Defendant's clearly improper, illegal, and perverted actions, Plaintiffs suffered injury and damage, including emotional distress, out-of-pocket losses for attorney's fees and other similar expenses, mental anguish and suffering, personal humiliation, physical suffering, and other compensable damages.

97.     Plaintiffs also seek a declaratory judgment that the Agreement, including each and every subpart, is void ab initio as a result of duress.

98.     Plaintiffs also seek a preliminary and permanent injunction against Defendants

barring Defendants from enforcing the Agreement in any respect, including the arbitration or delegation clause therein.

### PRAYER FOR RELIEF

99.     WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants, as follows:

        a.     Awarding compensatory damages in an amount to be proven at trial;

        b.     Awarding punitive damages for willful and malicious conduct;

        c.     Awarding Plaintiffs' costs and reasonable attorneys' fees (if permitted by statute);

        d.     Declaring the Agreement to be void and invalid;

        e.     Enjoining the Defendants from enforcing the Agreement in any respect; and

        f.     Granting all such further relief as this Court deems just and proper.

### DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all issues so triable.

Dated: August 21, 2025

> /s/ Peter Kaufman
> Peter Kaufman (Bar No. 548421)
> pkaufman@panish.law
> Jesse Creed (pro hac vice pending)
> jcreed@panish.law
> Hunter Norton (pro hac vice pending)
> hnorton@panish.law
> PANISH | SHEA | RAVIPUDI LLP
> 11111 Santa Monica Boulevard, Suite 700
> Los Angeles, California 90025
> 310.477.1700
>
> *Attorneys for Plaintiffs*