**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 25-cv-23733-ALTMAN/Lett**

**PAUL AKEO** *and* **CHRISTY AKEO**,

    *Plaintiffs,*

*v.*

**PALACE ELITE RESORTS**, *et al.*,

    *Defendants.*

    —————————————————/

## <u>ORDER DENYING MOTION TO REMAND</u>

The Plaintiffs have filed a Motion to Remand [ECF No. 31]—which, after careful review, we

**DENY**.[1]

### THE FACTS[2]

Our Defendants (collectively, "Palace Elite") own, operate, or manage hotels under the Palace

Resort brand. *See* Amended Complaint ("AC") [ECF No. 11] ¶¶ 2–8. Our Plaintiffs—Christy and Paul

Akeo (the "Akeos")—were "'socios mayoristas' and 'membresia mayorista'—'wholesale customers'

---

[1] The Motion to Remand is ripe for resolution. *See* Plaintiffs' Motion to Remand (the "Response") [ECF No. 40]; Defendants' Reply in Support of the Motion to Remand (the "Reply") [ECF No. 44].

[2] "In determining whether federal jurisdiction exists, we apply the well-pleaded complaint rule, which requires that we look to the face of the complaint . . . for the existence of a federal question." *Jones v. LMR Int'l, Inc.*, 457 F.3d 1174, 1178 (11th Cir. 2006) (citing *Caterpillar, Inc. v. Williams*, 482 U.S. 386, 392 (1987)). "To determine whether the case should be remanded, the district court must evaluate the factual allegations in the light most favorable to the plaintiff[.]" *Crowe v. Coleman*, 113 F.3d 1536, 1538 (11th Cir. 1997). "The federal court makes these determinations based on the plaintiff's pleadings at the time of removal." *Ibid.*; *see also Lowery v. Ala. Power Co.*, 483 F.3d 1184, 1213–14 (11th Cir. 2007) ("In assessing whether removal was proper in such a case, the district court has before it only the limited universe of evidence available when the motion to remand is filed—i.e., the notice of removal and accompanying documents."). "In a motion to remand, the removing party bears the burden of showing the existence of federal jurisdiction." *Pacheco de Perez v. AT & T Co.*, 139 F.3d 1368, 1373 (11th Cir. 1998).

and 'wholesale members[,]'" who "would resell bookings to third parties[.]" *Id.* ¶ 13. As "wholesale members," "the Akeos paid [Palace Elite] millions of dollars in downpayments and regular monthly payments over a six year period." *Id.* ¶¶ 13, 16. For example, "[t]he most recent contract," from November 21, 2021, "was for 1,217 bookings" and worth "$1,369,850." *Id.* ¶ 13.

But, in March 2022, the relationship went sideways. "On March 10, 2022, [Palace Elite's] general counsel, Isaac Carrasco Martinez, sent the Akeos a 'cease and desist letter' in the United States." *Id.* ¶ 18. "In the letter, Mr. Martinez claimed that the Akeos had breached their membership agreement by publishing with the intent to profit the rates and benefits offered to the Akeos." *Ibid.* "Mr. Martinez also claimed that the Akeos used the trademarks, logos, typography, and commercial brand of the Palace . . . hotels without authorization." *Ibid.* In his letter, "Mr. Martinez claimed to have given 'formal notice' that 'Palace [Elite] . . . has proceeded to definitely, immediately and irrevocably terminate'" the Akeos' membership benefits. *Id.* ¶ 20. That created a problem for the Akeos because they "had outstanding reservations for their referrals at the time." *Id.* ¶ 21. "To protect those bookings for their guests, the Akeos requested that all outstanding bookings be honored." *Ibid.* Luckily for the Akeos, then, "[o]n April 7, 2022, Palace [Elite] . . . promised to honor the outstanding reservations of the guests under the referral program." *Id.* ¶ 22. "On April 8, 2022, having extended their benefits to guests and referrals," the Akeos signed a "waiver of benefits," under which Palace Elite "promised to 'respect and honor all Bonus Weeks that were already generated by the use of the aforementioned Referral Programs that, as of this date, have already been booked.'" *Id.* ¶ 23.

