**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 25-cv-23733-ALTMAN**

PAUL AKEO and CHRISTY AKEO,

      Plaintiffs,

v.

PR GLOBAL RESERVATIONS, LLC,
PALACE ELITE RESORTS S.A. de C.V., *a Mexican corporation,*
JOSE GIBRAN CHAPUR DAJER, CHDB HOLDINGS, S.A. de
C.V., CONTROLADORA IHC, S.A.P.I de C.V., and
OPERADORA PALACE RESORTS JA LTD.

      Defendants.

_____/

## DEFENDANTS' MOTION TO COMPEL ARBITRATION AND STAY

Defendants, PR Global Reservations, LLC, Palace Elite Resorts S.A. de C.V., Jose Gibran Chapur Dajer, CHDB Holdings, S.A. de C.V., Controladora IHC, S.A.P.I de C.V., and Operadora Palace Resorts JA LTD., in accordance with the Court's March 23, 2026 Order denying Plaintiffs' Motion to Remand [ECF No. 48], move for an order pursuant to 9 U.S.C. §§ 3 and 201 (a) compelling Plaintiffs to arbitrate the claims asserted in this action before the International Chamber of Commerce, in accordance with the parties' Mutual Release and Non-Disparagement Agreement,[1] and (b) staying this action pending the outcome of the arbitration.

### I.    INTRODUCTION

In its March 23, 2026 Order this Court held that the parties' arbitration agreement falls within the New York Convention and that the Court has jurisdiction to enforce it. [ECF No. 48 at 14]. What

---

[1]On August 6, 2025, Defendants initiated arbitration proceedings against Plaintiffs before the ICC seeking a declaration that the Mutual Release and NDA is valid and enforceable. The parties have agreed to stay the arbitration proceedings, pending the outcome of this Motion.

remains is straightforward: the Akeos agreed to arbitrate any dispute arising out of the Mutual Release and NDA Agreement with Palace Elite, and nothing on the record permits them to evade that obligation.

The Akeos' opposition rests on a single theory: that they signed the Mutual Release and NDA Agreement under duress while detained in a Mexican prison. To avoid arbitration, the Akeos must clear three independent hurdles. The Akeos fail at the outset and at every step of the analysis.

The first hurdle is threshold and dispositive. The Akeos do not challenge the arbitration clause specifically as being procured through duress — they challenge the agreements as a whole. Under a consistent line of Eleventh Circuit authority, that challenge belongs before the arbitrator, not this Court. The inquiry ends there.

The second hurdle is legal. Even if this Court were to reach the merits, the duress defense fails as a matter of law. Palace Elite filed a lawful criminal complaint and exercised its undisputed right under Mexican law to pardon those charges in exchange for a negotiated resolution. A lawful act cannot constitute duress.

The third hurdle, should the Court need to reach it, is factual, and the record forecloses the Akeos' position entirely. This was not a take-it-or-leave-it ultimatum delivered to unrepresented parties in a prison cell. The Akeos retained experienced Mexican criminal counsel. They received direct assistance from the U.S. Consul, a White House envoy personally dispatched by President Donald Trump, and a sitting Member of Congress who flew to Cancún, negotiated terms on their behalf at the table, and escorted the Akeos home on a private plane. The parties exchanged five drafts over several weeks. The Akeos' counsel deleted the arbitration clause entirely in one draft and negotiated its reinstatement with a different seat of their own choosing — Vancouver, Canada — in the final version. Both Akeos then confirmed to a Mexican judge, under oath, that they had not been coerced

into the agreements. The day after their release, the Akeos performed under the agreement voluntarily. They raised no objection for nearly four months.

That conduct demonstrates the absence of duress and ratification on any analysis. A party who accepts the benefits of a settlement, performs under it, and waits four months to cry foul has no duress defense left. The Akeos agreed to arbitrate. This Court should hold them to that agreement, compel arbitration, and stay this action.

## II.     BACKGROUND

### A.  The Parties' Dispute

Palace Elite Resorts S.A. de C.V. ("Palace Elite") is a Mexican limited liability company (*Sociedad anónima de capital variable*) registered in Yucatán, Mexico. [ECF No. 11 at ¶ 3]. Palace Elite is part of "The Palace Company," a luxury hotel conglomerate dedicated to the promotion of tourism services. As part of The Palace Company, Palace Elite focuses on the sale of vacation club membership rights that grant clients benefits such as acquiring accommodation services at discounted rates at the hotels and resorts belonging to The Palace Company group, along with other exclusive benefits.

Between 2016 and 2021, Plaintiffs' Paul and Christy Akeo entered into nineteen vacation membership agreements with Palace Elite totaling approximately $1.4 million. [ECF No. 40-2 at ¶ 6][2]; *see also* [ECF No. 40-1].  The relationship broke down after the Akeos breached those agreements. [ECF No. 40-2 at ¶ 6]. Palace Elite terminated their memberships, and the Akeos responded by fraudulently disputing over $100,000 in legitimate credit card charges for fees owed to Palace Elite and launching a coordinated social media campaign encouraging other vacation club members to do

---

[2] Defendants rely on the sworn declaration of Manuel Alejandro Urtecho Delgado [ECF No. 40-2], their Mexican counsel who negotiated the NDA Agreement and Pardon Agreement with Plaintiffs. Defendants previously submitted Mr. Urtecho's declaration in support of their Opposition to Plaintiffs' Motion to Remand.

