**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Case No.: 1:25-cv-23733-ALTMAN (civil)**

**Jury Trial Demanded**

PAUL AKEO and CHRISTY AKEO,

Plaintiffs,

v.

PALACE ELITE RESORTS S.A. de C.V. et al.,

Defendants.

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO COMPEL**
**ARBITRATION AND STAY**

## INTRODUCTION

Christy and Paul Akeo left for a Cancún anticipating a beach vacation. Instead, they spent a month in a Mexican maximum-security prison, held hostage by a timeshare company, Palace Elite. It took the White House, the State Department, a hostage envoy, and a sitting congressman to bring them home—and even then, Palace would not let them leave until they signed a nondisparagement agreement, complete with an arbitration clause requiring confidential arbitration in Canada. The defendants now argue that that arbitration clause—extracted on pain of imprisonment and prosecution in a foreign country—prohibits the Akeos from holding those responsible for their horrific ordeal accountable in court. But an arbitration "agreement" coerced under such circumstances is no agreement at all. This Court should deny the defendants' motion.

## FACTUAL BACKGROUND

On March 4, 2025, Christy and Paul Akeo landed in the Cancún airport, anticipating a relaxing vacation. C.Akeo Decl. ¶¶ 14–15. Instead, after being held for hours at immigration, the Akeos were ambushed by armed police officers who arrested them in front of dozens of waiting press. *Id.* ¶¶ 15–18.  From there, the couple was transferred by armed guard to a police station and then a maximum-security prison, where they'd be held for the next month. *Id.* ¶ 21. No one told the couple why they were being arrested. The only hint they got was a single, curt response to their pleas for information: "You know, Palace." *Id.* ¶ 17.

**1.** The Akeos did know Palace. It's a timeshare company, where the couple had been "wholesale members" for years. *Id.* ¶ 2. A wholesale membership was essentially a business: Palace members paid Palace a down payment and a monthly fee. *Id.* ¶ 3. In exchange, Palace gave them the ability to book reservations at the resort at a preferred rate. *Id.* If a Palace member referred a person to Palace to book reservations, they could do so at the member's preferred rate. *Id.* And, when members referred others, Palace gave the member "bonus weeks"—additional free weeks at Palace. *Id.* Wholesale members could then sell these "bonus weeks" to defray the cost of the membership. *Id.* Palace was well aware that the Akeos were running this business. *Id.* ¶¶ 6–8. Palace encouraged it: It was the only way the Akeos could afford the membership. *Id.* ¶¶ 5–6. And when the Akeos sold their "bonus weeks" to others, Palace booked the reservations. *Id.* ¶ 8. The Akeos were in daily contact with Palace about their bookings. *Id.* ¶¶ 7–8.

But the Akeos' business was too successful. *Id.* ¶ 9. They were referring so many people to Palace that they were earning more "bonus weeks" than Palace wanted to give. *Id.* Palace decided to cut them off. *Id.* But the company wanted to keep their payments. So it came up with a scheme: It

told the Akeos that referring others to Palace and then selling the "bonus weeks" they'd earned—exactly Palace had encouraged them to do—was a breach of contract. *Id.* If the Akeos didn't agree to give up all of the bonus weeks they had earned, it would cancel their outstanding reservations. *Id.* The Akeos didn't have much choice: They signed a contract agreeing to give up their bonus weeks in exchange for Palace promising to do what it should have done anyway—honor its bookings. *Id.*

But the company reneged on that promise too, cancelling all of their reservations. *Id.* ¶ 10. This left the Akeos on the hook to refund the money their customers had paid. *Id.* With Christy retired and Paul, working for the Michigan State Police, the couple depended on the income from their wholesale business. *Id.* After Palace's breach, the Akeos had no choice but to declare bankruptcy. *Id.*

Working with an attorney, the Akeos tried to get Palace to issue a refund for the bookings it canceled. *Id.* ¶ 11. But Palace ignored their inquiries. *Id.* So the couple disputed the charges with their credit card companies, on the ground that they'd paid for services—reservations—they had not received. *Id.* After an investigation, in which the credit card companies heard from both the Akeos and Palace, every company agreed with the Akeos and refunded the charges. *Id.*

In the meantime, Christy came across a private Facebook group for Palace members who had been scammed or misled. *Id.* ¶ 13. Christy was not alone: The group had thousands of members. *Id.* Christy became an active poster, trying to help those, who, like her, had been taken advantage of by Palace. *Id.* She shared that, after Palace had breached its agreement to honor the Akeos' outstanding reservations, she and Paul had successfully disputed the charges underlying those reservations. *Id.* But she emphasized that they were only successful because Palace had, in fact, breached its agreement to provide bookings—she did not suggest that anyone fraudulently dispute their payments for services they'd actually received. *Id.*[1]

**2.** Unbeknownst to the Akeos, Palace had filed a criminal complaint against them in Quintana Roo, Mexico—where Palace is a wealthy and powerful player. C.Akeo Decl. Ex. 5. The complaint alleged that the Akeos had committed fraud against it. *See id.* at 2. But the allegations did not read like an ordinary fraud complaint. Palace alleged that the Akeos had breached their timeshare contract by reselling vacation bookings. *See id.* at 3. And it complained that American Express had refunded the charges paid by the Akeos in support of reservations Palace had canceled. *Id.* at 9–10. Mexican criminal

---

[1] Palace would also hold credit cards as "collateral" and charge them without authorization. C.Akeo Decl. ¶ 13. To stop the unauthorized charges, Christy suggested that members might be able to report their credit cards as lost or stolen because Palace had taken them without permission. *Id.* Again, she never suggested that members take benefits from Palace without paying; she tried to help members whom Palace was unlawfully charging. *Id.*

defense lawyers would later tell the Akeos that the complaint came nowhere close to alleging fraud. Lemke Decl. ¶ 17.

Palace never told the Akeos about this complaint. C.Akeo Decl. ¶ 14; P. Akeo Decl. ¶ 2. Nor did it tell them that it had gotten the prosecutors in Quintana Roo to procure an arrest warrant. *Id.* Instead, the day before the Akeos flew to Mexico, the prosecutors got an Interpol Red Notice, just in time to arrest the Akeos at the airport without them receiving advance notice, so they could contest the charges from the U.S. P.Akeo Decl. ¶ 2.

Following their arrest, the Akeos were put in maximum-security prison. C.Akeo Decl. ¶ 21; P.Akeo Decl. ¶ 5. They were terrified. C.Akeo Decl. ¶ 21; P.Akeo Decl. ¶ 5. They were separated and consigned to overcrowded cells and housed with people accused of violent crimes—a particularly dangerous situation should anyone find out that Paul works for the police. C.Akeo Decl. ¶¶ 21, 28; P.Akeo Decl. ¶¶ 6, 8.  On the first night, the guards pepper sprayed Paul's cell and then laughed as the inmates suffered. P.Akeo Decl. ¶ 7.  That night, Paul dug dry wall screws out of the wall to use as a weapon just in case. *Id.* The guards told Christy she need to be careful. C.Akeo Decl. ¶ 28.

