Docusign Envelope ID: FE3B35B4-1D52-8C41-804D-D83E35542A45

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA, MIAMI DIVISION

| | |
|---|---|
| PAUL AKEO and CHRISTY AKEO,<br><br>　　　　Plaintiffs,<br><br>v.<br><br>PALACE ELITE RESORTS S.A. de C.V., a Mexican corporation; PR GLOBAL RESERVATIONS, LLC, a Florida limited liability company; JOSÉ GIBRÁN CHAPUR DÁJER, an individual; CHDB HOLDING, S.A. de C.V., a Mexican corporation; and CONTROLADORA IHC, S.A.P.I. de C.V., a Mexican corporation; and OPERADORA PALACE RESORTS JA LTD., a Jamaican corporation,<br><br>　　　　Defendants. | Case No.: 1:25-cv-23733-RKA |

**DECLARATION OF MICHAEL LEMKE**

I, MICHAEL LEMKE, declare as follows:

1. My name is Michael Lemke. I have personal knowledge of the facts set forth herein, except as to those stated on information and belief and, as to those, I am informed and believe them to be true. If called as a witness, I could and would competently testify to the matters stated herein.

2. I am 35 years old. I am the son of Christy Akeo and the stepson of Paul Akeo. References to my "parents" in this declaration refer to my mom Christy and my stepdad Paul. I am a Vice President of Finance for Caesars Entertainment, an American hotel and casino company that operates more than fifty properties. I do not make this declaration on behalf of my company and am speaking solely in my personal capacity. I graduated from Michigan State University with a degree in the hospitality business. I am licensed by the Indiana Gaming

Commission. I refer to all the Palace businesses colloquially as Palace or Palace Elite.

3. On March 4, 2025, the day my parents were arrested, I received a phone call from my sister, Lindsey Hull, letting me know that our parents had been arrested at the airport and were being detained in Cancún, Mexico.

4. My sister and I immediately began scrambling to find a lawyer in Mexico who could represent my parents. They had an initial hearing scheduled for the next day. And we didn't even really know why they had been arrested. All we know is that it had something to do with Palace, a timeshare company that my parents used to be members of.

5. We tried to contact the U.S. consulate, but it was already closed for the day. We had no idea what to do. The U.S. consulate sent us a list of Cancún attorneys, which we started working our way through. We worked late into the night to trying to find someone with no luck.

6. On the morning of March 5, we were able to reach the U.S. consulate and spoke with an employee named Jose Miguel Garcia, the caseworker assigned to my parents' case. Mr. Garcia informed us that he had already heard from the prosecutor's office that Palace was looking to "settle" the case. He told us to be wary of the lawyers on the consulate's list. The consulate did not vouch for them, he said. And they might not even be barred.

7. After that call, we had just three hours before the hearing, and we still had not found counsel for my parents. We were frantic.  Through an internet search, we found a law firm in Lansing, Michigan that had a branch in Mexico City. That firm was able to put us in touch with two criminal lawyers in Mexico City. With about 45 minutes to go before the hearing, we immediately hired them to represent my parents. We didn't know anything about them, whether they were competent, or whether we could trust them, but we didn't have any other choice. My understanding is that these lawyers are now afraid for their personal safety if they speak out

2

Docusign Envelope ID: FE3B35B4-1D52-8C41-804D-D83F35542A45

because Palace and the Chapur family are powerful people in Mexico.

8. The Mexican criminal lawyers that we hired couldn't get to Cancún in time for the hearing, so they sent two lawyers from Cancún. Neither my sister and I nor my parents were able to talk to these lawyers before the hearing.

9. We also had not been able to talk to either of our parents. While in prison, our parents had little ability to communicate with those outside. It was days after the arrest before my sister or I could speak with our mom. And we did not hear from our stepfather for weeks.

10. In the days after the initial hearing, the criminal defense lawyers my sister and I had hired for our parents sent us all of the complaint and arrest documents, along with the evidence that had been presented to support the prosecution. From that, we were finally able to understand that Palace had alleged that my parents committed fraud by disputing credit card charges Palace had made. But we didn't understand how those disputes, which the credit card companies had investigated and agreed with my parents, could be fraud.

11. On March 6, the day after the initial hearing, my sister and I called Miguel, the case agent at the consulate. Miguel told us that there might be immigration alerts on our names, so we were scared to fly down to Cancún to try to help in person, because we could have ended up in prison just like my parents. And then we would be no use in trying to get them free. Miguel also informed us that the hearing that would determine whether the case could proceed, and if so, whether my parents would be detained while it does, would be March 10. He also reiterated that Palace wanted to make a deal.

12. The same day, we learned from the attorneys we'd hired for my parents that they had had breakfast with close contacts in the prosecutor's office, who told them that the office had a "special interest" in my parents' case. They said that the prosecutor's office was under

"instruction" from Palace to prosecute my parents aggressively.

13. We told the attorneys that Miguel, the consular case agent, had informed us that Palace reached out looking to make a deal. I later learned that Palace had also reached out to the attorneys directly, seeking to make an agreement.

14. Around this time, my sister and I were made aware, through a family friend, of news articles that had been released in English and Spanish about our parents' arrest, which included their mugshots and a video of them being detained at the Cancún airport. The attorneys informed us that Palace likely paid for these news articles.