But this rapprochement didn't last long. On April 16, 2022, Palace Elite "gave notice to the Akeos that it will revoke the promise to honor the outstanding bookings by unilaterally deciding to downgrade all the reservations without the benefits the Akeos had paid for and were promised." *Id.* ¶ 24. "Then, six weeks later," Palace Elite "cancelled the outstanding bookings entirely[.]" *Id.* ¶ 25. The Akeos responded "[o]n August 23, 2022," by requesting, through counsel, "a refund from Palace

Elite given its breach of the agreement." *Id.* ¶ 27. "The Akeos received no response." *Ibid.*

The Akeos then "dispute[d] the charges with the credit card companies on the basis that the Akeos paid for a service that Palace Elite had not provided." *Id.* ¶ 28; *see also id.* ¶ 29 ("The Akeos disputed the charges [on] the basis that the goods and services were not provided. The Akeos never told the credit companies that they did not recognize the charges or that the charges were fraudulent."). "Upon information and belief," the Akeos say, "the credit card companies provided copies of the credit card disputes made by the Akeos to Palace Elite or otherwise notified Palace Elite that the Akeos challenged the charges by Palace Elite on the basis that the services were not provided as agreed-upon." *Id.* ¶ 31. And, the Akeos add, "the credit card companies gave Palace Elite an opportunity to respond to the Akeos' claims in the dispute resolution process." *Ibid.*

Here's where things get interesting. "In or around March 2023, Palace [Elite] filed a[n] . . . accusation against [the Akeos] with the public prosecutor" in Mexico (the "Criminal Case"). *Id.* ¶ 37. The Criminal Case accused the Akeos (the Akeos say falsely) of "fraud on the basis that the [Akeos] disputed the credit card charges as 'unrecognized[.]'" *Ibid.* "On March 24, 2024, Mexican authorities issued a warrant for the arrest of the Akeos." *Id.* ¶ 44. Almost a year later, "[o]n March 3, 2025, Interpol published a red notice for the arrest of Paul Akeo at the request of Mexican authorities." *Id.* ¶ 46. Just one day after that, "[o]n March 4, 2025, as the Akeos were passing through Mexican immigration, they were apprehended by Mexico authorities and thrown in jail" pursuant to those warrants. *Id.* ¶ 47. Once the Akeos were detained in a Mexican jail, "[t]he Public Prosecutor publicly repeated" that the "core basis" of the Criminal Case was the allegation that the Akeos had fraudulently "stat[ed] that said charges were unknown," that they were "unaware of the charges," and that the Akeos "noted that these charges were not recognized by the cardholder of the American Express[.]" *Id.* ¶ 48.

"[A] media firestorm in the United States" ensued. *Id.* ¶ 49. "President Donald J. Trump assigned his Special Envoy for Hostage Affairs Adam Boehler to work to obtain the release of the

3

Akeos," and "Congressmember Tom Barrett of Michigan flew down to Cancun to assist with the Akeos' release from Mexico prison[.]" *Id.* ¶ 51.

To effectuate that release, on March 4, 2025, the parties appeared before Judge David Alberto Torres de la Luz of the Courts of Control of the Judicial District of Cancún, Quintana Roo. *See* Transcript of Hearing Entering Reparation Agreement and Dismissing Criminal Charges ("Crim. Tr.") [ECF No. 31-3] at 46–54; *id.* at 38–45 (English Translation).[3] At this hearing, "[a]s a condition" of the Akeos' release and the dismissal of the Criminal Case, the Akeos and Jordens Astrid Lorenzo Rodriguez, on behalf of Palace Elite Resorts, signed two documents: (1) an "Acuerdo Reparatorio Inmediato" (the "Reparation Agreement"), *see* [ECF No. 31-3] at 4–9 (Spanish), *id.* at 21–25 (English), which outlined the terms of the Akeos' release and of the dismissal of their Criminal Case; and (2) a Non-Disparagement Agreement (the "NDA Agreement"), appended as an exhibit to the Reparation Agreement, which contains an arbitration provision, *see id.* at 10–19.[4] At the March 4, 2025, hearing, Judge Torres approved the Reparation Agreement and dismissed the Criminal Case. *See* AC ¶ 54.