the same. [ECF No. 40-2 at ¶ 6]; *see also* [ECF No. 11 at ¶¶ 20, 28-29, 41-42]; Exhibit A, Declaration of Gibrán Chapur Dájer ("Chapur Decl."), at ¶ 7.[3]

Palace Elite filed a criminal complaint for fraud against the Akeos in Mexico. [ECF No. 40-2 at ¶ 7]; (Chapur Decl. ¶ 6). After a seven-month independent investigation, the prosecutor, who had the discretion to pursue or not pursue criminal charges, determined there was sufficient evidence to formally charge the Akeos for fraud against Palace Elite, and Mexican authorities arrested the Akeos in March 2025 upon entering Cancún. [ECF No. 40-2 at ¶¶ 8-10].

At their initial hearing, the Akeos appeared with private counsel, José Jesús Ricalde Vázquez and Roberto Barnstche. [ECF No. 40-2 at ¶10-11]; *see also* Exhibit B, Declaration of Kevin Ramon Salgado Quiroz ("Salgado Decl."), at ¶ 16.[4] At the outset, the Judge asked whether they wished to contact the U.S. Embassy and recessed the proceedings to allow that communication. (Salgado Decl. ¶ 15). The hearing resumed only after the Akeos had done so. *Id.* The Judge then confirmed that the Akeos understood their rights before proceeding and ordered pretrial detention based on flight risk, noting their lack of ties to Mexico. [ECF No. 40-2 at ¶ 10].

### B.  The Parties Negotiated a Comprehensive Settlement at Arms-Length

After the hearing, the Akeos' attorneys initiated settlement discussions. [ECF No. 40-2 at ¶13]. The parties agreed to resolve their civil disputes through an agreement governed by U.S. law and to address the criminal case through a separate reparation agreement under Mexican law. [ECF Nos. 40-1, 40-4]. Experienced counsel on both sides led the negotiations at every stage. [ECF No. 40-2 at ¶14].

From March 22 through April 3, 2025, the parties' counsel exchanged multiple drafts of what became the Mutual Release and NDA Agreement and the agreement leading to their pardon, the

---

[3] Defendants rely on the sworn declaration of Gibrán Chapur Dájer, which was submitted in the arbitration proceeding in support of their Application for Emergency Measures.

[4] Defendants rely on the sworn declaration of Kevin Ramon Salgado Quiroz, which was submitted in the arbitration proceeding in support of their Application for Emergency Measures.

Reparation Agreement. [ECF No. 40-2 at ¶¶ 13-24, 26]. This was not a take-it-or-leave-it arrangement. Both sides proposed revisions, rejected terms, and secured concessions across every material provision, including releases, non-disparagement obligations, damages, and dispute resolution. *Id.*

The drafts reflect that back-and-forth. Palace Elite's initial proposal included strict non-disparagement obligations and a $1 million liquidated damages provision in the event the Akeos breached the agreement. (Salgado Decl. ¶ 26, C-43). Palace Elite's counsel prepared a revised draft that introduced mutual releases, added confidentiality obligations, reduced the liquidated damages provision to $50,000 per breach plus daily penalties, and included an arbitration clause with the seat of arbitration in Mexico City. (Salgado Decl. ¶ 30, C-45). In the next round, the Akeos' counsel eliminated all mutual release provisions, removed entire sections on confidentiality obligations, rejected the provision requiring mandatory arbitration, deleted all financial penalties, and narrowed the non-disparagement standard. (Salgado Decl. ¶ 30, C-46).

The parties continued negotiating. In the fourth draft, the Akeos' attorneys proposed broader non-disparagement terms, restored the liquidated damages and daily penalties provision, and included mutual covenants not to sue. (Salgado Decl. ¶ 33, C-51). Palace Elite then reinstated mutual releases, modified the non-disparagement terms and added enforcement mechanisms, restored the arbitration provision with the seat of the arbitration as Mexico City, while clarifying governing law and including express language confirming the agreement was not signed under duress. (Salgado Decl. ¶ 33, C-52).

The final agreement, prepared by the Akeos' counsel, reflects a negotiated compromise. [ECF No. 40-2 at ¶ 26]; (Salgado Decl. ¶ 38). It includes mutual releases, covenants not to sue, non-disparagement and confidentiality provisions, a reduced liquidated damages clause, and no admission of wrongdoing by the Akeos. [ECF No. 40-1].

At the heart of this case is § 15 of the Mutual Release and NDA Agreement, which includes the following arbitration provision:

> All disputes arising out of or in connection with this Agreement shall be finally settled under the Rules of Arbitration of the International Chamber of Commerce by one or more arbitrators appointed in accordance with the said rules. The seat of the arbitration shall be Vancouver, Canada. The language of the arbitration shall be English. Except as may be required by law, neither a party nor its representatives may disclose the existence, content, or results of any arbitration hereunder without the prior written consent of all parties. No award or order made in the arbitration shall be published. This arbitration agreement shall be governed by the laws of the State of New York, including United States federal law as applied by United States federal courts seated in New York, New York.

Mutual Release and NDA Agreement § 15 [ECF No. 40-1].