When Paul and Christy first arrived, they were placed in holding cells that had concrete slabs for beds. C.Akeo Decl. ¶ 22; P.Akeo Decl. ¶ 6. And in Paul's cell, there were far more people than slabs, so they had to sleep on the floor. P.Akeo Decl. ¶ 6. When Christy asked for at least a blanket, she got what appeared to be a dirty shower curtain. C.Akeo Decl. ¶ 22. The cells didn't have functioning toilets. C.Akeo Decl. ¶ 22; P.Akeo Decl. ¶ 6. Christy's cell was cockroach-infested, and the sink was full of toilet paper with feces on it.  C.Akeo Dec. ¶ 22. The Akeos had little contact with the outside world. C.Akeo Decl. ¶¶ 31–32. Christy wasn't able to call her children for days, Paul for weeks. C.Akeo Decl. ¶ 31; P.Akeo Decl. ¶ 11. And though Christy eventually was able to make short calls, they were severely limited. C.Akeo Decl. ¶ 31. Although the couple listed their medications during intake, Paul was initially denied access to necessary heart medication. P.Akeo Decl. ¶ 10. And although, or perhaps because, Christy told the prison she had a severe seafood allergy, it confiscated her EpiPen and repeatedly served her fish—a meal it never served anyone else. C.Akeo ¶¶ 29–30 (explaining that, scared to eat what the guards were serving her, Christy eventually lost 25 pounds).

In case the Akeos were unclear why they were there, the guards brought Christy an unexpected delivery: Palace hotel slippers. C.Akeo ¶ 25.

**3.** Upon hearing that their parents had been arrested, the Akeos' children, Michael (Mike) Lemke and Lindsey Hull, immediately started working to try to get them released. Lemke Decl. ¶ 4. First, they scrambled to find their parents legal representation in time for an initial hearing the day

3

after their arrest. *Id.* ¶¶ 4–6. With only 45 minutes to spare, they finally found Mexican defense attorneys willing to represent their parents. *Id.* ¶ 7. Mike hired them even though they'd barely spoken, and he had no time to vet them. *Id.* With the hearing fast approaching, he had little choice. *Id.*

At that initial hearing, the lawyers Mike hired sent stand-ins because they could not make it in time. *Id.* ¶ 8. So the Akeos were represented by lawyers they'd never met before, with no preparation, in a proceeding that was in a language they didn't speak. *Id.*; C.Akeo ¶ 39. At the hearing, a Palace representative told the couple that if they had just taken down the Facebook group, this never would have happened. C.Akeo Decl. ¶ 41. The attorney then said the company would be willing to drop its criminal complaint in exchange for a "settlement." P.Akeo Decl. ¶ 13; *see* ECF 52-2 ¶ 19.

During the first week of the Akeos' detention, that was a constant refrain: The case agent at the U.S. Consulate repeatedly told the Akeos' son that Palace wanted to make a deal. Lemke Decl. ¶¶ 6, 11. Palace reached out directly to the Akeos' criminal defense attorneys to discuss settlement. *Id.* ¶ 13. And those attorneys learned from close contacts in the prosecutors' office that the office was under instruction from Palace to prosecute aggressively. *Id.* ¶ 12.

But the lawyers advised the Akeos not to give in to Palace's "blackmail and extortion," at least not yet. *Id.* ¶ 17. In their view, the fraud allegation was obviously false, and the "evidence" did not meet the legal requirements for a fraud claim to be pursued. *Id.* And the prosecutor's office had not adhered to the proper legal protocol in filing the warrant. *Id.* The lawyers advised the Akeos to assume that the prosecutors' office had been bought off. *Id.* But, they said, they were not sure about the judge. *Id.* They urged the family to wait until the next hearing—on March 10, 2025—because absent corruption, the case should be dismissed. *Id.*

That didn't happen. Instead, not only did the court decline to dismiss the case, but it held that the next hearing would not be for at least six months, and the Akeos were to be detained in the meantime. *Id.* ¶ 18. The Akeos were devastated. C.Akeo Decl. ¶ 47. The criminal defense attorneys told them that the hearing made clear that the judge had been bribed by Palace—a practice not uncommon in Quintana Roo. Lemke Decl. ¶¶ 16, 18; C.Akeo Decl. ¶ 48; ECF 31–3, at 7. And if they wanted to get out, they'd have to agree to a settlement. Lemke Decl. ¶ 18; C.Akeo Decl. ¶ 48. The CEO of Palace has now admitted that ███████████████████████████████ ███████████████████████████████████████████████ ████████ ECF 52-1 ¶ 9; *see also* Romero Decl. ¶ 10 (explaining this is improper under Mexican law).

**4.** Faced with the prospect of indefinite detention, the Akeos decided they had no choice but to bargain with Palace for their release. C.Akeo Decl. ¶ 48. But the company refused to even negotiate

until Christy had taken down the Facebook group for dissatisfied Palace members. Lemke Decl. ¶ 25. It wasn't her group, though, so the Akeos' children reached out to its owner. *Id.* ¶ 26. They worried that if they took the group down, Palace would have gotten what it wanted and have no incentive to release the Akeos. *Id.* But it was their only hope, so they worked with the group's owner to remove it. *Id.* Their fears came true: Once they deleted the Facebook group, Palace went dark. *Id.* ¶ 27.

Desperate, the Akeos' children sought more help. They reached out to American lawyer John Manly, who had previously represented the Akeos' daughter in the sexual abuse lawsuit against Larry Nassar. *Id.* ¶ 28. Only when Mr. Manly made clear to Palace that the media would be paying attention did Palace finally respond. *Id.* ¶ 29. But the response was an impossible demand: a non-disparagement clause with a $1 million liquidated damages provision per violation; an admission that the Akeos had caused $7 million in damages to Palace; a public admission of guilt and apology; and $250,000. *Id.* The Akeos' children—acting on the Akeos' behalf—could not accept that deal. *Id.* ¶ 30. They were concerned that even if their parents agreed, Palace wouldn't release them—or having obtained a false confession, would have them rearrested and demand more. *Id.* They proposed an option they hoped everyone could live with: release the Akeos, the Akeos would put the amount they had received in refunds from the credit card companies in escrow, and they could resolve the dispute in U.S. court. *Id.* Palace again went dark. *Id.*

As the days and weeks wore on, the Akeos grew despondent. Christy wrote in her journal: "I worry about what will happen. I wonder if my life will end w/o seeing my family / Paul again." C. Decl. ¶ 53. "I wonder if everyone will forget about us eventually or if there will be nothing left for anyone to do for us. … I feel my strength & faith are running out." *Id.* ¶ 54. "I feel this will be our new home. … We are gonna lose everything and I don't think our kids realize this but I know exactly what is going to happen … Words cannot describe the hopelessness I am feeling." *Id.* ¶ 56.

With the help of Mr. Manly, the Akeos' children raised their plight to the American government and media. *Id.* ¶ 31. The White House and the State Department quickly recognized that this was really a hostage negotiation. *Id.* ¶¶ 32, 34. And Special Presidential Envoy for Hostage Affairs Adam Boehler, at the behest of President Trump, began negotiating directly with Palace's CEO. *Id.* ¶ 34. The White House held daily briefings. *Id.* ¶ 32. Still, Palace did not release the Akeos.