15. On March 7, my sister and I were finally able to speak with our mom. The call lasted about ten minutes before she was told to hang up. In that time, we quickly explained that we had hired Mexican criminal defense attorneys for her and Paul. She told us that soon after she arrived at the prison, the guards brought her Palace Resort slippers.

16. Multiple people, including the criminal defense attorneys, told my sister and me that Mexico has a corrupt judiciary process that would treat my parents unfairly and would favor the powerful, wealthy, politically connected party like Palace.

17. Still, in the days before the March 10 hearing, the attorneys repeatedly advised us that we didn't yet need to give in to Palace's "blackmail and extortion." They said that the "evidence" that had been presented at the initial hearing made clear that the allegation of fraud was obviously false and did not meet the legal requirements for a fraud claim to be pursued. In addition, they said that the prosecutor's office had not adhered to the proper legal protocol to file the arrest warrant. Given the obviously frivolous charge and the improper processes, the lawyers said that we should assume that the prosecutors' office had been bought off. But they were not sure about the judge. They said we would find out at the March 10 hearing, because absent

4

corruption, the case should be dismissed, and my parents could go home. So they urged us to wait until after that hearing.

18.     After the March 10 hearing, our parents' defense lawyers contacted my sister and me to inform us that the case was not dismissed. Instead, the judge continued the hearing for six months, during which time my parents would remain in prison. They also let us know that there wasn't even a date set for the next hearing. So it would be at least six months, likely longer, until my parents even had the next hearing, and could be years before a trial. And if convicted, they could be sentenced to up to six years. The lawyers said that the hearing made clear that the judge had been bought off by Palace, so it was unlikely that any attempt to get our parents out of jail using the legal system would succeed.

19.     We were told that appellate judges might not yet have been approached by Palace and were solicited for a bribe. It was not clear that this would even help or that an appeal could be decided any time soon. But, either way, we refused to bribe a public official. I am afraid to disclose further information about this solicitation for fear of putting the safety of the person who told us at risk.

20.     In the first few weeks of my parents' detention, we repeatedly reached out to Miguel, the case agent from the consulate, to seek help. But he would not help.  For example, we tried to enlist his help to get my parents the medications they needed, but he wouldn't get involved. (The defense lawyers eventually were able to get the medications.) We urged Miguel to conduct a consular visit to the prison to check on my parents and the conditions under which they were being held, but he never did. We told him that my mom was being served food that the prison knew she was allergic to, but he didn't reach out to the prison about it. For weeks, nobody had heard from my stepdad, Paul, but Miguel did not try to remedy the problem. He did,

Docusign Envelope ID: FE3B35B4-1D52-8C41-804D-D83E35542A45

however, warn that we should not speak publicly about the situation, claiming it was to avoid the spread of misleading information. He repeatedly reiterated that Palace wanted to make a deal. And after the March 10 hearing, he emphasized that without a settlement, our parents could be waiting in jail for years without a trial.

21.     After that hearing, my sister and I realized that we had no choice but to bargain with Palace for my parents' freedom.  We were desperate because of the physical toll the imprisonment put both my parents in.

22.     During the course of the month, my mom's mental health rapidly deteriorated. She was terrified and had spiraled. For the first few weeks, while she had some contact with the consulate, we did not have ongoing communications with her. She lost about 25 pounds due to lack of edible food. The prison served her fish even though she was allergic to fish. She only ate packaged food because she didn't trust Mexico authorities. She broke into a rash on her body and was not given the medical treatment she needed. Paul needed medication for his heart but did not have access to it initially.

23.     On March 12, the defense attorneys met with Palace's attorneys. Afterwards, they told my sister and me that Palace insisted that before we could bargain for my parents' release, my mom would have to delete the Facebook group for dissatisfied Palace members that she had been active in when Palace had her arrested. The group had thousands of members. Those members posted about Palace's deceptive sales techniques and abusive business practices. Palace seemed to believe that my mom created the group, but she hadn't.

24.     The attorneys told us several times that Palace had made clear that deleting the Facebook group was most important to it. This demand made it even clearer to me that Palace was not actually concerned about any supposed fraud. By then, I had read Palace's criminal

6

complaint and saw that it didn't allege that my mom had committed fraud by posting on Facebook. It alleged that my parents had committed fraud by initiating investigations with their credit card companies into Palace's charges, after Palace canceled their reservations. But Palace's core demand was not money. It was taking down a Facebook group that might alert the public to its abusive business practices.

25.     The next day, the defense lawyers told us that Palace had called them again demanding that the Facebook group be deleted immediately, or they would not negotiate for my parents' release.

26.     We were concerned that if we gave Palace what it wanted, before it agreed to release my parents, Palace wouldn't actually release them. But we thought it was our only hope. So my sister and I got in touch with the creator and owner of the group. To help my parents, she agreed to work with us to remove all members and then delete the group.

27.     On March 14, we told the defense attorneys that we had successfully closed the Facebook group, and they told Palace. Palace responded that it would get back to us with further demands. Palace then went dark for a full week, allowing my parents to languish in prison. It seemed that our worry had come true. Now that Palace had achieved its most immediate goal—the deletion of a Facebook group warning of its abusive practices—it was delaying its other demands in an effort to keep my parents in prison and gain leverage.

28.     Losing hope, my sister and I tried to secure my parents' release in other ways. Close family and friends began making calls to the White House and the State Department. I spoke with the Commander of the Intelligence Division of the Michigan State Police, where Paul worked, who began activating resources at the NYPD and the FBI. And we reached out to John Manly, an attorney who had previously represented my sister—a two-time national champion

gymnast—along with hundreds of other women and girls in the sexual abuse lawsuit against former Olympic team doctor Larry Nassar.