At the heart of our case is § 15 of the NDA Agreement, which includes the following arbitration provision:

> All disputes arising out of or in connection with this Agreement shall be finally settled under the Rules of Arbitration of the International Chamber of Commerce by one or more arbitrators appointed in accordance with the said rules. The seat of the arbitration shall be Vancouver, Canada. The language of the arbitration shall be English. Except as maybe required by law, neither a party nor its representatives may disclose the existence, content, or results of any arbitration hereunder without the prior written consent of all parties. No award or order made in the arbitration shall be published.

---

[3] The Plaintiff has properly provided English translations of the relevant Spanish-language documents. Because the Defendants don't challenge the accuracy of these English translations, we'll cite to these.

[4] The Reparation Agreement says that the NDA Agreement is "attached hereto as a **SOLE EXHIBIT**." Reparation Agreement at 23.

> This arbitration agreement shall be governed by the laws of the State of New York, including United States federal law as applied by United States federal courts seated in New York, New York.

NDA Agreement § 15.

On August 15, 2025, our Plaintiffs sued the Defendants in Florida state court, asserting five claims: Defamation (Count I), *see* State Court Complaint [ECF No. 1-1] ¶¶ 60–64; Malicious Prosecution (Count II), *see id.* ¶¶ 65–72; Abuse of Process (Count III), *see id.* ¶¶ 73–77; Intentional Infliction of Emotional Distress (Count IV), *see id.* ¶¶ 78–83; and Duress (Count V), *see id.* ¶¶ 84–94. On August 19, 2025, the Defendants removed this case to federal court under the provisions of 9 U.S.C. § 205 and 28 U.S.C. §§ 1331, 1441, and 1446. *See* Notice of Removal [ECF No. 1] at 2. The Defendants contend that we have subject-matter jurisdiction over this case because "there is a valid arbitration clause that falls under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the 'Convention'), and this Court has original jurisdiction pursuant to 9 U.S.C. §§ 202, 203, and 205 and 28 U.S.C. § 1331." *Ibid.* In the Defendants' view, the arbitration provision in § 15 of the NDA Agreement "arises out of" a relationship between the parties that's "commercial" in nature. On August 21, 2025, the Akeos filed their now-operative Amended Complaint.

On August 29, 2025, the Akeos timely filed a Motion to Remand, arguing that "the Reparation Agreement (including the NDA [Agreement] and its arbitration agreement) did not arise out of a commercial relationship." Mot. at 17. "It arose," the Akeos say, "out of a criminal prosecution where the relationship between the Akeos and Palace Elite was as crime victim." *Ibid.* They therefore ask us to remand the case back to state court.

## THE LAW

"In 1958, the United Nations Economic and Social Council adopted the Convention on the Recognition and Enforcement of Foreign Arbitral Awards." *Cosgun v. Seabourn Cruise Line Ltd. Inc.*, 666 F. Supp. 3d 1270, 1278 (S.D. Fla. 2023) (Altman, J.) (citing the New York Convention, June 10, 1958,

21 U.S.T. 2517, 330 U.N.T.S. 3 (hereinafter the "New York Convention" or the "Convention")). "The New York Convention is a multilateral treaty that addresses international arbitration." *GE Energy Power Conversion Fr. SAS, Corp. v. Outokumpu Stainless USA, LLC*, 590 U.S. 432, 438 (2020) "The Supreme Court has explained that 'the principal purpose' behind the adoption of the Convention 'was to encourage the recognition and enforcement of commercial arbitration agreements in international contracts and to unify the standards by which agreements to arbitrate are observed and arbitral awards are enforced in the signatory countries.'" *Suazo v. NCL (Bah.), Ltd.*, 822 F.3d 543, 545 (11th Cir. 2016) (quoting *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 520 n.15 (1974)).