That arbitration provision was itself the product of negotiation. On the morning of April 3, 2023, just hours before the parties entered into the comprehensive settlement agreement, the parties' counsel continued to negotiate the arbitration terms. (Salgado Decl. ¶¶ 32-33).  While the Akeo's counsel agreed to include the arbitration clause, they objected to Mexico as the seat of the arbitration and requested that it be located in the U.S. *Id.* Palace Elite proposed a neutral forum and suggested the United Kingdom. *Id.* The Akeo's counsel countered with Vancouver, Canada, and Palace agreed. *Id.* The final agreement also includes express representations confirming that the parties entered into it voluntarily and with the benefit of counsel. [ECF No. 40-1 at 6]. The Akeos accepted these terms after multiple rounds of revisions. (Salgado Decl. ¶¶ 32-33).

In parallel, the parties negotiated a separate reparation agreement to resolve the criminal case. [ECF No. 40-2 at ¶¶ 23-24]. Initially, Palace Elite demanded millions of dollars as reparation for the damages caused by the Akeo's unpaid membership fees and the cancellation of memberships by participants of the disparaging Facebook group administered by Mrs. Akeo. *Id.*  The Akeos' counsel rejected Palace Elite's request, and negotiated the reparation payment down to $116,587.84, to be paid to a charitable organization. *Id.*

Throughout the entire negotiations and until the signing of the settlement and reparation agreements, the Akeos had unparalleled high-level diplomatic support. [ECF No. 40-2 at ¶¶ 14, 26]; (Chapur Decl. ¶ 23). At the outset, the Akeos were assisted by the U.S. Consul in Mérida, Justen

Thomas. *Id.* Mr. Thomas was promptly informed that the Akeos were detained and received procedural updates directly from the control judge overseeing the case. *Id.* The Akeos were also aided by special White House envoy, Mr. Adam Boher, who directly negotiated with The Palace Company's CEO, Gibrán Chapur on critical aspects of the agreements. *Id.*; (Chapur Decl. ¶¶ 10-12, 15). Additionally, U.S. Congressman from Michigan, Tom Barret, personally traveled to Mexico to advocate on behalf of the Akeos, negotiate for them, and ultimately take them home. [ECF No. 40-2 at ¶¶ 14, 26]; (Chapur Decl. ¶¶ 16-17).

### C.   The Akeos Freely Chose to Execute the Agreement

As negotiations neared completion, on April 2, 2025, Palace Elite asked the Public Prosecutor to request a hearing before the control judge to ask for the Akeos' release from pre-trial detention ahead of finalizing the agreements. [ECF No. 40-2 at ¶ 21]. The public prosecutor made the request, and the control judge scheduled the hearing for the following day, April 3, 2025. *Id.*

At the hearing, the judge recognized that the parties were close to resolving the matter and proposed that they finalize the agreements before proceeding. [ECF No. 40-2 at ¶ 22]. Although the Akeos could have declined the judge's suggestion and presented their case for release and potentially conclude the agreements outside custody, their counsel agreed to a short recess so the parties could complete their negotiations. [ECF No. 40-2 at ¶ 22].

During that recess, U.S. officials urged The Palace Company's CEO to accept a partial reparation payment to resolve the criminal action. [ECF No. 40-2 at ¶ 23]; (Chapur Decl. ¶¶ 18-20). Although this amount was significantly less than what Palace Elite initially demanded, Palace Elite conceded to the request. *Id.* The parties finalized and executed the Mutual Release and NDA Agreement and the related Reparation Agreement resolving the criminal case. *Id.*, at ¶ 24.

When the hearing resumed, the judge confirmed the parties' agreement and specifically inquired whether the Akeos and the representative for Palace Elite were acting without intimidation,

threats, or coercion. *Id.*, at ¶ 25. **<u>Both Akeos individually, verbally, confirmed that they had not acted under duress when they signed the agreements</u>**, as did Palace Elite's representative. (Salgado Decl. ¶¶ 37); *see also* [ECF No. 48, at 4], [ECF No. 31-3 at 51, 43 (English Translation)]. The court then accepted the agreement and dismissed the criminal case. [ECF No. 31-3 at 51-54, 43-45 (English Translation)]

The Akeos did not have to sign the Mutual Release and NDA or Reparation Agreement, they could have allowed the case to continue, gone to trial, and plead their case at the appropriate procedural stage. [ECF No. 40-2 at ¶ 22]; [ECF No. 40-3 at ¶¶ 30, 34-36][5]. Further, the Akeos could have awaited trial outside of pre-trial detention, Palace Elite was in favor of this as evidenced by its request to the prosecutor a day earlier, and Mexican law provides mechanisms, such as conditional release or bail, that allow individuals to remain free pending trial. [ECF No. 40-2 at ¶ 22]

The Akeos did not raise any objections to either agreement at the courthouse or after their release from pre-trial detention. (Salgado Decl. ¶¶ 37-38). Instead, they accepted the benefits of the agreements and then celebrated the resolution publicly with Congressman Barret who escorted the Akeos back to the U.S. on a private plane. (Chapur Decl. ¶ 17).