The Akeos' children tried to at least get their parents released on house arrest. *Id.* ¶ 35. But it was impossible. *Id.* ¶ 36. Nobody was willing to rent to them because doing so would require filing court documents and potentially coming into Palace's crosshairs. *Id.* Regardless, the Akeos' criminal

5

defense attorneys advised, if the Akeos were released, Palace would likely just file a new criminal complaint and get them arrested again. *Id.*

Pressure increased on April 1, when Palace emailed Christy's daughter to make clear the Akeos would remain in prison if they did not agree to its demands in what it called a "restitution agreement." Lemke Decl. ¶ 38; Lemke Decl. Ex. 1. The family shared the email with the U.S. government; recognizing the severity of the situation, the Akeos' congressman said he was going to Mexico the next day to try to negotiate the Akeos' return. Lemke Decl. ¶¶ 40, 41.

Throughout this time, the Akeos' attorneys attempted to push back on Palace's demands.  ECF 52-2 ¶ 29; ECF 40-4 at 3. That was only because it was never about the money for the company; it was about the parties' ongoing civil dispute and the public attention the Akeos had garnered about Palace's practices. ECF 52-1 ¶¶ 8, 20, 25-26. 

ECF 52-2 ¶ 30 & Ex. C-45; *see also* Manly Decl. ¶ 11. 

*Compare* ECF 52-2 Exs. C-46 & C-51 (Akeos drafts), *with* ECF 52-2, Ex. C-43 ¶ 4, Ex. C-45 at 2, Ex. C-52 ¶ 9 (Palace drafts); *see also* ECF 52-2 ¶¶ 30, 32-33; Manly Decl. ¶¶ 11-12.

ECF 52-2 ¶¶ 32-33; ECF Exs. C-51 & C-52; Lemke Decl. ¶ 32 & Ex. 2. 

ECF 52-2 ¶ 33; ECF 40-1 (Final NDA). By that point, it was clear to everyone advocating on behalf of the Akeos that they had no choice but to agree to Palace's demands, including about arbitration, if they wanted to return home any time soon. Manly Decl. ¶¶ 14-15, 17; C.Akeo Decl. ¶¶ 63-65. As Congressman Barrett texted Mr. Manly, "I am convinced that the only way Paul and Christy can leave is if they sign the NDA under the terms that Palace had demanded." Manly Decl. ¶ 16; Manly Decl. Ex. 3. He responded, "It appears they have no choice but to sign or stay in prison. Thx for all your efforts." Manly Decl. Ex. 3.

6

During this final back and forth, the Akeos had been taken from the prison to separate holding cells in the courthouse, shackled, and made to wait without explanation for nearly four hours. C.Akeo Decl. ¶¶ 59-61. Anxious and confused, they were eventually taken by armed guards to the courtroom. C.Akeo Decl. ¶ 62. Desperate to return home and not seeing any other way, the Akeos ultimately signed two agreements: an "Immediate Reparation Agreement" in Spanish and an exhibit to that agreement, a "Mutual Release and Non-Disparagement Agreement," in English. C.Akeo ¶¶ 65-65; *see also* ECF 40-4 (Reparation Agreement) & 40-1 (Final NDA).

The reparation agreement requires the Akeos to (1) pay $116,587.84, (2) cease making and remove any public "discrediting, derogatory or negative comments" about Palace, and (3) sign the NDA. Reparation Agreement at 4-5. In exchange, Palace would "consider[] the matter fully repaired" and drop its criminal complaint, resulting in the extinction and dismissal of the criminal action in accordance with Mexican procedural rules regarding reparation agreements. *Id.* at 4.

The NDA purports to release "any and all" civil claims between Palace Elite and the Akeos regarding their prior "dealings," including regarding the Akeos' timeshare agreements. NDA ¶ 1. It also prohibits the parties from bringing "any lawsuit, arbitration, or other proceeding" regarding any other claims. *Id.* ¶ 2. Next, like the reparation agreement, the NDA prohibits making or publishing "any disparaging, derogatory, or negative statements" about Palace and requires that "any and all" existing statements be "removed." *Id.* ¶ 4. The NDA goes further still to prohibit inducing or encouraging others to "use fraudulent means … to terminate any agreement or relationship with Palace." *Id.* ¶ 5. The NDA requires "[a]ll disputes arising out of or in connection with" the NDA to be settled by confidential arbitration in Vancouver, Canada. *Id.* ¶ 15. Finally, it sets liquidated damages at $50,000 plus an additional $1,000 per day until any breach is cured; authorizes injunctive relief in the event of a breach; and authorizes the prevailing party in any action regarding the NDA "to recover their reasonable attorneys' fees and costs." *Id.* ¶¶ 6-8.

After they signed, the court asked a few questions about the reparation agreement, but not the NDA, "approve[d] the reparation agreement," and ordered the "total dismissal" of the criminal case against the Akeos. ECF 3 at 1, 3. The Akeos then had to return to the prison for processing. C.Akeo Decl. ¶ 69; P.Akeo Decl. ¶ 26. Congressman Barrett, the U.S. Consular General, and their staff waited to ensure the couple was actually released, and then transported them via armored vehicle to a chartered jet, which they had arranged out of concern that the Akeos would be detained at the commercial airport. C.Akeo Decl. ¶¶ 69-70; P.Akeo Decl. ¶ 27. They were, finally, on their way home.

That does not mean that their fear has subsided. They both continue to experience significant anxiety and fear leaving the country. C.Akeo Decl. ¶¶ 71-72, 90; P.Akeo Decl. ¶¶ 29-30. Even so, they want to hold Palace accountable so that it can never again use the threat of prosecution and imprisonment as a cudgel to bully timeshare members into submission and silence. C.Akeo Decl. ¶¶ 73-74; P.Akeo Decl. ¶ 31. The company, however, seeks to siphon the Akeos' suit into confidential arbitration in Canada, where it has already initiated confidential and costly arbitration proceedings. C.Akeo Decl. ¶ 76; Creed Decl. Exs. 1 & 2. Indeed, for just the early stages of that arbitration, Palace claims the Akeos owe it more than $730,000 in legal fees and $7,000 in costs and has estimated that its damages from this suit alone exceed $13 million. C.Akeo Decl. ¶ 88; C. Akeo Decl. Exs. 8 & 9.

## LEGAL STANDARD

This Court has determined that Palace's arbitration clause is subject to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, ECF 48 at 14, which is "incorporated in and enforced through the" Federal Arbitration Act. *Doe v. Princess Cruise Lines, Ltd.*, 657 F.3d 1204, 1214 n.9 (11th Cir. 2011). A court's "first task" in deciding a motion to compel arbitration "is to determine whether the parties agreed to arbitrate." *Id.* A party seeking to compel arbitration bears the burden of demonstrating that such an agreement exists. *Bazemore v. Jefferson Cap. Sys., LLC*, 827 F.3d 1325, 1330 (11th Cir. 2016). Even if an arbitration agreement exists, a court may not order arbitration under the Convention if it is "null and void, inoperative or incapable of being performed." New York Convention, art. II(3). The party challenging arbitration bears the burden of demonstrating this defense. *De Gracia v. Royal Caribbean Cruises Ltd.*, 580 F. Supp. 3d 1217, 1220–21 (S.D. Fla. 2022).[2]

When the "making of the arbitration agreement … be in issue," the party opposing arbitration "may … demand a jury trial of such issue." 9 U.S.C. § 4. Duress goes to the "making of an agreement" to arbitrate. *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 355 n.* (2011) (Thomas, J. concurring) (citing Supreme Court precedent and historical tradition); *see Trafalgar Shipping Co. v. Int'l Mill. Co.*, 401 F.2d 568, 571–72 (2d Cir. 1968).