29. On Friday, March 21, Mr. Manly sent Palace's counsel in Florida a strongly worded letter, demanding that the company release my parents by Monday, March 24. The letter also informed Palace that Mr. Manly was receiving calls from media about the situation. The next day, Palace reached out to my parents' defense lawyers with its demands for their release, which the lawyers then shared with me and my sister: a non-disparagement clause with a $1 million liquidated damages provision per violation that would bind not just my parents but their family; an admission from each of my parents that they had caused $7 million in damages to Palace; a requirement that my parents create a Facebook post admitting guilt and apologizing to Palace; and $250,000.

30. We were very concerned that even if we agreed, Palace wouldn't release our parents—or, having obtained a (false) admission of guilt, have them rearrested and demand more. We also couldn't afford $250,000. We responded that Palace should release our parents immediately, and it could resolve their dispute with my parents in a U.S. court. We offered to put the $116,000 in payments that the credit card companies had refunded to my parents in escrow. Given that Palace took more than a week to give us its demands, we requested that it respond with 24 hours. Palace did not respond. Nor did it release my parents.

31. My sister and I hoped that if we could raise public awareness that American citizens were being held in a Mexican prison at the behest of a timeshare company and bring the situation to the attention of the U.S. government, Palace would finally agree to let them go. My sister posted about the situation on Facebook, asking people to contact their government officials. We began to speak with the media. We emailed Richard Grenell, Special Presidential

Envoy for Special Missions of the United States, whose email we had gotten from my sister's former gymnastics coach. And Mr. Manly reached out to government contacts.

32. The U.S. government quickly became involved. Special Presidential Envoy for Hostage Affairs Adam Boehler and Michigan Congressman Tom Barrett began working to help free my parents. My parents' case was also reassigned from the U.S. consulate in Cancún, and the caseworker that seemed to be working with Palace, to the consulate in Mérida, with the Consular Section Chief, Jacob Grannell, and his colleague, Wyatt Duea, taking over. Jacob and Wyatt told us that the White House and the State Department were now involved, and that the White House was holding daily calls. And Jacob and Wyatt began holding daily calls with us before the White House briefing.

33. We learned from the State Department and media contacts that Palace tried to convince the media and the State Department that we were somehow delaying negotiations for my parents' release, but that wasn't true. We were urgently trying to get them free. Around this time, I believed based on media activities that an aggressive PR firm—presumably hired by Palace—had begun trying to dig up dirt on my parents and plant negative stories about them. I believed this based on photographs and information that was in the stories that only Palace would have had.

34. Starting around March 27, 2025, Hostage Envoy Boehler began negotiating with Palace—including directly with José Gibrán Chapur Dájer, Palace's CEO—trying to get my parents released. He negotiated for days at the behest of President Trump, but still Palace did not release my parents.

35. During this time, we also tried to get my parents released on house arrest. On the morning of March 28, staff at the consulate told us that we might be able to get my parents

released on house arrest. To do so, they said, we had to find an apartment in Mexico, a notary, ankle monitors, and some court document the landlord had to sign. The Mexican criminal defense attorneys warned us that even if we were able to get my parents released on house arrest, Palace would likely simply file a new criminal complaint and get them arrested again.

36.     Still, we worked very hard to try to line up everything necessary to at least try to get them released on house arrest. But by March 31, it became clear that this was impossible. The State Department was not able to obtain ankle bracelets, although the reasons why were unclear to me. And we couldn't find anyone willing to rent to my parents, because they'd have to submit documents to the court in a case involving Palace. My sister searched. So did my parents' criminal defense lawyers. But every landlord refused. One of the defense lawyers told us that he learned from a friend tied to Hyatt that nobody would be willing to look like they were going against Palace.

37.     While my sister and I tried to make arrangements for potential house release, Palace attempted to make us believe that American Express was also going to file criminal charges against my parents in Mexico. But consular official Wyatt Duea informed us that this wasn't true. Mr. Duea told us that AmEx executives had assured the White House that the company was not bringing charges. I believe that Palace was trying to make us believe that AmEx was going to file charges in Mexico, to increase the pressure on my parents.

38.     On April 1, 2025, Palace Elite sent my sister an email, which she immediately forwarded to me. In this email, Palace Elite threatens that my parents would be subject to prosecution and remain in prison if they did not agree to its demands in what it called a "restitution agreement." This email also referenced "widespread media reports" about AmEx planning to file criminal charges against my parents. By that time, Mr. Duea had already

confirmed to us that AmEx wasn't planning to file criminal charges against my parents. And because there hadn't been any media reports, this made me and my sister believe that Palace was just spreading a rumor to increase pressure and gain leverage. A true and correct copy of that email is attached hereto as Exhibit 1.

39.    . The letter contained numerous untrue statements. For example, the letter claimed that neither our parents or their attorneys had attempted to negotiate with Palace in over a week, which I know to be untrue. My parents' criminal defense attorneys and Mr. Manly—along with consular officials and Hostage Envoy Boehler—had been continuing to try to negotiate for my parents' release throughout whole week. I am unsure whether Palace thought my sister would believe these statements, or whether Palace wrote the letter planning to share it with others, hoping to convince them that the false statements were true.