"In 1970, the United States acceded to the New York Convention, and Congress enacted implementing legislation in Chapter 2 of the [Federal Arbitration Act (the "FAA")]." *GE Energy*, 590 U.S. at 439; *see also* 9 U.S.C. §§ 201–08. "The President and the Senate acceded to the Convention with two limiting declarations." *Cosgun*, 666 F. Supp. 3d at 1279 (citing generally New York Convention). *First*, "[t]he United States of America will apply the Convention, on the basis of reciprocity, to the recognition and enforcement of only those awards made in the territory of another Contracting State." New York Convention. We'll call this the "First Declaration." *Second*, "[t]he United States of America will apply the Convention only to differences arising out of legal relationships, whether contractual or not, which are considered as commercial under the national law of the United States." *Ibid.* As you may have guessed, we'll refer to this as the "Second Declaration."

The Convention "creates obligations only for State Parties and 'does not by itself give rise to domestically enforceable federal law' absent 'implementing legislation passed by Congress.'" *Bond v. United States*, 572 U.S. 844, 850–51 (2014) (quoting *Medellín v. Texas*, 552 U.S. 491, 505, n.2 (2008)); *see also Medellín*, 552 U.S. at 521–22 (citing the New York Convention as an example of a "non-self-executing treat[y]"). Now codified in a federal statute (*i.e.*, the FAA), the Convention is "enforce[able] in United States courts in accordance with [the provisions of Chapter 2]." 9 U.S.C. § 201.

The FAA grants federal district courts "original jurisdiction" over "[a]n action or proceeding *falling under the Convention*," which "shall be deemed to arise under the laws and treaties of the United States." *Id.* § 203 (emphasis added). As a consequence, "[w]here the subject matter of an action or proceeding pending in a State court relates to an arbitration agreement or award falling under the Convention, the defendant . . . may, at any time before the trial thereof, remove such action or proceeding to the district court of the United States[.]" *Id.* § 205.

And the FAA tells us *which* kinds of cases "fall under the Convention"—and thus trigger the original jurisdiction of federal district courts:

> An arbitration agreement or arbitral award arising out of a legal relationship, whether contractual or not, which is considered as commercial, including a transaction, contract, or agreement described in section 2 of this title, falls under the Convention. An agreement or award arising out of such a relationship which is entirely between citizens of the United States shall be deemed not to fall under the Convention unless that relationship involves property located abroad, envisages performance or enforcement abroad, or has some other reasonable relation with one or more foreign states. For the purpose of this section a corporation is a citizen of the United States if it is incorporated or has its principal place of business in the United States.

*Id.* § 202. "In other words, all *commercial* arbitration agreements involving *at least one foreign party* 'fall[ ] under the Convention.'" *Cosgun*, 666 F. Supp. 3d at 1280 (quoting 9 U.S.C. § 202); *see also Fiorentino v. Cantiere Delle Marche*, 744 F. Supp. 3d 1263, 1269 (S.D. Fla. 2024) (Altman, J.) ("An arbitration agreement falls within the jurisdiction of the New York Convention if it: (1) is in writing; (2) involves at least one foreign party; and (3) arises out of a legal relationship, whether contractual or not, which is considered as commercial." (cleaned up)). When an agreement "falls under the Convention," the court "may direct that arbitration be held in accordance with the agreement at any place therein provided for, whether that place is within or without the United States." 9 U.S.C. § 206.

Here, the parties only dispute the Convention's third prong: whether the agreement "arises out of a legal relationship, whether contractual or not, which is considered as commercial." *Fiorentino*, 744 F. Supp. 3d at 1269 (quoting 9 U.S.C. § 202).