---

[5] Defendants rely on the sworn declaration of Pablo Hernández-Romo Valencia [ECF No. 40-3] for their summary on Mexican criminal law and procedure. *See generally* Hernández-Romo Decl. Defendants previously submitted Mr. Urtecho's declaration in support of their Opposition to Plaintiffs' Motion to Remand. Mr. Hernández-Romo has 23 years of experience in representing criminal defendants in Mexico, as well as teaching and writing extensively on Mexican criminal law and procedure. *Id.* at ¶¶ 5-6. He has authored over forty books on the topic, including a leading treatise, and he has lectured in law schools across Mexico, Spain, and the United States, including at University of Pennsylvania, Harvard University, and Yale University. *Id.* at ¶ 6. In addition, he has served as an expert on Mexican criminal law and procedure in nine other U.S. cases. *Id.* at ¶ 7. Mr. Hernandez-Romo holds an LL.M. from Northwestern University in Chicago. *Id.* at ¶ 4.

**D.** **The Akeos Accepted the Benefits of, and Performed Under, the Agreements Before Filing Suit**

After executing the Mutual Release and NDA Agreement, the Akeos acted in accordance with its terms. After their release, the media campaign targeting Palace Elite ceased. *See* Exhibit C, Declaration of Vladimir Ortiz García, at ¶¶ 5-6. Only months later did the Akeos reverse course.

On July 22, 2025, nearly four months after execution and performance, the Akeos sent Palace Elite a demand letter threatening litigation in Miami-Dade Circuit Court concerning matters squarely covered by the Mutual Release and NDA Agreement and the Reparation Agreement. (Chapur Decl. ¶ 27); [ECF No. 4-1, at ¶ 27 and Ex. B].

On August 6, 2025, Palace Elite, PR Global Reservations, LLC, CHDB Holding, S.A. de C.V., Controladora IHC, S.A.P.I. de C.V., and José Gibrán Chapur Dájer ("Claimants") initiated arbitration proceedings before the ICC by filing a Request for Arbitration against Plaintiffs seeking a declaration that the Mutual Release and NDA is valid and enforceable. [ECF No. 42 at 14]. Claimants also filed a request for Emergency Measures before the ICC, Plaintiff-Respondents were notified of the Emergency Proceedings on August 15, 2025. [ECF No. 42 at 63]. That same day, Plaintiffs initiate the current litigation proceedings. [ECF No. 1 at 17]. On August 29, 2025, the Emergency Arbitrator granted Claimants (Defendants here) the requested Emergency Relief, finding that the Mutual Release and NDA and its arbitration provision are valid and enforceable. *See* Exhibit D. On September 2, 2025, the parties agreed to stay the arbitration proceedings, pending the outcome of this Motion. [ECF No. 36].

On August 29, 2025, Plaintiffs moved to remand this case to state court for lack of Federal subject matter jurisdiction.  [ECF No. 31]. On March 23, 2026, this Court denied Plaintiffs' Motion to Remand. [ECF No. 48]. This Court rejected Plaintiffs' argument that there was no federal subject-matter jurisdiction, ruling that the agreement to arbitrate in the Mutual Release and NDA falls under

9

the New York Convention, as incorporated under the FAA. The Court's analysis centered on whether the Mutual Release and NDA was "commercial," in nature and concluded, that it was. *Id.* at 14.

### III.    <u>THE RELEVANT LEGAL STANDARD</u>

"The New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "Convention") is incorporated into federal law by the Federal Arbitration Act ("FAA"), which governs the enforcement of arbitration agreements, and arbitral awards made pursuant to such agreements, in federal and state courts." *Northrop and Johnson Yachts-Ships, lnc. v. Royal Van Lent Shipyard B. V.*, 2020 WL 5627263, at *2 (S.D. Fla. June 8, 2020) *aff d* 855 Fed. App'x 468 (l lth Cir. 2021). "The FAA mandates the enforcement of the Convention in United States Courts." *Id.* The Federal Arbitration Act provides that written agreements to arbitrate are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract[.]" *Fiorentino v. Cantiere Delle Marche*, 744 F. Supp. 3d 1263, 1268–69 (S.D. Fla. 2024) (Altman, J.) (quoting 9 U.S.C. § 2).

This provision reflects "both a liberal federal policy favoring arbitration and the fundamental principle that arbitration is a matter of contract." *Jones v. Waffle House, Inc.,* 866 F.3d 1257, 1264 (11th Cir. 2017) (quoting *AT&T Mobility LLC v. Concepcion,* 563 U.S. 333, 339 (2011)); *see also KPMG LLP v. Cocchi*, 565 U.S. 18, 21 (2011) (observing that the FAA reflects an "emphatic federal policy in favor of arbitral dispute resolution").The Supreme Court has made clear that courts do not have discretion to decline enforcement of a valid arbitration agreement but instead are mandated to compel arbitration of claims within the agreement's scope. *KPMG LLP*, 565 U.S. at 22. Courts apply a strong presumption in favor of arbitrability and must enforce the clause unless it is not susceptible to an interpretation covering the dispute. *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 650 (1986).