To determine whether a trial is necessary, courts apply a "summary judgment-like standard." *Bazemore, LLC*, 827 F.3d at 1333. Under that standard, once the party seeking arbitration has made an

---

[2] There's no dispute that duress renders an arbitration clause "null and void, [or] inoperative." Mot. at 11. In addition to being entered under duress, Palace's arbitration and purported delegation clause is unconscionable. But the Eleventh Circuit has held that for arbitration agreements subject to the Convention, unconscionability cannot be raised at the enforcement stage. *Bautista v. Star Cruises*, 396 F.3d 1289, 1302 (11th Cir. 2004). The Akeos reserve the right to challenge this conclusion en banc or before the Supreme Court, and if it is overruled, to raise an unconscionability challenge on remand.

8

initial showing that an agreement to arbitrate exists between the parties, the party opposing arbitration must show, "by factual submission or allegation of fact," "why the court should not compel arbitration." *De Gracia*, 580 F. Supp. 3d at 1220. Only if there is "no genuine dispute as to any material fact" may the court rule on a motion to compel arbitration as a matter of law. *Bazemore*, 827 F.3d at 1333. Otherwise, the court must hold a jury trial if the party opposing arbitration demands one. *Lamonaco v. Experian Info. Sols.*, 141 F.4th 1343, 1347 (11th Cir. 2025). If this Court does not deny the defendants' motion as a matter of law, the Akeos demand a jury trial—and, if necessary, arbitration-related discovery. *See Young v. Experian Info. Sols., Inc.*, 119 F.4th 314, 320 (3d Cir. 2024) (court should order arbitration-related discovery when factual dispute exists as to questions of arbitrability).[3]

## ARGUMENT

Most of the defendants do not point to *any* arbitration agreement between them and the Akeos. And none of them can point to one that binds the Akeos: An arbitration "agreement" compelled on pain of continued imprisonment in a foreign prison is no agreement at all.

Still, the defendants try to stack the deck in their favor. They assert (at 10) that the FAA reflects a "liberal federal policy favoring arbitration." But they fail to note that, after the cases they cite were decided, the Supreme Court clarified that the "policy favoring arbitration … is about treating arbitration contracts like all others, not about fostering arbitration." *Morgan v. Sundance, Inc.*, 596 U.S. 411, 418 (2022). The defendants also claim (at 10) that there is a "strong presumption in favor of arbitrability," but they don't mention that any such presumption applies "*only* where" it has already been established that there is a "a validly formed and enforceable arbitration agreement" between the parties, and the question is only whether a particular dispute falls within the scope of that agreement. *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 301 (2010) (emphasis added). The questions here are not about scope. They're about whether the defendants have a valid arbitration agreement at all.

But ultimately it doesn't matter what presumptions apply. Parties that seek to compel arbitration must have a valid arbitration agreement. And timeshare companies cannot force their customers to arbitrate by throwing them in a foreign prison. Unable to convincingly argue otherwise, the defendants argue that this Court should compel arbitration anyway because, they say, Palace's arbitration provision has a so-called delegation clause requiring that the Akeos arbitrate disputes about

---

[3] The defendants argue (at 14) that this Court must apply the arbitration clause's choice of law: New York law. Like the NDA's other terms, this choice of law was entered under duress, and most of the defendants aren't even party to it. But because the motion to compel arbitration must be denied under any jurisdiction's law, we do not object to applying New York law.

whether they have to arbitrate. But defendants who have no arbitration agreement at all also have no delegation clause. And there is no duress exception for delegation clauses: Companies can no more use prosecution and imprisonment to force their customers to arbitrate questions about arbitrability than they can to force them to arbitrate the merits of their claims.

## I.   Besides Palace Elite, none of the defendants have even attempted to show that they have an arbitration agreement with the Akeos.

A party seeking to compel arbitration must demonstrate that they have an agreement to arbitrate. *Bazemore*, 827 F.3d at 1330. Here, the only purported agreement to arbitrate the defendants identify is between Palace Elite and the Akeos. *See* ECF 40-1. Without even addressing the issue, however, *all* of the defendants purport to rely on Palace Elite's arbitration clause. But a "non-party to a contract governed by New York law lacks standing to enforce the agreement in the absence of terms that clearly evidence an intent to permit enforcement by the third party in question." *Brettler Tr. of Zupnick Fam. Tr. 2008 A v. Allianz Life Ins. Co. of N. Am.*, 57 F.4th 57, 62 (2d Cir. 2022). So "the right to compel arbitration does not extend to a nonparty unless the agreement itself so provides." *Cnty. of Onondaga v. U.S. Sprint Commc'ns Co.*, 596 N.Y.S.2d 223, 224 (N.Y. App. Div. 1993).

The contract here does not extend the right to compel arbitration to nonparties. ECF 40-1 at 7. Other terms of the NDA reference nonparties, but the arbitration clause itself "notably contains no such reference." *Morales-Posada v. Cultural Care, Inc.*, 141 F.4th 301, 318 (1st Cir. 2025). When nonparties are referenced in other parts of the contract, "the absence of a reference … in a contract's arbitration provision [is] evidence that the signatories did not intend to confer arbitration rights on that third party." *Id.* (collecting cases). So, even if Palace Elite's arbitration clause were valid, and it's not, only Palace Elite could enforce it.

## II.   Palace's arbitration and delegation clause were entered under duress.

"[A]rbitration is a matter of consent, not coercion." *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 681 (2010). Compelling arbitration based on an arbitration clause obtained through threat of indefinite imprisonment and prosecution in a foreign country violates this fundamental rule. *See Concepcion*, 563 U.S. at 339 (arbitration clauses may be invalidated for duress). Two types of duress apply here: duress by imprisonment and duress by improper threat.

Duress by imprisonment occurs when a party enters a contract to escape imprisonment that was "without just cause," absent "lawful authority," or in accordance with law but "for an improper purpose." *Brown v. Pierce*, 74 U.S. 205, 214 (1868); *Strong v. Grannis*, 26 Barb. 122 (N.Y. Gen. Term. 1857). The "compulsion … produced by imprisonment, is sufficient to destroy free agency, without

10

which there can be no contract" because "there is no consent." *Baker v. Morton*, 79 U.S. 150, 158 (1870). When a purported contract is extracted under duress by improper imprisonment, therefore, it is void: No contract is ever formed. *Id.*; *Guilleaume v. Rowe*, 94 N.Y. 268, 272 (1883); *Osborn v. Robbins*, 36 N.Y. 365, 371 (1867); *Lazzarone v. Oishei*, 21 N.Y.S. 267, 269–70 (N.Y. Super. Ct. 1892); *Foshay v. Ferguson*, 5 Hill 154, 154 (N.Y. 1843). And because no contract was ever formed, there can be no ratification. *Lipedes v. Liverpool & London & Globe Ins. Co.*, 229 N.Y. 201, 209 (1920) ("A void contract or act, in law, is from its inception null—a nothing—it cannot be ratified or confirmed and cannot be the subject of disaffirmance or election."). Because people are generally no longer thrown in prison to compel them to enter a contract, duress by imprisonment is exceedingly rare. But because that's what Palace did here, its arbitration and purported delegation clause is void.