40.    I immediately forwarded that email to the U.S. State Department to report Palace's threats.

41.    With negotiations with Palace still unsuccessful in securing my parents' release, on April 1, Congressman Barrett called me to say that he would be going to Mexico the next day to try to negotiate my parents' return in person. He did, in fact, arrive the next day. At that point my parents had been imprisoned for almost a month.

42.    On April 2, Representative Barrett took over the negotiations with Palace. My understanding is that negotiations between Representative Barrett and Palace representatives continued until late that evening, and Representative Barrett's team worked throughout the night.

43.    The following day, one of my parent's defense lawyers sent me a document called "NDA final," and informed me that if my parents signed that document, Palace would release them that day. A true and correct copy of that document is attached as Exhibit 2. The document

Docusign Envelope ID: FE3B3EB4-1DF2-8C41-804D-D83E35542A4F

did not contain an arbitration clause, nor did it contain any language about duress. I was very surprised to see the document my parents were forced to sign contained an arbitration clause and stated that it was not entered under duress. Everyone knew that my parents only signed the contract because they had no choice.

44.     After my parents' release, my family was swarmed by media, friends, and family. With the approval and at the behest of my parents, Lindsey and I put out the statement attributed to us in the news report attached hereto as Exhibit 3.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 27th day of April, 2026, at _____Cedar Lake_____, __IN____.


_Michael Lemke_
_____
MICHAEL LEMKE

12

# EXHIBIT 1

**From:** **The Palace Company** notifications@thepalacecompany.com
**Subject:** The Palace Company: Official Statement
**Date:** April 1, 2025 at 4:14 PM
**To:** lindseylemke11@gmail.com

To **Ms. Lindsey Hull**:

Over the last several weeks there have been many disparaging and inaccurate statements made regarding The Palace Company with respect to the actions of Christy and Paul Akeo. Please allow this statement to provide an accurate depiction of the facts in this matter.

*Undisputed Facts:*

- On February 1, 2016, Christy and Paul Akeo (the "Akeos") purchased from Palace Elite Resorts S.A. de C.V. ("Palace Elite") a vacation club membership and entered into a Sale of Membership Rights Agreement (the "Agreement"), which afforded the Akeos certain rights and status as vacation club members at Palace Resorts Hotels.

- From February 3, 2016, until the end of 2022 (when the Agreement was terminated), the Akeos made a total of **1570 bookings** at Palace Resorts Hotels. Palace Elite does not have any documented complaints from or on behalf of the Akeos during the 5+ year period between February 3, 2016, and the date of the last membership they purchased from Palace Elite (November 21, 2022).

- In March of 2022, Palace Elite informed the Akeos that they were in breach of the Agreement and explained the basis for such breach. Among other

breaches, the Akeos improperly publicized and made their membership rights available for purchase to third parties at discounted rates, causing millions of dollars in damages to Palace Elite. Palace Elite conservatively estimates that the Akeos obtained a windfall of $1,250,000 from their improper use of membership benefits.

- In April of 2022, the Akeos admitted their breach, in writing, and committed to refrain from further breaches of the Agreement.

- In July of 2022, Christy Akeo actively engaged in a Facebook group where, among other posts and publications, she advised Palace Elite members that they could terminate their Palace Elite membership contracts by reporting their credit cards as lost or stolen, even if they were not (this is considered fraud under Mexican law). See corresponding screenshot below:



- Shortly thereafter, the Akeos stopped making payments on the Agreement, and on September 23, 2022, Palace Elite terminated the Akeos' Agreement.

- Between September of 2022 and November of 2022, Palace Elite received formal notification that Paul Akeo initiated thirteen (13) credit card chargebacks with his provider for services already rendered by Palace Elite and enjoyed by the Akeos. The chargebacks pertained to installment payments of the membership benefits that the Akeos had already received, enjoyed and used. By virtue of Christy Akeo's own comments on her Facebook posts, the basis provided to American Express for these chargebacks was false. Note that under the Criminal Code of Quintana Roo:

  - *Article 152: The crime of fraud is committed by anyone who, deceiving someone or taking advantage of a mistake, obtains something that belongs to another or gains an undue profit for themselves or for another. […]*

- In August of 2023, Palace Elite, in accordance with applicable Mexican law, filed a criminal complaint in Mexico against the Akeos, alleging fraud in connection with the foregoing chargebacks, and alleging damages in connection with the subject chargebacks.

- The matter was investigated by the Mexican authorities, and on March 9, 2024, criminal arrest warrants were issued against the Akeos for their probable participation in the commission of the crime of fraud against Palace Elite.

- On March 4, 2025, almost nineteen (19) months after Palace Elite filed the initial criminal complaint, the Akeos were arrested in Cancun, Mexico, with the assistance of INTERPOL.

- Palace Elite, in accordance with its rights as victim under the aforementioned

criminal proceeding, is entitled under Mexican law to reach a restitution agreement with the Akeos as an alternative way to terminate the criminal proceeding which, otherwise, would proceed in their ordinary course until a judgment is issued by the competent judge. Please see below.

***Mexican Criminal Justice System***

Under Mexican law, the criminal justice system favors resolving conflicts through restorative justice rather than traditional criminal punishments like jail time.

Mexican law requires alternative ways to resolve criminal cases, including methods to compensate victims for damages. This process is overseen by judges when necessary and may require judicial oversight in certain instances.