**ANALYSIS**

When two parties are engaged in a commercial relationship, which results in allegations of fraud and a criminal prosecution against one of those parties, we think it fair to say that the *prosecution* "arises out of" that commercial relationship. And when the parties resolve their commercial disagreement by signing a contract that includes an arbitration clause, we think it clear that this contract too "arises out of" their commercial relationship. The question here is whether that agreement *likewise* "arises out of" the commercial relationship when it's attached as an exhibit to a separate agreement that purports to resolve the pending criminal prosecution. We think it does.

We'll start with three uncontested—and crucial—points. *First*, the parties have a longstanding commercial relationship. It's undisputed that "[t]he Akeos have entered into six separate membership interest agreements with Palace [Elite] beginning in February 2016" and ending on "November 21, 2021[.]" AC ¶ 13; *see also* Mot. at 21 ("Finally, Palace Elite is likely to argue that the Akeos and Palace Elite had a commercial relationship from 2016 to 2022 through timeshare contracts and Palace Elite's criminal complaint arose out of that relationship. But the fact that a commercial relationship preceded a prosecution for a financial crime is true in every circumstance."). These are all plainly "commercial" contracts—a proposition the Akeos never even try to dispute. *Cf. Rosenblatt v. City of Santa Monica*, 940 F.3d 439, 445 (9th Cir. 2019) (finding that "vacation rentals generally implicate interstate commerce"); *Rowe v. Wyndham Resort Dev. Corp.*, 2021 WL 5911210, at *3 (D.S.C. Aug. 6, 2021) (finding that "timeshare contracts in dispute here affect and fall within the flow of interstate commerce"); *Bedgood v. Wyndham Vacation Resorts, Inc.*, 88 F.4th 1355, 1359 (11th Cir. 2023) (applying the FAA to "purchase agreements with a number of timeshare owners"); *Spirit Airlines, Inc. v. Maizes*, 899 F.3d 1230 (11th Cir. 2018) (applying the FAA to contracts for Spirit Airlines' discount membership club). Indeed, the NDA Agreement—which the Akeos signed—makes clear that "Palace Elite and Christy Akeo and Paul K. Akeo have had a longstanding commercial relationship[.]" NDA Agreement at 10.

8

*Second*, the contracts the parties signed were "private" agreements—as the Akeos themselves repeatedly emphasize in their complaint. *See* AC ¶ 59 ("It was a private contract signed by the Akeos[.]"); *ibid.* ("Palace Resorts told the Akeos that their signature on the private contract between Palace Resorts and the Akeos was an express condition to be free from jail."); *id.* ¶ 60 ("After securing this private agreement in favor of a wealthy and powerful Mexican business, the public prosecutor formally abandoned the criminal proceedings against the Akeos and the charges were dismissed.").

*Third*, the agreements were signed only by "private" parties—the Akeos and Palace Elite. *See* NDA Agreement at 17 (signed by "Christy L. Akeo" on "4/3/25"), 18 (signed by "Paul K. Akeo" on "4/3/25"), and 19 (signed by "Jordens Astrid Lorenzo Rodriguez, Astrid P." on "04/03/2025" for "Palace Elite Resorts, S.A. DE C.V."); Reparation Agreement at 25 (signed by "Paul Kawika Akeo"); *ibid.* (signed by "Christy Lin Akeo"); (signed by "Palace Elite Resorts S.A. DE C.V. Through Its Legal Representative Jordens Astrid Lorenzo Rodriguez").

Given all this, we easily conclude that these agreements "arise out of" the commercial relationship between the parties. The Eleventh Circuit has explained that "the phrase 'arising out of' should be interpreted broadly and encompasses all of the following meanings: originating from, having its origin in, growing out of, flowing from, incident to, or having a connection with." *Eastpointe Condo. I Ass'n, Inc. v. Travelers Cas. & Sur. Co. of Am.*, 379 F. App'x 906, 908 (11th Cir. 2010) (cleaned up); *see also Metz v. United States*, 788 F.2d 1528, 1533 (11th Cir. 1986) ("[T]he phrase 'arising out of' should be broadly construed." (quoting *Kosak v. United States*, 465 U.S. 848, 853, n.9 (1984))). In our view, these agreements unquestionably have their "origin in" and have "a connection" to the parties' longstanding commercial relationship, which had broken down and which these agreements attempted to resolve.