This Court has already ruled that the parties' arbitration agreement falls "within the ambit of the New York Convention." [ECF No. 48 at 14]. Critically, the Court in that Order explicitly identified

the motion to compel stage as the appropriate procedural time for the Akeos to raise coercion arguments, and it set out the governing standard: **at the arbitration-enforcement stage, the court may refuse to enforce an arbitration agreement only if it is "null and void, inoperative, or incapable of performance."** *Vera v. Cruise Ships Catering & Serv. Int'l, N.V.,* 594 F. App'x 963, 966 (11th Cir. 2014). The Eleventh Circuit construes this exception narrowly to include only standard contract defenses such as fraud, mistake, duress, or waiver that can be applied neutrally on an international scale. *Lindo v. NCL (Bahamas), Ltd.,* 652 F.3d 1257, 1272 (11th Cir. 2011); *Escobar v. Celebration Cruise Operator, Inc.*, 805 F.3d 1279, 1286 (11th Cir. 2015); *Fiorentino*, 744 F. Supp. 3d at 1277.

The party opposing arbitration bears the burden of proving such a defense applies. *Green Tree Fin. Corp.-Alabama v. Randolph,* 531 U.S. 79, 91 (2000); *VVG Real Estate Investments v. Underwriters at Lloyd's, London*, 317 F. Supp. 3d 1199, 1204 (S.D. Fla. 2018). That burden is substantial and comparable to summary judgment. *VVG Real Estate Investments*, 317 F. Supp. 3d at 1204; *De Gracia v. Royal Caribbean Cruises Ltd.*, 580 F. Supp. 3d 1217, 1221 (S.D. Fla. 2022). Any doubts concerning arbitrability must be resolved in favor of arbitration. *Id.* Accordingly, unless the Akeos can meet their heavy burden to prove a narrowly construed defense, the Court must enforce the arbitration agreement and compel arbitration.

IV.     **ARGUMENT**

A.     **The Validity of the Parties' Agreement Must Be Determined by the Arbitrator**

The Akeos cannot avoid arbitration because they attack the agreements as a whole, not the arbitration clause specifically. That ends the inquiry.

It is well-settled that a party cannot avoid arbitration by attacking the contract generally; it must specifically challenge the arbitration clause. *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 70–71 (2010); *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 445–46 (2006). When a party fails to do so, the court must enforce the arbitration agreement and leave any broader validity arguments to the

11

arbitrator. The Eleventh Circuit applies this rule consistently. Claims of duress, fraud, mistake, or waiver directed at the contract as a whole belong in arbitration. *Coleman v. Prudential Bache Sec., Inc.*, 802 F.2d 1350, 1352 (11th Cir. 1986); *Miccosukee Tribe of Indians v. Cypress*, 814 F.3d 1202, 1208 (11th Cir. 2015).

Here, Plaintiffs' duress allegations are directed to the contract as a whole rather than the arbitration provision itself. See [ECF No. 11, at ¶ 54] ("After being jailed for 30 days in Mexico maximum security prison, the Akeos were released after dismissal of criminal charges. As a condition to agreeing to drop its false accusations against the Akeos, Palace Resorts coerced the Akeos to affix their signature to an invalid agreement requiring the Akeos to make a payment to Palace Resorts' foundation and to keep what happened secret. The agreement is clearly invalid, as it was entered into by the Akeos - American citizens in maximum security prison in a foreign country whose native language is not English who were induced to sign this agreement to procure their freedom - under clear textbook duress."); [ECF No. 11, at ¶ 58] ("This agreement between the Akeos and Palace Resorts was not a plea agreement, admission of guilt, or any plea for mercy. The Akeos expressly maintained their innocence in the agreement. The Akeos signed the agreement under duress to escape prison and criminal prosecution."); see also [ECF No. 11, at ¶¶ 59, 95] (alleging duress in signing the agreement without specifically challenging the arbitration clause).

Plaintiffs' motion for remand advances the same theory. See [ECF No. 31, at 11]. The Akeos do not allege in their Complaint that the arbitration provision itself was separately induced by duress or otherwise invalid. That omission is fatal. Because the Akeos' allegations target the agreements as a whole, their challenge must be decided by the arbitrator, not this Court. *Globecast N. Am. Inc. v. Eagle Broadband, Inc.*, No. 06-21721-CIV, 2006 WL 8432678, at *2 (S.D. Fla. Aug. 23, 2006).

Moreover, parties' incorporation of the Rules of Arbitration ("ICC Rules") in § 15 of the Mutual Release and NDA Agreement independently delegate arbitrability questions to the arbitrator.

*See*, *e.g.*, ICC Rules, Arts. 6(3) ("[I]f any party raises one or more pleas concerning the existence, validity or scope of the arbitration agreement . . . the arbitration shall proceed and any question of jurisdiction or of whether the claims may be determined together in that arbitration shall be decided directly by the arbitral tribunal"); 6(4) ("In all cases referred to the [International Court of Arbitration] under Article 6(3), the [International Court of Arbitration] shall decide whether and to what extent the arbitration shall proceed.").[6] Under *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63 (2019), when parties incorporate institutional arbitration rules that assign jurisdictional questions to the arbitrator, courts must honor that delegation without independently evaluating whether the claim is arbitrable, even if the court believes the argument for arbitration is "wholly groundless." *Id.* at 68–70.

By agreeing to ICC Rules, the Akeos delegated all threshold arbitrability questions, including whether a valid agreement exists, to the arbitrator. *Glob. Gold Min., LLC v. Robinson*, 533 F. Supp. 2d 442, 444 (S.D.N.Y. 2008); *Path Wireless, LLC v. Nokia of Am. Corp*, No. 3:20-CV-392-J-34JRK, 2020 WL 5821377, at *5 (M.D. Fla. Sept. 1, 2020); *Shaw Group Inc. v. Triplefine Intern. Corp.*, 322 F.3d 115, 124-125 (2d Cir. 2003). The Court should enforce that delegation.