Duress by "improper threat" is the more common form of duress. "If a party's manifestation of assent" to a contract "is induced by an improper threat" that leaves "no reasonable alternative," that constitutes duress. Restatement (Second) of Contracts § 175; *see Austin Instrument v. Loral Corp.*, 29 N.Y.2d 124, 130 (1971). This form of duress also applies here: Using the threat of imprisonment and prosecution for private gain—to extract a civil contract—is improper, regardless of whether the party threatened is guilty of the alleged crime. *See* Restatement (Second) of Contracts § 176; *Adams v. Irving Nat. Bank*, 116 N.Y. 606, 613 (1889) (collecting cases). Palace admits it did just that. Duress by improper threat renders a contract voidable, meaning that absent ratification, the Akeos are not bound by its terms. Restatement (Second) of Contracts § 175. And contrary to Palace's assertion (at 18–19), the Akeos never ratified the contract: They repudiated it.

### A.  Duress by imprisonment.

The Akeos were subject to duress by imprisonment for three independent reasons: They were imprisoned without just cause, absent lawful authority, and for an improper purpose. *First*, Palace filed a criminal complaint against the Akeos "without just cause." *Brown*, 74 U.S. at 214. As their Mexican criminal lawyers explained, Palace's complaint came nowhere near alleging fraud under Mexican law. Lemke Decl. ¶ 17. The company accused the Akeos of breaching their timeshare contract by marketing and selling vacation bookings. C.Akeo Decl. Ex. 5. But Palace had sold the Akeos a "wholesale" membership. C.Akeo Decl. ¶¶ 3–8. The company knew they were reselling memberships—it had encouraged them to do so. *Id.* Indeed, that's the only way ordinary people like the Akeos can afford a "wholesale membership." *Id.* ¶ 6. And in any event, a breach of contract is not fraud. Lemke Decl. ¶ 17. Palace also asserted that the Akeos committed fraud by disputing its credit card charges, when Palace refused to honor the reservations it promised. C.Akeo Decl. Ex. 5. But the credit card

companies investigated and concluded that it was Palace, not the Akeos, that acted wrongfully. C.Akeo Decl. ¶ 86 & Ex. 7. Palace was concerned about the Akeos speaking out about its misleading business practices, not about their vacation bookings or credit card chargebacks. ECF 52-1 ¶ 20. But, presumably knowing that criticizing a company is not a crime, Palace's complaint didn't seek prosecution on that basis. Instead, it manufactured a claim of fraud. That is not "just cause."

*Second*, the Akeos' arrest and imprisonment was without "lawful authority" or "proper process." *Brown*, 74 U.S. at 214. The Akeos' defense attorneys advised the family that Palace had corrupted the prosecutor's office. Lemke Decl. ¶ 17. The U.S. Consulate had also informed them that the prosecutors were taking instructions from Palace, and Palace had instructed them to aggressively prosecute, so the Akeos would agree to Palace's terms. *Id.* ¶ 12. In fact, Palace's CEO admits to having spoken directly with "with the President of the Superior Court of Justice of Quintana Roo," the court hearing the Akeos' case, about a reparation agreement. ECF 52-1 ¶ 9; Romero Decl. ¶ 19 (explaining that this is improper under Mexican law).] And, after the March 10 hearing, the Akeos' defense attorneys informed them that Palace had bribed the judge. Lemke Decl. ¶ 18.  The company wasn't hiding its efforts: To demonstrate that Palace—not the law—controlled the Akeos' fate, it sent Christy Palace-branded slippers in prison. C.Akeo Decl. ¶ 25.

*Finally*, even if the Akeos were imprisoned for "just cause … under proper process," Palace sought their prosecution for an "improper purpose." *Brown*, 74 U.S. at 214. Palace's CEO admits that the company's goal was not to seek justice for any fraud the Akeos supposedly committed or to be made whole for any harm it purportedly suffered. *See* ECF 52-1 ¶¶ 8, 20, 25-26. The company's goal was to silence the Akeos: to "definitively end" any claims the Akeos might have against it, "prevent" the Akeos from speaking out against Palace, and ensure that any future litigation that did occur would be shunted to "confidential arbitration" to protect the company's reputation. *Id.* ¶ 20.

Because Palace's arbitration and purported delegation clause were entered under duress by imprisonment, they are void for lack of consent. At the very least, there is a dispute of fact sufficient to send that question to the jury.

### B.   Duress by improper threat.

Palace's arbitration and purported delegation clause was also obtained under duress by improper threat: The Akeos' "manifestation of assent" was "induced by an improper threat" that left them "no reasonable alternative" but to accede to Palace's demands. Restatement (Second) of Contracts § 175.

### C.   Duress by improper threat.

Palace's arbitration and purported delegation clause was also obtained under duress by improper threat: The Akeos' "manifestation of assent" was "induced by an improper threat" that left them "no reasonable alternative" but to accede to Palace's demands. Restatement (Second) of Contracts § 175.

**Improper threat.** Palace does not dispute that it used the threat of continued imprisonment and prosecution to get the Akeos to "agree" to its arbitration and purported delegation clause. Instead, it claims this threat was not improper. But it's well established that using the criminal system to extract a contract is "improper." Restatement (Second) of Contracts § 176. It doesn't matter whether the threatened party is guilty or innocent. *Id.*; *Adams*, 116 N.Y. at 613. The impropriety isn't that someone is falsely accused, though that, too, would render the threat improper. It's that using the criminal system to extract a civil contract "involves a misuse, for personal gain, of power given for other legitimate ends." Restatement (Second) of Contracts § 176; *Morse v. Woodworth*, 29 N.E. 525, 528 (Mass. 1892) (improper to "use for his private benefit processes provided for the protection of the public and the punishment of the crime" (citing cases from across the country)).

Courts routinely hold that this misuse of the criminal system—threatening imprisonment or prosecution for private gain—is sufficiently improper to avoid a contract by reason of duress. *See, e.g.*, *Schoener v. Lissauer*, 13 N.E. 741, 742 (1887) (mortgage obtained by threatening that the property-owner's son—who had been arrested for embezzlement—would be convicted unless a mortgage was granted to the employer); *Adams*, 23 N.E. at 8 (voiding mortgage "obtained from a wife by threats to imprison her husband"); *Cushing v. Hughes*, 195 N.Y.S. 200, 202 (N.Y. Sup. Ct. 1922) (voiding contract where mother was told "only way" daughter could "avoid[]" prosecution "was by settlement of [a] claim"); *Derenoncourt v. Costco Cos., Inc.*, 1998 WL 883305, at *2–3 (S.D.N.Y. Dec. 16, 1998) (rejecting company's efforts to rely on a release signed by a customer to avoid being arrested on a shoplifting accusation because a "threat to instigate a criminal prosecution is an improper means of persuading a party to enter into a contract"); *Gottex Indus., Inc. v. Menczel*, 1995 WL 412419, at *2 (S.D.N.Y. July 12, 1995) (employer threatened employee "with jail" and "deportation" for alleged embezzlement if he didn't sign termination agreement and promissory note); *Yoon Jung Kim v. Gahee An*, 55 N.Y.S.3d 210, 211-13 (N.Y. App. Div. 2017) (couple signed note and mortgage "under a state of duress" after being told they would be "prosecuted," "sent to prison," and "deported"). Indeed, threatening imprisonment or prosecution to coerce a contract can be a crime. *See, e.g.*, N.Y. Penal Code § 135.60(1), (4), (7); *id.* § 215.45; *see also Lewkowicz v. El Paso Apparel Corp.*, 625 S.W.2d 301, 304 (Tex. 1981) (under Texas law, voiding a contract entered under similar circumstances as Palace's contract here).