Mexican law gives individuals two key rights in alternative dispute resolution proceedings. The first is the freedom to choose whether to participate in these proceedings and reach an agreement, and the second is the right to receive full information about the process and its consequences before agreeing to participate.

These resolution options are available to all individuals, even those in preventive detention.

One key and frequently used option in Mexican criminal dispute resolution proceedings is a restitution agreement between the victim (Palace Elite) and the accused (Christy and Paul Akeo). If a judge approves the parties' restitution agreement and confirms both parties follow its terms, the criminal case can be resolved without further prosecution.

***Application to Present Matter***

On March 10, 2025, a criminal court ordered the Akeos to remain in preventive detention for a minimum of six (6) months until trial. Immediately thereafter, Palace Elite presented the Akeos with general terms regarding a potential restitution

agreement, which, to Palace Elite's understanding, was preliminarily agreed to by the Akeos and their Mexican counsel.

Since then, however, the Akeos' representatives have chosen to disparage Palace Elite and its reputation. It is unclear to Palace Elite whether these disparaging statements stem from a misunderstanding of Mexican law and Mexican criminal proceedings, or the Akeos' fear that, per widespread media reports, American Express may initiate legal proceedings against them in Mexico for their actions. Regardless of the reason, these representatives have taken to the media and the courts of public opinion to share everything except an accurate picture of the criminal justice system in Mexico and Palace Elite's limited involvement in this matter.

Despite these antics, Palace Elite remains committed to entering into a restitution agreement with the Akeos in accordance with applicable Mexican law. Moreover, Palace Elite has already committed itself to (i) donate any funds received through such restitution agreements to established nonprofit organizations dedicated to combatting fraud and injustice in Mexico, as our focus is on justice, not financial gain, and (ii) stipulate and support, before the Judge presiding over the subject criminal proceedings, the Akeos' request to lift the preventive detainment measure currently in force, so that the Akeos may execute any proposed restitution agreement outside of jail – an offer that was made by Palace Elite more than one (1) week ago but to which has received no response from the Akeos or their attorneys.

We welcome the opportunity to resume negotiations regarding a restitution agreement with you and the Akeos. Otherwise, and as set forth above, Mexican law does not require the Akeos to participate in alternative dispute resolution proceedings or enter into any restitution agreement, in which case the parties may permit the criminal proceedings in Mexico to continue and present their respective evidence at trial when the date presents itself.

We thank you in advance for taking the time to review this statement.

# EXHIBIT 2

<u>NO-DISPARAGEMENT AGREEMENT</u>

This NON-DISPARAGEMENT AGREEMENT (this "<u>Agreement</u>") is entered into as of the _____ day of _____, 2025 (the "<u>Effective Date</u>"), by and among CHRISTY LIN AKEO and PAUL K. AKEO, on one hand, and PALACE ELITE RESORTS, S.A. DE C.V. ("PALACE ELITE"), on the other hand.

WHEREAS, PALACE ELITE and CHRISTY LIN AKEO and PAUL K. AKEO have had a long-standing commercial relationship since at least February 1, 2016 pursuant to a series of contracts and ancillary agreements entered into on or about February 1, 2016, February 3, 2016, April 28, 2016, May 19, 2016, September 25, 2016, November 22, 2016, May 6, 2017, July 26, 2017, January 4, 2018, September 21, 2018, December 21, 2018, February 17, 2019, April 27, 2019, September 29, 2019, July 4, 2020, October 25, 2020, February 12, 2021, May 24, 2021, and November 21, 2021 (collectively, the "<u>Membership Agreements</u>").

WHEREAS, PALACE ELITE has asserted that CHRISTY LIN AKEO and PAUL K. AKEO have acted wrongfully in its dealings with PALACE ELITE.

WHEREAS, CHRISTY LIN AKEO and PAUL K. AKEO have asserted that PALACE ELITE has acted wrongfully in its dealings with CHRISTY LIN AKEO and PAUL K. AKEO.

1. <u>Consideration for Non-Disparagement</u>

   a. CHRISTY LIN AKEO and PAUL K. AKEO expressly acknowledge and agree that PALACE ELITE's promises and covenants set forth herein, including but not limited to as set forth in Paragraph 2, are good, valuable, and sufficient consideration for the promises, covenants, and terms contained herein, including but not limited to the terms of Paragraphs 3 through 11 of this Agreement.

   b. PALACE ELITE expressly acknowledges and agrees that CHRISTY LIN AKEO's and PAUL K. AKEO's promises and covenants set forth herein, including but not limited to as set forth in Paragraph 2, are good, valuable, and sufficient consideration for the promises, covenants, and terms contained herein, including but not limited to the terms of Paragraphs 3 through 10 of this Agreement.