The NDA Agreement, for instance, begins by noting that the parties "have had a long-standing commercial relationship," as evidenced by their many "Membership Agreements," and then proceeds to release both parties from "any and all claims or causes of action arising out of or related to the

assertion or pursuit" of claims that either party "has acted wrongfully in its dealings with" the other and "any and all claims or causes of action arising out of or relating to the Membership Agreements[.]" *Id.* at Preamble. The NDA Agreement thus explicitly grounds itself in the parties' commercial relationship and then sets out to remedy, with commercial releases, the dissolution of that relationship. In doing so, the NDA Agreement includes only standard commercial language and never even references the Criminal Case or says anything about the rights of the Mexican government to prosecute the Akeos for their alleged crimes. *See, e.g.*, NDA Agreement § 2 (listing the "Mutual Covenants Not to Sue"); *id.* § 3 (observing, under the title "Consideration," that the "promises and covenants set forth herein . . . are good, valuable, and sufficient consideration for the promises, covenants, and terms contained herein"); *id.* § 6 (providing that the "Liquidated Damages" are "a sum of $50,000.00 U.S. Dollars per breach"). Finally, as we've highlighted, the NDA Agreement is signed *only* by our private parties—the Akeos and Palace Elite—and not by any governmental entity or anyone acting on behalf of a governmental entity. *See* NDA Agreement at 17 (signed by "Christy L. Akeo" on "4/3/25"), 18 (signed by "Paul K. Akeo" on "4/3/25"), and 19 (signed by "Jordens Astrid Lorenzo Rodriguez, Astrid P." on "04/03/2025" for "Palace Elite Resorts, S.A. DE C.V."). Since the phrase "'arise out of' should be interpreted broadly," we hold that the NDA Agreement "originat[es] from, ha[s] its origin in, grow[s] out of, flow[s] from, [is] incident to, or ha[s] a connection with" the longstanding commercial relationship between the parties. *Eastpointe*, 379 F. App'x at 908.

Resisting this conclusion, the Akeos argue that "the Reparation Agreement (including the NDA Exhibit and its arbitration agreement) didn't arise out of a commercial relationship" because it "arose out of a criminal prosecution where the relationship between the Akeos and Palace Elite was as crime victim." Mot. at 17.[5] At its core, this argument relies on two assumptions—that the NDA

---

[5] The Akeos also claim that, "[a]s a condition to agreeing to drop its false accusations against the Akeos, Palace Resorts coerced the Akeos to affix their signature to an invalid agreement requiring

Agreement isn't a separate contract and that, as a single document, the Reparation Agreement cannot "arise out of" the parties' commercial relationship. *See* Mot. at 20 (arguing that "the Reparation Agreement and its NDA Exhibit are between the same parties, were signed by all parties at the same time, and formed a single writing"); Reply at 8 ("[T]here's no dispute that the agreement was exacted as a condition of the dismissal of criminal charges, based on [ ] Palace [Elite's] role as gatekeeper of a pardon—that is a criminal relationship, not a commercial one."). Both assumptions are mistaken. Starting with the first, the NDA Agreement is plainly a separate contract, signed by both parties who