Accordingly, the Court should enforce the arbitration clause and compel arbitration, leaving any challenge to the validity of the agreements to the arbitrator. *Polvent v. Glob. Fine Arts, Inc.*, No. 14-21569-CIV, 2014 WL 4672442, at *3 (S.D. Fla. Sept. 18, 2014).

###### B.   The Akeos' Duress Defense Fails

Even if the Akeos had directed their challenge to the arbitration clause rather than the agreement as a whole, their duress defense still fails as a matter of law.

---

[6] The ICC Rules may be accessed at: https://iccwbo.org/dispute-resolution/dispute-resolution-services/arbitration/rules-procedure/2021-arbitration-rules/

### 1.  Governing Law

The Eleventh Circuit "repeatedly has emphasized that 'state law generally governs whether an enforceable contract or agreement to arbitrate exists.'" *Bazemore v. Jefferson Capital Sys., LLC*, 827 F.3d 1325, 1329 (11th Cir. 2016) (citations omitted).  Federal courts "enforce choice-of-law provisions unless the law of the chosen forum contravenes strong public policy." *Interface Kanner, LLC v. JPMorgan Chase Bank, N.A.*, 704 F.3d 927, 932 (11th Cir. 2013); *see also MDS (Canada), Inc. v. Rad Source Techs.*, 822 F. Supp. 2d 1263, 1295 (S.D. Fla. 2011) ("Under Florida's choice-of-law rules, courts should respect a choice-of-law provision within a contract, unless the chosen law contravenes Florida public policy.").

Here, Section 15 of the Mutual Release and NDA Agreement provides that the arbitration agreement "shall be governed by the laws of the State of New York." New York law therefore governs the duress analysis. Mutual Release and NDA at 7 [ECF No. 40-1]. Under New York law, duress requires proof of a wrongful threat that deprives a party of free will and forces agreement. *Heinemann v. Heinemann*, 189 A.D.3d 1553, 1554 (2d Dep't 2020); *United States v. Twenty Miljam-350 IED Jammers*, 669 F.3d 78, 89 (2d Cir. 2011) (explaining that duress requires showing that acceptance of the contract terms was involuntary "because the circumstances permitted no other alternative"). The party asserting duress must show that threats of an unlawful act compelled that party to perform an act that he or she had a legal right to refuse. *Id.* A lawful act cannot satisfy that standard.  *United States v. Twenty Miljam-350 IED Jammers*, 669 F.3d at 91.

### 2.  Palace Elite's Conduct Was Entirely Lawful

The Akeos' duress theory rests on their claim that they signed the Mutual Release and NDA Agreement and the Reparation Agreement in exchange for their release. Plaintiffs contend that they were "induced to sign this agreement to procure their freedom" [ECF No. 11, at ¶ 51] and that Defendants threatened to maintain criminal prosecution if they did not. [ECF No. 11, at ¶¶ 88, 92].

14

However, exercising a legal right does not constitute duress. *Bachorik v. Allied Control Co.*, 34 AD2d 940 (1st Dept. 1970) ("A threat to do that which one has the legal right to do does not constitute duress."); *Aish Hatorah New York, Inc. v. Fetman*, 45 Misc. 3d 1203(A), 998 N.Y.S.2d 305 (N.Y. Sup. 2014) (same); *Lewis v. Wayne Cnty. Prosecutor's Off.*, 2016 WL 1670640, at *4 (Mich. Ct. App. Apr. 26, 2016) (quoting *Hackley v. Headley*, 45 Mich. 569, 576; 8 NW 511 (1881) ("[I]t is not duress for a party to threaten to do what he or she has a lawful right to do.").

A party does not commit duress by threatening to do what it has the legal right to do. *Bachorik*, 34 A.D.2d at 942; *Fetman*, 998 N.Y.S.2d 305. Mexican law expressly permits a victim's pardon to extinguish criminal liability at the victim's discretion. [ECF No. 40-3 at ¶ 38]. Conditioning that pardon on a restitution payment and on a negotiated settlement is not duress; it is the lawful exercise of a legal right. There is a strong public policy reason to hold this line: if lawful criminal prosecutions followed by negotiated private settlements could constitute duress sufficient to void an arbitration clause, it would destabilize every negotiated resolution of parallel civil and criminal disputes. Defendants lawfully exercised their prosecutorial rights under Mexican law to file a criminal complaint based on the Akeos' fraudulent chargebacks. [ECF No. 40-3 at ¶ 30]. Importantly, it was the public prosecutor, not Palace Elite, who decided to bring charges after an independent investigation and presented those charges to the court. *Id.* at ¶¶ 25, 30-31.

Moreover, Plaintiffs retained meaningful choices. They could have joined in Palace Elite's request and sought pretrial release to continue negotiating the agreements. The Akeos could also have declined to sign the agreements and opted to continue with the legal proceedings and pursue civil remedies against Palace Elite. They chose neither and instead elected to finalize negotiating the agreements and then voluntarily signed them. Although Plaintiffs may have faced a difficult decision, difficult choices alone do not establish duress. *See In re Centric Brands, Inc.*, 639 B.R. 34, 48–49 (Bankr. S.D.N.Y. 2022) (quoting *Joseph v. Chase Manhattan Bank,* N.A., 751 F. Supp. 31, 34 (E.D.N.Y. 1990)).