██████████████████████████████████████████

████████████████████████████████ Creed Decl., Ex. 1; ECF 52-1 ¶¶ 25–26. That's an improper threat under over a century of New York law. Palace claims (at 15) that its conduct can't be duress because, it says, Mexican law grants alleged crime victims the legal right to coerce alleged perpetrators into executing contracts they'd never otherwise agree to as a condition of escaping foreign prison and prosecution. That's wrong several times over. First, Palace's claim to lawful coercion relies on its assertion that a crime victim may dismiss their complaint if the alleged perpetrator agrees to provide reparation. But as explained above, there was no fraud and Palace was no victim. Palace has identified no Mexican law that allows a company that breaches its contract with its customers to have them arrested for fraud to extort an agreement to never speak about the company, release all claims, and send any disputes to confidential arbitration in a foreign country, with the arbitrator deciding whether any of this is valid.

Second, even if Palace's complaint was not itself improper, Palace still improperly extracted an arbitration clause—*civil* dispute resolution—to an agreement that, under Mexican law, is limited to resolving *criminal* matters. The parties agree that Mexican law limits reparation agreements to restitution. Romero Decl. ¶¶ 6–9; ECF 40-3 ¶ 14. An arbitration clause is not restitution for any alleged fraud the Akeos may have committed. Romero Decl. ¶ 9. Indeed, Palace's own expert agrees that the "obligations" imposed by Palace's NDA are "unrelated to criminal harm reparation." ECF 40-3 ¶ 13. As Palace's CEO himself has made clear, it was never about the asserted fraud; it was about "permanently stop[ping] the Akeos from continuing" their criticism of the company, "definitively end[ing] all claims" they might have, and "ensur[ing] that any future disputes would be resolved through confidential arbitration rather than through public forums where they could continue damaging our reputation." ECF 52-1 ¶ 20. So, even if Palace had some rights as a victim, it far exceeded those rights when it conditioned its agreement to drop the criminal complaint on these additional concessions. *See also* 28 Williston on Contracts § 71:33 (4th ed.) ("Means, in themselves lawful, may be used so oppressively as to constitute an abuse of legal remedies.").

Palace tries to skirt these limits by claiming that the "Immediate Reparation Agreement" is not, in fact, a reparation agreement at all. Although it's called a reparation agreement, and cites the statutes governing reparation agreements, according to Palace (at 15), it is a victim's pardon. And a victim's pardon, Palace says, gives an alleged victim the right to coerce any terms it wants from a defendant. *Id.*; ECF 40-3 ¶ 14. To start, Palace's argument depends on a misunderstanding of the use of "pardon" in the reparation agreement. Romero Decl. ¶¶ 12–16. Moreover, a victim's pardon is an

14

entirely different—and mutually exclusive—legal act. Under Mexican law, a victim's pardon is a *unilateral* dismissal of all claims granted by the victim. *Id.* ¶ 12. It "must be granted without conditions of any kind," and cannot, therefore, be conditioned on the defendant's fulfillment of any obligation. *Id.* So, by definition, the bilateral agreement between Palace and the Akeos is not a victim's pardon— it is a reparation agreement, subject to the requirements that govern such agreements. *Id.* ¶ 13.

Third, even if the NDA were a separate agreement privately negotiated outside the limits of reparation, it still wasn't permissible under Mexican law. In Mexico, as in the United States, it is wrongful to bargain with another's freedom to gain a private benefit. *Id.* ¶ 18. And threatening continued prosecution and imprisonment certainly counts. *Id.*

Finally, Palace's effort to rewrite Mexican law ultimately doesn't matter. Courts have long held that the oft-repeated maxim that exercising a legal right is not duress does not legitimize the use of criminal process to extract a civil contract. *See Jamestown Farmers Elevator, Inc. v. Gen. Mills, Inc.*, 552 F.2d 1285, 1290–91 (8th Cir. 1977) ("We recognize that good faith insistence upon a legal right which one believes he has usually is not duress, … [but] threats to institute criminal or regulatory proceedings, made in order to secure another's consent to an undeserved bargain for one's own private benefit, may be sufficiently wrongful to constitute duress"); *see, e.g.*, *Derenoncourt*, 1998 WL 883305, at *2–3.

**No meaningful choice.** Palace's improper threats left the Akeos with "no reasonable alternative" but to agree to its demands in exchange for their freedom. Restatement (Second) of Contracts § 175. This "subjective" inquiry asks whether the "threat actually induced assent." *Id.* It did.

The Akeos had no choice but to sign the NDA—including its arbitration and delegation clause—to secure their freedom. They'd already spent a month in a dangerous foreign prison, and there was no end in sight. Their next hearing would, at best, be months away—and, they were told, trial could take years. Conditions in the prison were awful. They were separated from each other and largely cut off from the outside world, housed with potentially violent offenders, subjected to violent crowd control tactics by armed guards, and denied access to basic hygiene and edible food. By the time they signed, their loved ones had done everything they could to try to secure their release, including trying to arrange house arrest and turning to the media. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮ Creed Decl., Ex. 1; Manly Decl. ¶¶ 8–15; *compare* ECF 52-2 Exs. C-46 & C-51 (Akeos drafts), *with* ECF 52-2, Ex. C-43 ¶ 4, Ex. C-45 at 2, Ex. C-52 ¶ 9 (Palace drafts). Palace refused to move forward without those terms. *See id.* Referring to the arbitration and delegation clause, Congressman

15

Barrett wrote, "I am convinced that the only way Paul and Christy can leave is if they sign the NDA under the terms that Palace has demanded." Manly Decl., Ex. 3.

Palace's contrary arguments fall short. While the company now claims (at 15) that the Akeos could have "sought pretrial release to continue negotiating" outside prison, the family had tried, and failed, to make that happen—no landlord was willing to rent to them when it meant filing in court in a case involving Palace. Lemke Decl. ¶¶ 35–38; ECF 52-1 ¶ 13 (Palace CEO recognizing that the Akeos were unable to find housing that would satisfy the court's release conditions). And, in any event, the "coercive atmosphere created by imprisonment is not significantly lessened by the defendant's temporary release on bail, as he must ultimately surrender and resubmit himself to imprisonment." *Gray v. City of Galesburg*, 247 N.W.2d 338, 340 (Mich. Ct. App. 1976). So, even if the Akeos had been released on house arrest, they still would have been trapped in Mexico at the mercy of a powerful conglomerate hell on exploiting their situation to stifle future public criticism, including in court.