2. <u>Non-Disparagement</u>.

   a. CHRISTY LIN AKEO represents and warrants, on behalf of herself and her agents, representatives, legal guardians, heirs, executors, administrators, successors, and assigns, that she shall refrain from making or publishing, in writing or verbally, directly or indirectly, by word, statement, or gesture, any statements made about PALACE ELITE or its ownership, managers, shareholders, attorneys,

1

employees, agents, directors, officers, servants, subsidiaries, affiliates, related entities, parent corporations, stockholders or stockholding entities, insurers, reinsurers, successors, assigns, third party administrators, or legal representatives, including, but not limited to, in or on websites, interviews, press releases, news releases, media releases, press statements, video releases, articles, commentaries, written, audio or visual means (e.g., YouTube, Facebook, Instagram, X, Threads, advertising or marketing materials, blogs, chat-rooms, etc.).

b.   PAUL K. AKEO represents and warrants, on behalf of himself and his agents, representatives, legal guardians, heirs, executors, administrators, successors, and assigns, that he shall refrain from making or publishing, in writing or verbally, directly or indirectly, by word, statement, or gesture, any statements made about PALACE ELITE or its ownership, managers, shareholders, attorneys, employees, agents, directors, officers, servants, subsidiaries, affiliates, related entities, parent corporations, stockholders or stockholding entities, insurers, reinsurers, successors, assigns, third party administrators, or legal representatives, including, but not limited to, in or on websites, interviews, press releases, news releases, media releases, press statements, video releases, articles, commentaries, written, audio or visual means (e.g., YouTube, Facebook, Instagram, X, Threads, advertising or marketing materials, blogs, chat-rooms, etc.).

c.   PALACE ELITE represents and warrants, on behalf of itself and its agents, representatives, ownership, managers, shareholders, attorneys, employees, agents, directors, officers, servants, subsidiaries, affiliates, related entities, parent corporations, stockholders or stockholding entities, insurers, reinsurers, successors, assigns, third party administrators, or legal representatives, and assigns, that it shall refrain from making or publishing, in writing or verbally, directly or indirectly, by word, statement, or gesture, any statements about CHRISTY LIN AKEO and PAUL K. AKEO or their agents, representatives, legal guardians, heirs, executors, administrators, successors, and assigns, including, but not limited to, in or on websites, interviews, press releases, news releases, media releases, press statements, video releases, articles, commentaries, written, audio or visual means (e.g., YouTube, Facebook, Instagram, X, Threads, advertising or marketing materials, blogs, chat-rooms, etc.).

3. <u>Mutual Covenants Not to Sue</u>. Other than the Released Claims, Palace Elite does not know of any claims that Palace Elite might have against either CHRISTY LIN

AKEO or PAUL K. AKEO. PALACE ELITE, on behalf of itself and its ownership, managers, shareholders, attorneys, employees, agents, directors, officers, servants, subsidiaries, affiliates, related entities, parent corporations, stockholders or stockholding entities, insurers, reinsurers, successors, assigns, third party administrators, or legal representatives, covenants and agrees that it will not bring any lawsuit, arbitration, or other proceeding, in Mexico or any state or other constituent jurisdiction thereof, in the United States or any state or other constituent jurisdiction thereof, or in any other jurisdiction, against CHRISTY LIN AKEO and PAUL K. AKEO, or their respective agents, representatives, legal guardians, heirs, executors, administrators, successors, and assigns, on account of the Released Claims.

Other than the Released Claims, CHRISTY LIN AKEO does not know of any claims that CHRISTY LIN AKEO might have against Palace Elite or its ownership, managers, shareholders, attorneys, employees, agents, directors, officers, servants, subsidiaries, affiliates, related entities, parent corporations, stockholders or stockholding entities, insurers, reinsurers, successors, assigns, third party administrators, or legal representatives. CHRISTY LIN AKEO, on behalf of herself as well as her respective agents, representatives, legal guardians, heirs, executors, administrators, successors, and assigns, covenants and agrees that she will not bring any lawsuit, arbitration, or other proceeding, in Mexico or any state or other constituent jurisdiction thereof, in the United States or any state or other constituent jurisdiction thereof, or in any other jurisdiction, against Palace Elite or its ownership, managers, shareholders, attorneys, employees, agents, directors, officers, servants, subsidiaries, affiliates, related entities, parent corporations, stockholders or stockholding entities, insurers, reinsurers, successors, assigns, third party administrators, or legal representatives, on account of the Released Claims.

Other than the Released Claims, PAUL K. AKEO does not know of any claims that PAUL K. AKEO might have against Palace Elite or its ownership, managers, shareholders, attorneys, employees, agents, directors, officers, servants, subsidiaries, affiliates, related entities, parent corporations, stockholders or stockholding entities, insurers, reinsurers, successors, assigns, third party administrators, or legal representatives. PAUL K. AKEO , on behalf of himself as well as his respective agents, representatives, legal guardians, heirs, executors, administrators, successors, and assigns, covenants and agrees that he will not bring any lawsuit, arbitration, or other proceeding, in Mexico or any state or other constituent jurisdiction thereof, in the United States or any state or other constituent jurisdiction thereof, or in any other jurisdiction, against Palace Elite or its ownership, managers, shareholders, attorneys, employees, agents, directors, officers, servants, subsidiaries, affiliates, related entities, parent corporations, stockholders or stockholding entities, insurers, reinsurers, successors, assigns, third party administrators, or legal representatives, on account of the Released Claims.

4. <u>Non-Inducement</u>. From and after the Effective Date, each of CHRISTY AKEO, PAUL AKEO, and PALACE ELITE represent and warrant that they shall not, whether directly or indirectly, induce or attempt to induce or encourage others to induce or attempt

3

to induce, any person to use fraudulent means under applicable law or any means whatsoever to terminate any agreement or relationship with Palace Elite.

5. <u>Liquidated Damages</u>. In the event of a breach of this Agreement, CHRISTY AKEO, PAUL AKEO  and PALACE ELITE agree that a should either of them breach this Agreement, each any of them shall immediately pay individually as fixed and liquidated damages a sum of $50,000.00 U.S. Dollars per breach to the other party, as well as $1,000 U.S. Dollars per breach, per calendar date, until each and every breach is cured. Such liquidated damages in the amount of $50,000.00 U.S. Dollars. The payment of such liquidated damages will not affect the continued enforcement of this Agreement.