---

the Akeos to make a payment to Palace Resorts' foundation and to keep what happened secret." AC ¶ 54. But the Akeos cite no case for the proposition that our *jurisdiction* depends on whether they voluntarily entered into the commercial agreement that contains the relevant arbitration provision. And that's probably because *that* question—whether the arbitration clause is valid and enforceable—is downstream of the question we answer today, which is whether we have jurisdiction over this case in the first instance. *See Reddy v. Buttar*, 38 F.4th 393, 399 (4th Cir. 2022) ("[T]he Convention's requirements for an agreement that can give rise to an enforceable award speak to the merits of a plaintiff's enforcement action, whereas § 203 confers subject matter jurisdiction on U.S. district courts over actions 'falling under' the Convention. Focusing on this distinction between merits and jurisdiction, a plaintiff's failure to establish the Convention-specified requirements of an enforceable arbitration agreement or award will raise the *merits* question of whether the plaintiff's claim is valid. But that validity is something to be litigated and determined. It does not go to *the power* of the court to make the determination — its subject matter jurisdiction." (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998))); *Sarhank Grp. v. Oracle Corp.*, 404 F.3d 657, 660 (2d Cir. 2005) (holding that a party's argument that "the district court lacked subject matter jurisdiction in the absence of a signed written arbitration agreement . . . depends entirely upon its view of the merits of the case, and therefore does not involve a lack of subject matter jurisdiction"); *N.L.R.B. v. Loc. Union No. 103, Int'l Ass'n of Bridge, Structural & Ornamental Iron Workers, AFL-CIO*, 434 U.S. 335, 351 (1978) ("That a court has jurisdiction to consider a suit on a particular contract does not suggest that the contract is enforceable."); *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 68 (2010) (considering a contract where the court had subject-matter jurisdiction under the FAA and noting that the "current 'controversy' between the parties is whether the Agreement is unconscionable"). At some point, Palace Elite may file a motion to compel arbitration, to which the Akeos can respond with their coercion contentions. *See Vera v. Cruise Ships Catering & Serv. Int'l, N.V.*, 594 F. App'x 963, 966 (11th Cir. 2014) (explaining that, at the "arbitration-enforcement stage, the only affirmative defense that a reviewing court can accept is a defense that demonstrates the arbitration agreement to be null and void, inoperative, or incapable of performance, under Article II of the Convention. And, as to a 'null and void' challenge, which is essentially what a public policy argument is, such a challenge must be grounded in standard breach-of-contract-type defenses, such as fraud, mistake, duress, and waiver, which defenses can be applied neutrally before international tribunals."); *Moran v. Svete*, 366 F. App'x 624, 627–28 (6th Cir. 2010) ("[Where] an arbitration clause in a contract [ ] is the result of fraud or coercion, arbitration will not be compelled.").

offered each other binding consideration. *See* NDA Agreement § 3 (observing, under the title "Consideration," that the "promises and covenants set forth herein [i.e., in the NDA Agreement] . . . are good, valuable, and sufficient consideration for the promises, covenants, and terms contained herein"); *id.* § 6 (providing that the "Liquidated Damages" are "a sum of $50,000.00 U.S. Dollars per breach"). If the NDA Agreement weren't a separate contract, there (obviously) would have been no need for the parties to separately sign it or to offer each other separate consideration under its terms. And the fact that the NDA Agreement was appended *as an exhibit* to the Reparation Agreement only underscores its separateness. After all, only documents that are separate from the primary contract— whether affidavits, declarations, or other contracts—can be attached as exhibits to it. *Cf. PCL Civ. Constructors, Inc. v. Arch Ins. Co.*, 979 F.3d 1070, 1075 (5th Cir. 2020) ("It is a well established rule of contract law that *separate documents* may be incorporated into a contract by attachment or reference thereto." (emphasis added)); Black's Law Dictionary (12th ed. 2024) (defining "exhibit" as "[a] document attached to and made part of a pleading, motion, contract, or other instrument"). In the end, parties in a commercial relationship are always free to resolve their commercial disputes through NDA agreements and then, if a criminal prosecution is pending, to append those commercial agreements to the criminal agreement that resolves the criminal case. But that act of including the commercial agreement in the criminal case doesn't change the fact that the underlying NDA Agreement "arises out of" a commercial relationship between the parties.