15

### 3.   The Record Independently Forecloses Corruption and Coercion

Plaintiffs have not presented a single piece of evidence to support their allegations that the Mexican legal proceedings against them were corrupted.  They instead rely on innuendo and broad characterizations about the Mexican legal system, calling it "notoriously corrupt." [ECF No. 11, at ¶ 12]. That is far from enough.  At this stage, Plaintiffs must put forth evidence akin to that offered on summary judgment to support their affirmative defense. *De Gracia*, 580 F. Supp. 3d at 1221.  None of the sworn declarations they presented in support of their motion to remand—including the Plaintiffs'—comes close to proving any impropriety with the Mexican criminal action, let alone that it was infected with corruption.

The record evidences a routine criminal proceeding, not corruption or coercion. The Mexican criminal process afforded the same core due process protections recognized under U.S. law, including the presumption of innocence, the right to counsel, and the right to present evidence.  [ECF No. 40-3 at ¶¶ 18, 20]. The Akeos were represented by counsel, and were permitted to communicate with the U.S. Embassy; their pretrial detention was based on flight risk, not coercion.  [ECF No. 40-3 at ¶ 51].

After evaluating the evidence, the Mexican court found probable cause to believe that the Akeos had committed fraud. [ECF No. 40-2 at ¶ 10]; [ECF No. 40-3 at ¶¶ 31-32]. The Akeos retained the right to challenge those rulings, pursue appeals, and proceed to trial. *See* [ECF No. 40-3 at ¶ 35]. They did not. Instead, they elected to engage in extensive negotiations to resolve the dispute.  That choice defeats any claim of coercion.

### 4.   Represented Parties with Diplomatic Support Cannot Claim Duress

The Akeos negotiated with continuous advice and assistance from experienced counsel and received extraordinary diplomatic support. They were represented by private Mexican counsel and assisted by U.S. government officials, including the U.S. Consul General, a White House envoy, and a Member of Congress, who actively negotiated terms and secured concessions in their favor. [ECF

No. 40-2 at ¶¶ 14, 26]. Under these circumstances, the Akeos claim of duress cannot stand. *In re Stamell*, 252 B.R. 8, 20 (Bankr. E.D.N.Y. 2000) (noting where party claiming duress had access to independent counsel makes it difficult to demonstrate duress).

The negotiations themselves confirm that the Akeos exercised free will and independent judgment. The parties exchanged multiple drafts, debated key terms, and restructured the agreements through counterproposals. [ECF No. 40-2 at ¶¶ 16-26]; (Salgado Decl., at ¶¶ 22-36, 38). The Akeos' side secured material concessions, including a substantial reduction in the payment amount and revisions to the structure of the agreements. [ECF No. 40-2 at ¶¶ 19, 23]. Most telling, the Akeos' counsel drafted the final agreement that the parties executed and which the court approved. [ECF No. 40-2 at ¶ 26].

### 5.   **The Agreement's Express Anti-Duress Representations Control**

Further fatal to their duress argument are the representations made by the Akeos in the Mutual Release and NDA Agreement.  The agreement includes an express representation that each party acted voluntarily, without duress, and with the benefit of counsel. Specifically, Section 9 states:

> Each signatory to this Agreement represents and warrants that they are of appropriate legal, physical, and mental capacity, **are not under duress or undue influence**, has read this Agreement thoroughly and had an opportunity to have this Agreement fully explained by independent counsel and other advisor(s) of their choosing, and are legally authorized to execute this Agreement. In entering into the Agreement, each party to this Agreement relies wholly upon their own judgment, belief, and knowledge of their respective obligations related to the terms, considerations, covenants, and promises contained herein, and does not rely upon any statement or representation of any other party or any other party's representatives.

Mutual Release and NDA Agreement § 9 [ECF No. 40-1] (emphasis added).

Courts routinely credit and enforce such acknowledgments. *J.M. v. G.V.*, 225 N.Y.S.3d 859, 875 (N.Y. Sup. Ct. 2025) ("defendant's allegations that he signed the agreement while under duress is further rebutted by the recitation to the contrary"). This representation carries particular weight here: the parties negotiated multiple drafts, the Akeos had counsel and diplomatic assistance throughout

the negotiations and proceedings, and both Akeos confirmed to the judge that they were not acting under duress when they signed the agreement. [ECF No. 40-2 at ¶ 25]; [ECF No. 31-3 at 51, 43 (English Translation)].

###### C.   The Akeos Ratified the Agreement and Are Estopped from Claiming Duress

Even if the Court were to credit the Akeos' duress defense, it would not save them from arbitration. The Akeos ratified the agreements, including the arbitration provision, and cannot disavow them now with a claim of duress.

"A party may ratify a contract or release entered into under duress by 'intentionally accepting benefits under the contract,' by 'remaining silent or acquiescing in the contract for a period of time after he has the opportunity to avoid it,' or by 'acting upon it, performing under it, or affirmatively acknowledging it.'" *VKK Corp. v. National Football League*, 244 F.3d 114, 123 (2d Cir. 2001) (applying New York law). A party's failure to repudiate within a reasonable time after the duress ends is itself ratification. *Id.* Once a party ratifies an agreement, it cannot later avoid it on grounds of duress.