Second, although Palace asserts (at 16–17) that the Akeos' legal and diplomatic support categorically forecloses duress here, the fact that it took a team of attorneys, a sitting congressman, and the Special Presidential Envoy for Hostage Affairs to rescue the Akeos reflects the seriousness of the situation. And, even with the United States government intervening on their behalf, the only way the Akeos were leaving was by signing the NDA—*with* the arbitration clause Palace insisted on.

And third, Palace argues (at 17) that courts "routinely credit" the language in the NDA that the parties weren't "under duress." But it cites just one case, in which a no-duress recitation wasn't dispositive, for that proposition. *See J.M. v. G.V.*, 225 N.Y.S.3d 859, 875 (N.Y. Sup. Ct. 2025). And other courts have concluded that statements that a party was not under duress do *not* defeat a duress defense. *See Amoia v. Amoia*, 202 N.Y.S.3d 615, 617, 618 (N.Y. App. Div. 2023) (setting aside separation agreement on duress grounds even though wife was recorded as "stating upon the husband's prompting that she was not under duress in doing so"); *see also Lewkowicz*, 625 S.W.2d at 303 (under Texas law, voiding contract entered under similar circumstances as Palace's contract here even though party claiming duress executed "affidavit of voluntariness"). Palace's lack of support makes sense: The whole point of the defense is that a person has no meaningful choice but to sign. It would be nonsensical to credit language disclaiming what the circumstances otherwise confirm is duress, particularly because the defense would apply to that language too. *See Centro Empresarial Cempresa S.A. v. Am. Movil, S.A.B. de C.V.*, 952 N.E.2d 995, 1000 (2011). And, in fact, recognizing the situation for what it was, the Akeos' attorneys tried repeatedly to remove this language, but Palace wouldn't budge. *See supra* 15. Moreover, while Palace claims (at 18) that the "Akeos confirmed to the judge that they

16

were not acting under duress," that question was specifically about the reparation agreement—which Palace claims is separate from the NDA. *Supra* 7. The Akeos had no idea what they were being asked— they said what their lawyers told them to say. C. Akeo Decl. ¶ 67; P. Akeo Decl. ¶ 25. And, in any event, again, being forced to agree that there was no duress on pain of imprisonment is itself an act conducted under duress.

**No ratification.** Falling back, Palace briefly argues (at 18–19) that the Akeos somehow ratified its NDA, and therefore cannot now claim that the arbitration agreement was entered under duress. As an initial matter, this argument can only apply to duress by threat. Duress by imprisonment renders a contract void to begin with, meaning there never was any contract to ratify. *See supra* 11. The ratification argument fails anyway.

"Whether ratification occurred is generally a question of fact." *Phillips v. Orleans*, 2019 WL 3088051, at *9 (W.D.N.Y. July 15, 2019). And it is well-established that a party asserting ratification "ordinarily must demonstrate" an "inten[t] to ratify the agreement." *Brown v. City of S. Burlington*, 393 F.3d 337, 343–44 (2d Cir. 2004); *see Phillips*, 2019 WL 3088051, at *9; *Barnard v. Gantz*, 140 N.Y. 249, 258 (1893); *Stilwell v. Mut. Life Ins. Co.*, 72 N.Y. 385, 392 (1878). Palace cannot demonstrate that the Akeos intended to ratify its arbitration or delegation clause (or the NDA as a whole). To the contrary, those negotiating for the Akeos' release repeatedly protested Palace's claim that the contract was being entered without duress. *See* Manly Decl. Once the Akeos had been released, their children immediately protested: "No American should be held hostage to the demands of a private company." Lemke Decl. Ex. 3; *see Sosnoff v. Carter*, 568 N.Y.S.2d 43, 47 (N.Y. App. Div. 1991) ("repeated protests" are "inconsistent" with ratification). And the Akeos' counsel sent Palace a letter stating that the contract "is clearly invalid as the Akeos signed it under duress." *See* Creed Decl., Ex. 4.

Palace halfheartedly asserts (at 18) that the Akeos manifested an intent to ratify by "accept[ing] benefits" under the contract. ██████████████████████████████████ ████████ Creed Decl. Ex. 2 (ICC App. 29). That is not a benefit provided by the arbitration or delegation clause (or the NDA). It's the threat Palace used to force the Akeos to sign it. Palace also asserts, in passing, that the Akeos manifested an intent to ratify by performing obligations under the NDA. But they did the opposite: Rather than giving in to Palace's demand that they conceal its misconduct, they immediately publicly denounced it. *See* Lemke Decl. Ex. 3 (statement on behalf of Akeo family that Palace held the Akeos "hostage" to its demands); C.Akeo Decl. ¶ 89 & Ex. 10 (interview, where they made clear that they were arrested at Palace's behest after *Palace* breached their contract). Without further explanation, Palace says that the Akeos performed by deleting disparaging

17

online content. Content was deleted twice, neither time by either Paul or Christy. Before the contract was signed, their children worked with the owner of the Facebook group for dissatisfied Palace members to delete the group at Palace's behest. That can't be ratification: The contract didn't exist yet. And shortly after the Akeos were released, their daughter deleted a Facebook group she had created to "bring them home." ECF 52-3 ¶¶ 5-6. That, too, can't demonstrate as a matter of law that the *Akeos* intended to ratify Palace's demands. It wasn't performed by the Akeos; the group had served its purpose, so there was no need to continue it; and the deletion occurred shortly after the Akeos were released—when they were still acutely traumatized and terrified of retaliation. *See Yoon Jung Kim*, 55 N.Y.S.3d at 213 ("no obligation to repudiate" when under "continuing duress"). And it certainly can't demonstrate an intent to ratify the arbitration or delegation clause. *See* Restatement (Second) of Contracts § 383 (1981) (performance of one term doesn't necessarily bar the avoidance of others).

Palace also argues that, as a matter of law, the Akeos waited too long to repudiate the contract. "Under New York law, the test is whether the party claiming duress acted reasonably … under the circumstances." *Citibank, N.A. v. Real Coffee Trading Co., N.V.*, 566 F. Supp. 1158, 1163 (S.D.N.Y. 1983). They did. The Akeos were held under terrible conditions in a foreign prison for a month. When they finally returned home, they were terrified. C.Akeo Decl. ¶¶ 71-72; P.Akeo Decl. ¶¶ 29-30. Both required medical treatment. *Id.* Christy could not leave the house and started taking anti-anxiety medication and working with a therapist. *Id.* Nevertheless, in three-and-a-half months, they managed to overcome their fear and inform Palace that they were filing a lawsuit. Palace cites no case that holds that such a short period of time constitutes delay sufficient for ratification—let alone a case under these circumstances. Palace cites three cases: involving a delay of two and a half years, *VKK Corp. v. Nat'l Football League*, 244 F.3d 114, 125 (2d Cir. 2001); almost two years, *JEDA Cap.-56, LLC v. Vill. of Potsdam*, 661 F. App'x 20, 23 (2d Cir. 2016); and four months, still longer than that here and where the key fact, which Palace ignores, is that before trying to repudiate, the party "explicitly ratified" it by emailing, "I will honor what I signed," *United States v. Twenty Miljam-350 IED Jammers*, 669 F.3d 78, 91 (2d Cir. 2011). Nothing like that happened here. There is no evidence at all of ratification, so this Court can reject Palace's argument as a matter of law. But if the Court disagrees, a jury must decide.