6. <u>Enforcement of this Agreement</u>. Each party shall pay their own respective attorneys' fees and costs relating to this Agreement. In the event of a legal action or other proceeding arising out of an alleged breach of this Agreement or to enforce this Agreement, the prevailing party shall be entitled to recover their reasonable attorneys' fees and costs, whether incurred before suit, during suit, or at the appellate level. The prevailing party also shall be entitled to recover any attorneys' fees and costs incurred in litigating the entitlement to attorneys' fees and costs, as well as in determining or quantifying the amount of recoverable attorneys' fees and costs. The reasonable costs to which the prevailing party is entitled shall include costs that are taxable under any applicable statute, rule, or guideline, as well as non-taxable costs, including but not limited to costs of investigation, copying costs, electronic discovery costs, mailing and delivery charges, information technology support charges, consultant and expert witness fees, travel expenses, court reporter fees, and mediator fees, regardless of whether such costs are otherwise taxable.

7. <u>Capacity to Execute</u>. Each signatory to this Agreement represents and warrants that they are of appropriate legal, physical, and mental capacity, has read this Agreement thoroughly and had an opportunity to have this Agreement fully explained by independent counsel and other advisor(s) of their choosing, and is legally authorized to execute this Agreement. In entering into the Agreement, each party to this Agreement relies wholly upon their own judgment, belief, and knowledge of their respective obligations related to the terms, considerations, covenants, and promises contained herein, and does not rely upon any statement or representation of any other party or any other party's representatives.

8. <u>Severability</u>. Should any provision of this Agreement be invalid or unenforceable for any reason, the remaining provisions hereof shall remain in full force and effect. The parties agree that any tribunal may modify any invalid or unenforceable provision to the maximum extent permitted by law while preserving the intended effect of such provision.

9. <u>Contract.</u>  The terms of this Agreement are contractual and the parties to this Agreement represent and warrant that they intend to be bound by them.

4

10. <u>Construction.</u>   Any rule of construction to the effect that ambiguities are resolved against the drafting party will not apply to the interpretation and construction of this Agreement.

11. <u>Headings.</u>  The paragraph headings in this Agreement are intended solely for reference and shall not by themselves determine the construction or interpretation of this Agreement.

12. <u>Governing Law.</u> This Agreement shall be governed by and construed in accordance with the internal law of the State of Delaware and/or the State of Michigan, without giving effect to any choice of law or conflict of law provisions or rules.

13. <u>Counterparts.</u>  This Agreement may be executed in counterparts, each of which will be deemed an original, and such counterparts will together constitute a single Agreement.  Faxed, e-mailed, or electronic signatures will be deemed originals.

[SIGNATURE PAGES FOLLOW]
<u>THE PERSON SIGNING THIS AGREEMENT REPRESENTS AND WARRANTS AS FOLLOWS: (i) HE/SHE HAS READ THE AGREEMENT IN ITS ENTIRETY, (ii) FULLY UNDERSTANDS AND ACCEPTS ALL TERMS OF THE AGREEMENT, (iii) HAS CONSULTED WITH INDEPENDENT LEGAL COUNSEL REGARDING THE MEANING AND CONSEQUENCES OF THE AGREEMENT OR VOLUNTARILY WAIVED SUCH RIGHT, (iv) ACKNOWLEDGES THAT THIS AGREEMENT IS BINDING AND ENFORCEABLE.</u>

_____
CHRISTY LIN AKEO


_____
Date



[INSERT NOTARY TEMPLATE]

6

THE PERSON SIGNING THIS AGREEMENT REPRESENTS AND WARRANTS AS FOLLOWS: (i) HE/SHE HAS READ THE AGREEMENT IN ITS ENTIRETY, (ii) FULLY UNDERSTANDS AND ACCEPTS ALL TERMS OF THE AGREEMENT, (iii) HAS CONSULTED WITH INDEPENDENT LEGAL COUNSEL REGARDING THE MEANING AND CONSEQUENCES OF THE AGREEMENT OR VOLUNTARILY WAIVED SUCH RIGHT, (iv) ACKNOWLEDGES THAT THIS AGREEMENT IS BINDING AND ENFORCEABLE.

_____

PAUL K. AKEO

_____

Date

[INSERT NOTARY TEMPLATE]

7

THE PERSON SIGNING THIS AGREEMENT REPRESENTS AND WARRANTS AS FOLLOWS: (i) HE/SHE HAS READ THE AGREEMENT IN ITS ENTIRETY, (ii) FULLY UNDERSTANDS AND ACCEPTS ALL TERMS OF THE AGREEMENT, (iii) HAS CONSULTED WITH INDEPENDENT LEGAL COUNSEL REGARDING THE MEANING AND CONSEQUENCES OF THE AGREEMENT OR VOLUNTARILY WAIVED SUCH RIGHT, (iv) ACKNOWLEDGES THAT THIS AGREEMENT IS BINDING AND ENFORCEABLE.

PALACE ELITE RESORTS, S.A. DE C.V.