Of course, if the NDA Agreement is a separate contract, then this case is rather straightforward. The Akeos, in fact, never even suggest that the NDA Agreement—with its emphasis on the parties' commercial relationship, its standard commercial language, and its private signatories— doesn't "arise out of" a commercial relationship. They've thus forfeited any such argument. *See United States v. Campbell*, 26 F.4th 860, 873 (11th Cir. 2022) ("[F]ailure to raise an issue in an initial brief . . . should be treated as a forfeiture of the issue, and therefore the issue may be raised by the court *sua*

*sponte* [only] in extraordinary circumstances."); *Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1319 (11th Cir. 2012) ("[T]he failure to make arguments and cite authorities in support of an issue waives it."); *In re Egidi*, 571 F.3d 1156, 1163 (11th Cir. 2009) ("Arguments not properly presented . . . are deemed waived."); *Sappupo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014) ("We have long held that an appellant abandons a claim when he either makes only passing references to it or raises it in a perfunctory manner without supporting arguments and authority.").

But here's the thing: Even if the Reparation Agreement and the NDA Agreement *were* a single document, we *still* think that document would "arise out of" the parties' commercial relationship. As we've said, the Reparation Agreement, which was signed only by our *private* parties, was (in the Akeos' own words) a "private contract between Palace [Elite] and the Akeos[.]" AC ¶ 59. And we'll hold the Akeos to that allegation because "a party is bound by the admissions in his pleadings." *Best Canvas Prod. & Supplies, Inc. v. Ploof Truck Lines, Inc.,* 713 F.2d 618, 621 (11th Cir. 1983); *see also Soo Line R.R.. v. St. Louis Sw. Ry. Co.*, 125 F.3d 481, 483 (7th Cir. 1997) ("The [plaintiff] has fallen victim to the well-settled rule that a party is bound by what it states in its pleadings."). Plus, although the Reparation Agreement (unlike the NDA Agreement) does reference the Criminal Case, it too "arises out of" the parties' commercial relationship. The Reparation Agreement only became necessary, after all, because Palace Elite alleged that the Akeos violated the terms of that commercial relationship. Again, since the phrase "'arise out of' should be interpreted broadly," we conclude that the Reparation Agreement "originat[es] from, ha[s] its origin in, grow[s] out of, flow[s] from, [is] incident to, or ha[s] a connection with" the longstanding commercial relationship between the parties. *Eastpointe*, 379 F. App'x at 908.

The Akeos' reliance on the Ninth Circuit's decision in *Breazeale v. Victim Servs., Inc.*, 878 F.3d 759 (9th Cir. 2017), is misplaced. That case involved "California's bad check diversion program [which] permits district attorney offices throughout the state to defer prosecution of those accused of writing bad checks if the accused satisfies certain criteria established by statute[.]" *Id.* at 761. That

program allowed "district attorneys [to] contract with private parties to administer the program." *Ibid.* The parties in *Breazale* were "individual[ ] [plaintiffs] who [we]re subject to potential prosecution for violations of California's bad check statute" and "a private administrator under the program" who "sent notices to the [p]laintiffs [stating] that[,] to avoid criminal prosecution[,] they could participate in California's Bad Check Diversion Program[.]" *Ibid.* The Ninth Circuit held that, since "[a]n agreement with an entity acting on behalf of a prosecutor is not a private agreement," *id.* at 778, "the agreement was not 'a contract evidencing a transaction involving commerce' under 9 U.S.C. § 2," *id.* at 768. But *Breazale* didn't involve (as our case does) two parties with a long history of commercial dealings who had resolved their commercial dispute through a "private agreement" signed by both sides. It's thus inapposite here.

For all these reasons, we find that the parties' arbitration provision "aris[es] out of a legal relationship . . . which is considered as commercial[.]" 9 U.S.C. § 202. It therefore brings our case within the ambit of the New York Convention, which grants us subject-matter jurisdiction over this action.

\* \* \*

After careful review, therefore, we **ORDER and ADJUDGE** as follows:

1.  The Plaintiff's Motion to Remand [ECF No. 31] is **DENIED**.

2.  The Defendants must move to compel arbitration by **March 30, 2026**.

3.  In the meantime, the Clerk shall **CLOSE** this case.

**DONE AND ORDERED** in the Southern District of Florida on March 23, 2026.

_____
**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:      counsel of record