The Akeos did exactly that. They executed the agreements on April 3, 2025. They performed by removing disparaging content and ceasing the media campaign the agreements prohibited. Palace Elite performed under the agreements and did everything it was required to do.  Plaintiffs did not object, rescind, or repudiate the agreements at the time of execution or upon their release. Instead, they remained silent, accepted the benefits of the agreements, and acted in accordance with the agreements' terms.

Only on July 22, 2025, nearly four months **after** execution and performance, did the Akeos send a demand letter attempting to disavow the agreements. [ECF No. 4-1, at ¶ 27 and Ex. B]. That delay is dispositive. *See JEDA Capital-56, LLC v. Vill. of Potsdam, New York*, 661 Fed. Appx. 20, 23 (2d Cir. 2016); *United States v. Twenty Miljam-350 IED Jammers*, 669 F.3d at 91 (finding ratification where party did not attempt to repudiate until four months after signing). A party cannot accept the benefits

of a settlement, perform under it, and then seek to avoid its obligations when it becomes convenient. At a minimum, the Akeos' conduct independently bars their duress defense and requires enforcement of the arbitration provision. Having ratified the agreements, they are equitably estopped from denying their validity.

### D.   This Action Should Be Stayed Pending Resolution of Arbitration

Because this Court should compel the entire case to arbitration, it should stay proceedings pending completion of arbitration. Section 3 of the FAA provides that a court "shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement." 9 U.S.C. § 3.

As the Supreme Court recently held in *Smith v. Spizzirri*, "when a district court finds that a lawsuit involves an arbitrable dispute, and a party requests a stay pending arbitration, § 3 of the FAA compels the court to stay the proceeding." 601 U.S. 472, 478 (2024). Section 3 "overrides any discretion a district court might otherwise have had to dismiss a suit when the parties have agreed to arbitration." *Id.* at 477.

Accordingly, Defendants respectfully request that this Court stay this action pending resolution of arbitration. *See Sanchez v. Adverit Int'l LLC*, No. 25-CV-21144, 2025 WL 2171607, at *4 (S.D. Fla. July 31, 2025) (Altman, J.) (staying case pending resolution of arbitration); *Pro. Consulting Servs. S.A.S. v. Inmigracion Pro, LLC*, No. 23-CV-22055, 2024 WL 4103919, at *9 (S.D. Fla. Sept. 6, 2024) (Altman, J.) (same).

### V.   CONCLUSION

The Akeos agreed to arbitrate. This Court has already determined that their agreement falls under the New York Convention. Their challenge, directed at the agreements as a whole rather than the arbitration clause, belongs before the arbitrator. And on the merits, the record shows a freely negotiated, fully performed, and voluntarily executed settlement agreement, not coercion. For all of

19

the foregoing reasons, Defendants respectfully request that the Court compel arbitration and stay this action pending the arbitration.

## REQUEST FOR HEARING

Pursuant to S.D. Fla. Local Rule 7.1(b)(2), Defendants respectfully request a hearing on this Motion. This Motion presents a narrow but dispositive issue: whether Plaintiffs can avoid a negotiated arbitration agreement based on a claim of duress, even though they were represented by counsel, negotiated multiple drafts including the arbitration provision itself, and confirmed to a judge that they acted voluntarily.

A brief hearing will allow the Court to focus on that issue, address the threshold arbitrability questions the Court must decide, and test Plaintiffs' duress theory against the actual record. It will also allow the Court to ask targeted questions on the specific issues raised, which Defendants submit will assist in efficiently resolving whether any basis exists to avoid arbitration.

Given the Court's prior ruling that the agreement falls under the New York Convention, these issues will determine whether this case proceeds here or in arbitration. Defendants estimate that one hour will be sufficient.

DATE: March 30, 2026                                        Respectfully submitted,

**QUINN EMANUEL URQUHART &**          **MARK FERRER & HAYDEN**
**SULLIVAN LLP**                                       80 S.W. 8th Street, Suite 1999
2601 S. Bayshore Drive                                 Miami, Florida 33130
Miami, Florida 33133                                    Telephone: (305) 374-0440
305-402-4880
                                                                        By: *s/ Jose M. Ferrer*
By: */s/ David M. Orta*                                Jose M. Ferrer, Esq.
David M. Orta                                               Florida Bar No. 173746
FL Bar Number 35750                                   Desiree Fernandez, Esq.
davidorta@quinnemanuel.com               Florida Bar No. 119518
                                                                        jose@mfh.law
*Co-counsel for Defendants*                        desiree@mfh.law
                                                                        eservice@mfh.law

                                                                        *Co-counsel for Defendants*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of this document was served via the

CM/ECF portal on this 30th day of March 2026 upon all individuals listed on the service list below.

Peter Kaufman (Bar No. 548421)
pkaufman@panish.law
Jesse Creed (pro hac vice pending)
jcreed@panish.law
Hunter Norton (pro hac vice pending)
hnorton@panish.law
PANISH I SHEA I RAVIPUDI LLP
11111 Santa Monica Boulevard, Suite 700
Los Angeles, California 90025
310.477.1700

*/s/ Jose M. Ferrer*
Jose M. Ferrer