Unable to muster a convincing legal argument, Palace tries policy (at 15): "[I]f lawful criminal prosecutions followed by negotiated private settlements could constitute duress," that "would destabilize every negotiated resolution of parallel civil and criminal disputes." But this was not a lawful criminal prosecution. And, even if it were, it was not "*followed by*" a private settlement. A timeshare company had a business dispute with U.S. citizens, and chose to resolve that dispute by having them

18

arrested and thrown in a Mexican prison—requiring not only private attorneys but also the full force of the U.S. government to get them out. *See* Lemke Decl. ¶ X. What Palace calls a "negotiated private settlement" was the price it demanded for their release. Most agreements are not "negotiated" in this manner. And those that are *should* be invalidated. The imprisonment of vacationing Americans should not be a viable option for foreign corporations to resolve disputes with, or to silence, their customers.

### III.   The question of duress is for this Court to decide.

**A.** Perhaps recognizing that it cannot succeed on law or policy, Palace now argues that the Court cannot decide whether the arbitration agreement was entered under duress at all—an arbitrator must do so. Palace affirmatively waived that argument. ███████████████████████

███████████████████████████████████████████████████████████

███████████████████ *See* Creed Decl. Ex. 3 at 22, 32, 58–59 ██████████████████

███████████████████████████████████████ *See* ECF 52-4 ¶¶ 158, 204–05, 222, 236. Palace cannot resurrect an argument it intentionally waived.

In any event, it is for this Court to decide whether Palace's arbitration clause was entered under duress. "Before referring a dispute to an arbitrator," a court must "determine[ ] whether a valid arbitration agreement exists." *Coinbase, Inc. v. Suski*, 602 U.S. 143, 149 (2024). Palace asks (at 11–12) this Court to disregard this rule because, it says, the Akeos have not specifically challenged the arbitration clause. A party contesting arbitration must "directly challenge" the arbitration clause itself. *Coinbase*, 602 U.S. at 150–51. The Akeos have done so here. As explained, they directly and explicitly challenge the arbitration clause as having been extracted under duress. Palace suggests (at 12) that the Akeos were required to lodge this challenge in their complaint. But that argument is foreclosed by both Eleventh Circuit and Supreme Court precedent, which hold that it is enough to raise a challenge in an opposition to a motion to compel arbitration. *See Parm v. Nat'l Bank of Cal., N.A.*, 835 F.3d 1331, 1335 n.1 (11th Cir. 2016) (discussing *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 72 (2010)).

Palace also contends (at 11–13) that it is not enough to directly challenge the arbitration clause; the challenge, it says, must apply *only* to that clause. According to Palace, if it had limited its use of duress to extracting an arbitration clause, the Akeos could challenge that clause in court, but because the company imposed numerous terms under duress, this Court must enforce the arbitration clause— even if it is invalid. The Supreme Court has expressly rejected that argument: Where a party directly challenges an arbitration or delegation clause, the "court *must* consider the challenge," even if that challenge "applies equally to the whole contract." *Coinbase*, 602 U.S. at 150–51 (emphasis added). The cases Palace relies on were decided years before *Coinbase*.

Even if the Akeos had to raise an argument that did not apply equally to the rest of the contract, they have. The Akeos' counsel repeatedly tried to take the arbitration clause out of the contract; Palace, however, insisted: If the Akeos wanted to be released, they had to agree to arbitration. In other words, separate from the rest of the contract, Palace extracted the arbitration clause itself under duress.

**B.**   In a last-ditch effort to avoid this Court's review, Palace argues (at 12–13) that because its arbitration clause states that arbitration will take place under the International Chamber of Commerce's arbitration rules, the parties delegated to the arbitrator the question of whether the arbitration clause was entered under duress. That's wrong twice over. First, before delegating questions of arbitrability, there must be "clear and unmistakable evidence" that the parties agreed to do so. *Coinbase*, 602 U.S. at 149. Ordinarily, incorporating arbitral rules that allow an arbitrator to decide arbitrability constitutes such evidence.[4] But this isn't an ordinary case: The Akeos didn't and couldn't have seen the ICC rules before they signed Palace's contract. C. Akeo Decl. ¶ 79. And because they would have no way of knowing that those rules included a delegation clause, a mention of them in the NDA cannot be "clear and unmistakable evidence" of delegation. It's not even a valid incorporation under New York law. *See Garcia v. Fed LI, LLC*, 238 N.Y.S.3d 431, 437 (N.Y. App. Div. 2025) ("[T]he material to be incorporated" must be "so well known to the contracting parties that a mere reference to it is sufficient."); *Eshaghpour v. Zepsa Indus., Inc.*, 101 N.Y.S.3d 836, 837 (N.Y. App. Div. 2019).

Second, even if the contract could be understood to include a delegation clause, that clause, too, was entered under duress. A delegation clause is simply another arbitration agreement: an agreement to arbitrate disputes about whether the arbitration clause is valid. *Coinbase*, 602 U.S. at 148. If the delegation clause itself is invalid, a court may not rely on it to compel arbitration. *Id.* at 151. Here, the delegation clause, no less than the arbitration clause that contained it, was extracted under duress by imprisonment and by threat. *See supra* Part II; *see also Coinbase*, 602 U.S. at 151 (where a "applies equally" to the whole contract and the arbitration and delegation clause, a "court must address that challenge"). This Court may not compel arbitration without identifying *some* arbitration clause between the parties that was not entered under duress. *See Coinbase*, 602 U.S. at 151. There is none.

## CONCLUSION

This Court should deny the motion to compel arbitration.

---

[4] Although courts of appeals have largely assumed that incorporating arbitral rules is sufficient, the Akeos reserve the right to challenge that assumption en banc or before the Supreme Court.

## REQUEST FOR HEARING

Pursuant to S.D. Fla. Local Rule 7.1(b)(2), the Akeos respectfully request a hearing. A motion to compel arbitration is evaluated under a summary-judgment-like standard. Although the law that applies here is well established, this is an unusual case with a significant factual record. A hearing will allow the Court to ask questions of counsel about the record, as well as how the longstanding legal principles apply to it. As with any motion at summary judgment, that, in turn, will allow the court to determine whether it can rule as a matter of law or whether there is any material dispute of fact that requires resolution by a jury. The Akeos estimate that one hour will be sufficient.

Date: April 27, 2026

Respectfully submitted,

*/s/ Peter Kaufman*
PETER KAUFMAN (Florida Bar No. 548421)
pkaufman@panish.law
JESSE CREED (admitted pro hac vice)
jcreed@panish.law
HUNTER NORTON (admitted pro hac vice)
hnorton@panish.law
PANISH SHEA RAVIPUDI LLP
11111 Santa Monica Boulevard, Suite 700
Los Angeles, California 90025
(310) 477-1700

JOHN C. MANLY (admitted pro hac vice)
jmanly@manlystewart.com
MANLY, STEWART & FINALDI
19100 Von Karman Avenue, Suite 800
Irvine, CA 921612
(949) 252-9990

JENNIFER D. BENNETT (admitted pro hac vice)
HANNAH M. KIESCHNICK (pro hac vice pending)
GUPTA WESSLER LLP
235 Montgomery Street, Suite 629
San Francisco, CA 94104
(415) 573-0336

*Attorneys for Plaintiffs*

21