By:   _____
      [INSERT NAME OF SIGNATORY]
      Its: [INSERT TITLE OF SIGNATORY]


_____
Date

[INSERT NOTARY TEMPLATE]

8

# 'We'll never leave again': Michigan couple back home after stay in Mexican prison

by: Shajaka Shelton, Rachel Ramsey Posted: Apr 3, 2025 / 08:42 PM EDT
Updated: Apr 4, 2025 / 09:08 AM EDT

LANSING, Mich. (WLNS) — Spring Arbor couple Paul and Christy Akeo, who spent almost a month **behind bars** in a **maximum-security prison in Mexico**, are now back stateside. Their flight touched down at the Capital Region International Airport at around midnight.



'We'll never leave again': Michigan couple back home after stay in Mexican prison

They returned to Michigan after a Thursday court hearing, in which the court ruled that the Akeos were to be released from custody. The Akeos and U.S. Rep. Tom Barrett (R-Charlotte) say they no longer face charges, and the entire case against them has been dropped.

Case 1:25-cv-23733-RKA   Document 64-3   Entered on FLSD Docket 04/27/2026   Page 30 of 40



The Akeos return home after almost a month in a Mexican prison. (WLNS)

The pair was **initially arrested** on March 4 at an airport in Cancún on fraud allegations. They were accused of defrauding resort chain **Palace Elite** out of more than $116,000 by breaching a timeshare contract and illegally canceling membership charges to an American Express credit card.

'We'll never leave again': Michigan couple back home after stay in Mexican prison                4/27/26, 4:17 PM



'We'll never leave again': Michigan couple back home after stay in Mexican prison
4/27/26, 4:17 PM



The Akeos and Barrett board the plane from Mexico

6 News spoke with **Michael Lemke, the Akeos' son**, who said his parents could have been held for up to six months, as a judge previously gave the

company that much time to gather evidence.

The Akeos. (Lindsey Hull)



The Akeos. (Lindsey Hull)

The Akeos' release comes a day after Barrett **visited the couple in prison**. Barrett told 6 News he also spoke with the president of the Quintana Roo Supreme Court to work on getting the couple released.

"We are so happy that it's over," said Christy.

6 News captured the moment when the Akeos reunited with their family. Paul Akeo shared what happened after police arrested the couple on March 4th.

"We were whisked off to another facility and then we were sent directly to prison. We weren't able to talk to anybody, didn't have any contact with lawyers, didn't have our phones, so we were just sitting there," said Paul.

The two say days went by before they could talk to their family or even each other. Now, they're sharing what their time spent inside a maximum security prison in Mexico was like.

"It's awful. It's nothing like you would ever want to go through, it's unbelievable. The language barrier is unreal," said Christy.

Congressman Tom Barrett shared what he saw in the prison as well when he visited the couple in Mexico.

"I walked through part of the interior of the prison, and it was enough for me to see that no person would want to be detained there, no American should have to go through that, especially under the conditions they were in for the amount of time that they were," the Congressman said.



Barrett visits the Akeos.

Barrett visits the Akeos.

Christy's kids started reaching out for help after they heard about the arrest. Word got to U.S. Representative Tom Barrett, who flew to Mexico Wednesday to meet with them.

"I insisted when I went down there that I wasn't going to leave empty-handed, and I wasn't going to leave without bringing them back," Rep. Barrett said.

By then the Akeos felt hopeless, even after meeting with Congressman Barrett.

"I never thought we would be coming home for months," Christy said.

Case 1:25-cv-23733-RKA   Document 64-3   Entered on FLSD Docket 04/27/2026   Page 38 of 40

The Akeos. (Lindsey Hull)

Congressman Barrett said he met with Mexican officials, who arranged a hearing Thursday. That's when the charges against the Akeos were dropped.

"There were some things that were getting a little uncertain at the end and we were able to resolve those quickly, took a lot of effort from all parties involved," said Rep. Barrett.

The Congressman adds that every level of both the United States and Mexican Governments was involved in this conversation, including President Donald Trump.

"The president was very excited to hear this and expressed his excitement and welcomed them back to America," Congressman Barrett said.

Christy said now that the couple is home, the first thing she is going to do is take a shower.

"There were no showers there, and if you could take a shower it was cold," Christy said.

After a month of uncertainty, this family can now rest easy with the Akeos back in the United States.

"Be thankful for what America has given us," Paul continued. "And just be thankful for the little things."

Thursday evening, 6 News received a statement from the Akeo children, saying:

> *The Akeo family wishes to thank President Donald J. Trump, his Special Envoy for Hostage Affairs Adam Boehler and Congressman Tom Barrett(R-Lansing) for working tirelessly for the release of Paul and Christy Akeo. We also want to express our deepest gratitude to Secretary of State Marco Rubio, Mark Coolidge Johnson, Charge d 'Affaires, U.S. Embassy Mission Mexico and his dedicated team. Through four straight weeks of fear and uncertainty, Congressman Barrett's commitment to bringing our parents' home safely provided us with hope and reassurance. He traveled to Cancun at great personal risk, camped out at the prison and made it clear that he would not return home without them. His heroic efforts as a veteran represent the finest traditions of our nation's military to never leave an American behind. No American should be held hostage to the demands of a private company anywhere in the world. Paul and Christy are under the care of physicians and therapists to be treated for illnesses and trauma inflicted upon them during their captivity. We ask that their privacy be respected as they rest and heal. The family will have much more to say about this ordeal in the coming*



> *days.*
>
> *Lindsey Lemke Hull and Michael Lemke, April 4.*

Couple returning home to Mid-Michigan

[Add as preferred source on Google](#)