Docusign Envelope ID: 0534A1E8-E5A1-8BAF-80C6-B7EBD0B13CE1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA, MIAMI DIVISION

PAUL AKEO and CHRISTY AKEO,

Plaintiffs,

v.

PALACE ELITE RESORTS S.A. de C.V., a Mexican corporation; PR GLOBAL RESERVATIONS, LLC, a Florida limited liability company; JOSÉ GIBRÁN CHAPUR DÁJER, an individual; CHDB HOLDING, S.A. de C.V., a Mexican corporation; and CONTROLADORA IHC, S.A.P.I. de C.V., a Mexican corporation; and OPERADORA PALACE RESORTS JA LTD., a Jamaican corporation,

Defendants.

Case No.: 1:25-cv-23733-RKA

**DECLARATION OF PAUL AKEO**

I, Paul Akeo, declare as follows:

1.      I am a plaintiff in this action and the husband of the other plaintiff, Christy Akeo. I served in the United States Navy for 23 years and retired holding the rank of Senior Chief Petty Officer.  I am currently employed at the Michigan State Police as a civilian employee. My work title with the State Police is the Physical Plant Supervisor (Mechanical Engineer). I am currently employed as a mechanical engineer with the Michigan State Police. I make this declaration based on my personal knowledge. If called as a witness, I could and would competently testify to the matters stated herein.

**The Arrest**

2.      On March 3, 2025—the day before Christy and I traveled to Mexico for a

Docusign Envelope ID: 0534A1F8-F5A1-8BAF-80C6-B7EBD0B13CE1

vacation—Interpol issued a "red notice" for our arrest based on a criminal complaint filed by Palace Resorts. We did not know this at the time. Had the notice been issued sooner, my employer, the Michigan State Police, would have flagged it for me, and we would have had the opportunity to address the matter from home. That's because the Michigan State Police is notified when there is an outstanding warrant out for an employee's arrest. Attached hereto as Exhibit 1 is a true and correct copy of the Spanish version of the Red Notice (with an official translation procured by our lawyers).

3. On March 4, 2025, when Christy and I passed through immigration at the airport in Cancún, we were detained without explanation for approximately three hours. We were then told we could enter the country if we signed documents written in Spanish, which we did—only to be ambushed by six armed police officers. When Christy demanded to know what was happening, one of the officers responded, "You know, Palace?" As we were being arrested, we were photographed and videotaped by waiting press. We were then transported by armed officers to a police station. Although we had been held for nearly seven hours at that point, that was the first time we were given water; we were not offered food.

4. I wasn't given any food that whole day.

**Prison Conditions**

5. Christy and I were eventually transferred to a maximum-security prison in Quintana Roo, where we remained for the next month. We were terrified. We were immediately separated.

6. I was placed in a jail cell with roughly 35 other men. But there were only eight concrete slabs for people to sleep on. Everyone else slept on the floor. I did not have a shower that worked. I had to wash from a bucket and splash the water over my body. The toilet did not

work—I had to get water in the bowl to go down via gravity. I was often forced to sleep on the floor without proper bedding. Each night, up to ten new people would be placed in the holding cell with me. I was sleeping shoulder-to-shoulder with other inmates on the floor.

7.     On the first night, there were arguments going on in the cell. So the guards sprayed pepper spray into a fan to blow it into my cell. There was no need for them to do that, and they just laughed. I was so scared that I couldn't sleep. It was terrifying to see the way Mexican prison officials treated the inmates.  I thought I was screwed.  During that first week, I also pulled drywall screws from the wall and slept with them for protection.

8.     I was acutely concerned about what could happen if anyone in the prison learned I work for the Michigan State Police.

9.     During my stay I was transferred to a few different jail cells for my own safety and this was directed by the Prison Warden, and not requested by me. In the first two weeks, I was in the general lockup cell with individuals who were there for drug dealing, armed robbery, and murder. I was then moved to a cell with individuals who had been detained for two or three years. In my final cell, I was with individuals who were members of the Mexico cartel and had killed people or committed armed robbery, rape, or stealing. I feared for my personal security and safety the entire time in prison. I understood that nobody spoke English. Inmates told me they recognized me "from the TV," referring to the media coverage of my arrest by Mexican authorities. I was afraid the inmates would find out that I worked for law enforcement in the United States. I later found out from Christy that one of the ladies on the female side of the prison told her that she knew I worked for the Michigan State Police.

10.     Although I had listed my medications my CPAP machine during the intake process, I was initially denied access to them, including to my necessary heart medication. It was

3

not until media attention began that the Mexican authorities began to provide me with adequate medical care.

11. Christy and I had extremely limited contact with each other and the outside world. We were permitted to see each other only when meeting with our attorneys, which happened rarely, or with someone from the U.S. Consulate. I wasn't able to make contact with my stepchildren, Michael and Lindsey, for weeks.

## Court Hearings

12. Christy and I attended our first court hearing the day after our arrest on March 5, 2025. We were forced to wear shackles. The criminal defense attorneys who were with us asked for additional time to prepare our defense, and the judge ordered that we remain detained until our next hearing on March 10.

13. While we were at the hearing, someone from Palace told me that the company had spoken to the American consulate and said that it was willing to drop the criminal charges only in exchange for a settlement agreement. He said that the settlement agreement would not be "about the money," but "about the Facebook group." I do not know the name of the corporate representative, but I have met him before at Palace Resorts and know what he looks like. The corporate representative had laughed at us, when we walked into the courtroom in shackles.

14. We had no idea what the arrest or charges were for.  When we learned it related to the funds the credit card companies decided to reimburse me, we could not comprehend how this conduct could possibly be the basis of criminal charges.

15. Christy and I had our next court hearing on March 10. We don't speak Spanish, so we didn't know what was happening during the hearing. Our criminal defense attorneys told us that the court delayed the next hearing for six months, and that it wasn't even scheduled yet. It

might be years, they told us, before we get a trial. And they said that the court had ordered that we remain in prison the whole time. They told us that, if we were found guilty, the sentence was up to six years .

### April 3 Courthouse and Signing

16.     Our next court appearance wasn't until April 3. During that time, I had very little contact with the criminal defense attorneys, my stepchildren, or my wife. Christy and I did meet with Congressman Tom Barrett on April 2. We learned that he had traveled from Michigan to Mexico to help negotiate our release. He said that he wouldn't leave until we were free.

17.     At approximately 12:30 p.m. on the day of the hearing, guards at the prison came to my cell and asked me to come out. I had no idea what was happening. I was escorted down to the prison garage in shackles where I met my wife, also in shackles. The warden then appeared and told us we were going to the courthouse for a hearing to get some "good news."

18.     We arrived at the courthouse at about 1:00 p.m. for what we were told was a 2:00 p.m. hearing. I was placed in a separate, filthy basement holding cell—in shackles—and could not see my wife. I was the only one in my separate holding cell and was left there for hours. Christy and I could talk to each other by shouting back and forth, but we could not see one another. It was very hot down there.

19.     By this point, we had been waiting for over three hours—two hours past our scheduled hearing time. The repeated delays made me fear something had gone wrong and that we would not be going home that day. I kept asking for my lawyers and for Congressman Tom Barrett, but no one could help me or even understand my requests.

20.     Finally, around 4:00 p.m., guards came to take us to the hearing. We were escorted by three armed guards carrying machine guns. In the courtroom, we saw our criminal

defense attorneys, Congressman Barrett and his chief of staff, the U.S. General Consul, his bodyguard, and the Chief of American Citizen Services for the U.S. Embassy. Palace attorneys and corporate representatives were also there. Our criminal defense attorneys translated for us because the interpreter wasn't good enough. We remained in shackles most of the time and surrounded by armed guards.

21.     Once seated, Congressman Barrett told us that we needed to sign paperwork to be free from prison and had no choice to sign unless we wished to remain in prison and subject to criminal prosecution. All we wanted to do was sign and leave prison, where I feared for my life and personal security, and have the criminal charges—which could lead to up to six years in prison—dropped. We were so scared as to what was happening and why it was delayed for so long.

22.     Our criminal defense attorneys also told us that we needed to sign agreements to be released from these terrible circumstances.

23.     During a brief recess in the court hearing, we signed two documents where we were told to by our defense attorneys. Then, an attorney for Palace signed. Everyone then went back into court.

24.     This was the first time we ever saw the documents, one of which was in Spanish (which we can't understand) and the other in English. I thought these were the same document, but I later learned that they were different.  I was not able to read them. I was told to just sign as quickly as possible. It was my understanding at the time, based on the statements made by Palace's lawyers and CEO to my defense attorneys and the U.S. government officials, that I had no choice but to sign the agreements in order to be free from prison and criminal prosecution. After spending more than a month in the maximum-security prison, I truly believed that if we did

not sign the agreements, we would remain in prison indefinitely. We asked for copies of what we signed, but were told we could not have copies at the time of signature but would be sent copies later. We left without any paperwork from court.

25. After we returned to the courtroom, the judge asked us a question, which we couldn't understand. Our criminal defense attorneys told to respond, "No." We did. Then, we were told that the criminal case had been dismissed.

26. Instead of being free to go directly home, we were required to return to the prison for processing first. We were surrounded by numerous armed guards on our way back to the prison. Based on statements made to us, everybody around us distrusted Palace Resorts and were afraid that we were not going to be released from prison. As a result, Congressmember Barrett, the Consular General, and members of their staff followed us in their own armored vehicle.

27. After we were processed and released from the maximum security prison, Congressmember Barrett and the Consular General transported us in an armored vehicle to the airport, where they had arranged a chartered jet. Because of Palace's power in Cancún and their conduct, everyone was afraid that Palace might have us re-arrested or even physically harm us. I feared for my personal safety and security the entire time until we left Mexico airspace.

28. Throughout the signing process, Christy and I were threatened with imprisonment and criminal prosecution, scared, confused, intimidated, and humiliated. The armed guards with machine guns, the Palace lawyers' stalking and assaulting behavior at the signature time, the hours of unexplained delays, and the previous thirty days of constant fear for our personal safety and security next to drug dealers and murderers added to our fear and anxiety. We had no reasonable choice but to sign the Agreement if we wanted to be released from prison and to be free from the constant fear for our personal safety and security. We truly believed that if we did

Docusign Envelope ID: 0534A1F8-F5A1-8BAF-80C6-B7EBD0B13CF1

not sign immediately, we would remain in prison indefinitely.

## **Post-Release**

29.     After our release and prior to retuning to work, I was directed to seek mental health counseling due to my ordeal and month-long prison detention. I continued this for a month and half. It took me that long to even begin to try to return to my normal life. But even now, I still haven't gotten there.

30.     I continue to fear for my personal safety because I know that Palace is a powerful company with connections throughout the world. I continue to experience significant anxiety as a result of being unjustly imprisoned for a month in a foreign prison. And I'm scared to leave the country because I don't want to be detained again.

31.     At the same time, I want to hold Palace accountable for what it did to me and Christy. So, although we are scared, Christy and I decided to bring a lawsuit against Palace.

32.     On July 22, 2025, our counsel sent a letter to Palace's counsel indicating our intention to file suit on or before August 1, 2025 in Florida Circuit Cocket. Our lawyers asked if Palace wished to resolve the lawsuit before suit was filed. No demand for money was made by our lawyers. Our lawyers asked for a response by July 28, 2025.

33.     On July 31, 2025, our lawyers received a letter from Palace asking for "an additional five (5) business days" to "conduct a thorough internal assessment and prepare a more considered response" to our communication. Palace stated: "We appreciate your cooperation, and we will be in touch no later than Thursday August 7, 2025 with our response."

34.     Palace Resorts did not respond to our lawyers' communication as it had promised. Rather, on August 11, 2025, the International Court of Arbitration sent a Request for Arbitration dated August 6, 2025. I felt deceived yet again by Palace, including its own general counsel, in

Docusign Envelope ID: 0534A1E8-E5A1-8BAF-80C6-B7EBD0B13CE1

their statements and conduct by asking us to wait to file our lawsuit with a promise to respond to our letter and then choosing not to respond at all.

35. On August 15, 2025, I received a notification that Palace was requesting "emergency orders" based on the Non-Disclosure Agreement it forced us to sign under duress. On the same day, the emergency arbitrator wrote to us that we were required to respond by August 18 to give availability for a hearing and disclose counsel, and by August 20 to respond to Palace Elite's request for emergency orders. I will be emotionally traumatized if I am forced to arbitrate my disputes with Palace because we only signed the NDA, and its arbitration clause, because Palace threatened us with prosecution and continued imprisonment. Palace repeatedly told our advocates that we had to sign the NDA, and its arbitration clause, as a condition of being released from the maximum-security prison and its terrible conditions. The way I think about this is that Palace caused our arrest based on its false accusations, coerced us to sign the NDA and its arbitration clause under threat of criminal prosecution and imprisonment, and now seeks to exploit the coerced provision against us.

36. I understand the Agreement provides that "All disputes arising out of or in connection with this Agreement shall be finally settled under the Rules of Arbitration of the International Chamber of Commerce by one or more arbitrators appointed in accordance with the said rules. The seat of arbitration shall be Vancouver, Canada." My signature on this provision, like all provisions of the NDA, was procured through duress. Palace insisted that we sign this clause as a condition to being released from Mexico maximum security prison, being freed from the threat of criminal prosecution and further imprisonment, and being freed from the fear for my personal safety and security that brings. Congressmember Barrett told us when we saw him on the date we signed that the only way we leave prison is if we sign these agreements in the form

demanded by Palace Resorts without negotiation.

37.     I understand that the NDA's arbitration clause references the Rules of Arbitration of the International Chamber of Commerce. I did not have access to the Rules of Arbitration of the International Chamber of Commerce at any time prior to or at signing. When we were in prison, guards restricted and barred our access to any outside literature, Internet, computer, or other resource that could possibly contain these rules, effectively depriving me of any and all access to these Rules. And I would not have had any reason to read them anyway. I know now that they are mentioned in the NDA Palace forced us to sign, but we saw that NDA for the first time at the signing. And the rules were not available there either. The notion that I consented to those rules is a joke. Had I not been imprisoned in Mexico and threatened with further imprisonment and criminal prosecution and had I not been under constant fear for my personal safety and security, I would not have agreed to any provision releasing my claims against Palace or requiring arbitration of any dispute. We had successfully persuaded four credit card companies of the merits of our contract dispute with Palace Resorts.

38.     Palace Elite's actions—including the breach of our timeshare agreement that triggered this entire chain of events—have had devastating financial consequences for Christy and me. We were forced to declare bankruptcy, which remains ongoing. I work for the Michigan State Police Department earning roughly $98,000 a year, and my wife is retired. We do not have significant assets.  The costs that Palace Elite has claimed to have incurred in connection with its arbitration proceedings in Canada, and its claimed damages for our supposed breach of the NDA, are completely out of reach for us.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Docusign Envelope ID: 0534A158-E5A1-8BAF-80C6-B7EBD0B13CE1

Executed on this 27th day of April, 2026, at __Spring Arbor__, Michigan.

_Paul K. Akeo_
_____
Paul Akeo

11

# EXHIBIT 1

**Nº de control:** A-3033/3-2025

**País solicitante:** México
**Número de expediente:** 2025/16600
**Fecha de publicación:** 3 de marzo de 2025
**Última actualización:** 3 de marzo de 2025



### PRÓFUGO BUSCADO PARA UN PROCESO PENAL

Distribución a los medios de comunicación (internet inclusive) del extracto de la notificación publicado en la zona de acceso público del sitio web de INTERPOL: No

## 1. DATOS DE IDENTIFICACIÓN




| | |
|---|---|
| **Apellidos:** | AKEO |
| **Nombre:** | Paul K |
| **Sexo:** | Masculino |
| **Fecha y lugar de nacimiento:** | 30 de septiembre de 1966 |
| **Nacionalidad:** | Alemania (comprobada), Estados Unidos (comprobada) |
| **Idiomas que habla:** | inglés, alemán, español |
| **Regiones/países a donde pudiera desplazarse:** | Estados Unidos, Guatemala, Belice, Alemania |

### Documentos de identidad

| | Nacionalidad | Tipo | Número | País |
|---|---|---|---|---|
| 1. | Estados Unidos | Pasaporte | 507262571 | Estados Unidos |

## 2. CASO

### Exposición de los hechos

| Ciudad | País | Fecha |
|---|---|---|
| Quintana Roo | México | 21 de noviembre de 2021 |

### Exposición de los hechos

El día 21 de noviembre de 2021, en la Ciudad de Cancún, Quintana Roo, la víctima celebró con el imputado Paul K. AKEO y otra persona, un contrato de membresía con lo que se adquiriría la categoría de miembros y a su vez acceso a los beneficios de la membresía, a cambio de una contraprestación económica debiendo pagar los investigados un total de $913,900.22 dólares americanos, mismos que serían pagados en 132 mensualidades, cada una de $6,923.48 dólares americanos, al celebrar el contrato se quedó como garantía una tarjeta de crédito, por lo que se realizaron 13 pagos por medio de la tarjeta de crédito, por una cantidad de $116,587.84 dólares americanos, posteriormente las víctimas reciben vía correo electrónico 13 notificaciones por parte de la empresa que respalda la tarjeta de crédito, en la cuales informaron la cancelación del pago de 13 transacciones que habían sido desconocidas por el titular de la cuenta, por lo mediante el engaño PAUL K AKEO y otra imputada gozaron del servicio y obtuvieron la restitución del dinero, es decir mediante engaños obtuvieron un beneficio.

### PRÓFUGO BUSCADO PARA UN PROCESO PENAL

#### ORDEN DE DETENCIÓN O RESOLUCIÓN JUDICIAL 1/1

**Calificación del delito:** Fraude

**Referencias de las disposiciones de la legislación penal que reprimen el delito:** Previsto y sancionado por los artículos 152, en correlación con los artículos 12, 13 fracción I, 14 párrafo segundo y 16 fracción II de Código Penal vigente del Estado de Quintana Roo

**Pena máxima aplicable:** Años: 06

**Prescripción o fecha de caducidad de la orden de detención:**                    9 de septiembre de 2031

**Orden de detención o resolución judicial equivalente**

| Número | Fecha de expedición | Expedida o dictada por | País |
|---|---|---|---|
| C.A. 214/2024 | 9 de marzo de 2024 | Juez de Control del Estado, actuando en los Juzgados de Control y Tribunales de Juicio Oral Penal de Primera Instancia de Distrito Judicial de Cancún, Quintana Roo | México |

**Firmante (nombre y apellidos):**   Jueza Gina Dianela Canul Solís
¿Dispone la Secretaría General de una copia de la orden de detención en el idioma del país solicitante? Sí


# 3. MEDIDAS QUE SE DEBERÁN TOMAR EN CASO DE LOCALIZAR A ESTA PERSONA

## LOCALIZAR Y DETENER CON MIRAS A SU EXTRADICIÓN:

Se dan garantías de que se solicitará la extradición al ser detenida la persona, de conformidad con la legislación nacional aplicable y con los tratados bilaterales y multilaterales pertinentes.


## DETENCIÓN PREVENTIVA:

Esta solicitud debe ser tratada como una solicitud oficial de detención preventiva. Rogamos procedan a la detención preventiva, de conformidad con la legislación nacional aplicable y con los tratados bilaterales y multilaterales pertinentes.


Avísese inmediatamente a la OCN MÉXICO México (referencia de la OCN: AKEO Paul K del 27 de febrero de 2025) y a la Secretaría General de la OIPC-INTERPOL en caso de localizar a esta persona.

# AKEO Paul K
**Control No.:** A-3033/3-2025

**Requesting country:** Mexico
**File Number:** 2025/16600
**Publication Date:** March 3, 2025
**Last Updated:** March 3, 2025



**INTERPOL**

**NOTIFICACIÓN ROJA**

## FUGITIVE WANTED FOR CRIMINAL PROCEEDINGS

Distribution to the media (including the internet) of the extract of the notification published in the public access area of the INTERPOL website: No.

## 1. IDENTIFICATION DETAILS



| | |
|---|---|
| **Surname:** | AKEO |
| **Name:** | Paul K |
| **Sex :** | Male |
| **Date and place of birth:** | September 30, 1966 |
| **Nationality:** | Germany (verified), United States (verified) |
| **Languages spoken:** | English, German, Spanish |
| **Regions/countries where he could move:** | United States, Guatemala, Belize, Germany |

### ID Documents

| | Nationality | Type | Number | Country |
|---|---|---|---|---|
| 1. | United States of America | Passport | 507262571 | United States of America |

## 2. CASE

### Statement of the facts

| City | Country | Date |
|---|---|---|
| Quintana Roo | Mexico | November 21, 2021 |

### Statement of the facts

On November 21, 2021, in the city of Cancún, Quintana Roo, the victim entered into a membership agreement with the accused Paul K. AKEO and another individual. Through this agreement, they would acquire membership status and, in turn, access to the associated membership benefits, in exchange for a financial consideration. The accused were to pay a total of USD $913,900.22, to be paid in 132 monthly installments of USD $6,923.48 each. At the time the contract was signed, a credit card was provided as collateral. Accordingly, 13 payments were made using the credit card, totaling USD $116,587.84. Subsequently, the victims received 13 email notifications from the company supporting the credit card, informing them of the cancellation of 13 transactions that had been reported as unauthorized by the account holder. As a result, through deception, PAUL K. AKEO and the other accused parties benefited from the service and obtained reimbursement of the money; that is, they obtained a benefit through fraudulent means.

## FUGITIVE WANTED FOR CRIMINAL PROCEEDINGS

### ARREST WARRANT OR COURT ORDER 1/1

| | |
|---|---|
| **Crime qualification:** | Fraud |
| **References to the provisions of the legislation that punish the crime:** | Provided for and sanctioned by articles 152, in correlation with articles 12, 13 section I, 14 second paragraph and 16 section II of the current Criminal Code of the State of Quintana Roo |
| **Maximum applicable penalty:** | Years: 06 |

**Prescription or expiration date of the order of arrest:**                    September 9, 2031

**Arrest warrant or equivalent court order**

| Number | Date of issuance | Issued or dictated by | Country |
|---|---|---|---|
| C.A. 214/2024 | March 9 2024 | State Control Judge, acting in the Control Courts and Criminal Oral Trial Courts of First Instance of the Judicial District of Cancun, Quintana Roo | Mexico |

**Signatory (name and surname):** Judge Gina Dianela Canul Solís
Does the Secretary-General have a copy of the arrest warrant in the language of the requesting country? Yes

## 3. MEASURES TO BE TAKEN IN CASE OF LOCATING THIS PERSON

**LOCATE AND ARREST LOOKING TO EXTRADITION:**
Assurances are given that extradition will be requested upon arrest, in accordance with applicable national law and relevant bilateral and multilateral treaties.

**PRE-TRIAL DETENTION:**
This request should be treated as an official request for pre-trial detention. Please proceed to pre-trial detention, in accordance with applicable national legislation and relevant bilateral and multilateral treaties.

Immediately notify the OCN MEXICO Mexico (reference of the OCN: AKEO Paul K of February 27, 2025) and the General Secretariat of the OIPC-INTERPOL in case of locating this person.


## Southeast
### Spanish, Inc.

**Professional Document Translation Services and Worldwide Apostille Services**
Main Office: Southeast Spanish, Inc., 11409 Municipal Center Dr., Box 23002, Knoxville, TN 37933
877-374-0095 (office), 877-376-2085 (cell), 877-470-1177 (fax)
**American Translators Association [ATA] Member Number: 264123, expires January 2028**
www.SeSpanish.com

April 27, 2026

To whom it may concern:

RE: Certification of Translation of the following document(s):

- Fugitive Info Summary written in Spanish- All Pages Stamped and Signed

### Translator's Declaration

I, Daniel N. Hickman, declare that I understand the Spanish language and the English language; that I hold advanced degrees from the University of Tennessee and Georgetown University in Modern Foreign Languages, and that I am a professional translator; and that, to the best of my knowledge and belief, the statements in the English language in the attached translation, which I have stamped and signed (Translated/Verified by Southeast Spanish, Inc.), have the same meanings as the statements in the Spanish language in the scanned and included document(s), which I have examined, stamped and signed.

According to the United States Citizenship and Immigration Services (USCIS) and the Department of Homeland Security (DHS), the preceding translation statement certifies the above referenced document. For more information, please see the following site: www.uscis.gov.

This document has not been translated by a family member, friend or business associate.

**Translation Certification Statement**

This translation was verified by the following individual:
Daniel N. Hickman, Ph.D. (on behalf of Southeast Spanish, Inc.)

_____          April 27, 2026
[Signature]                                [Date]

CERTIFICATE OF ACKNOWLEDGMENT OF NOTARY PUBLIC
This document was acknowledged before me, Caleb J. Brush, by Daniel N. Hickman.

_____          September 5, 2027
(Signature of Notarial Officer)           My commission expires:

CALEB J. BRUSH
STATE OF TENNESSEE
NOTARY PUBLIC
COUNTY OF KNOX

Copyright © 2007—2026 Southeast Spanish, Inc.

**AKEO Paul K**
**Control No.: A-3033/3-2025**

**Requesting country:** Mexico
**File Number:** 2025/16600
**Publication Date:** March 3, 2025
**Last Updated:** March 3, 2025

**INTERPOL**
**NOTIFICACIÓN ROJA**

## FUGITIVE WANTED FOR CRIMINAL PROCEEDINGS

Distribution to the media (including the internet) of the extract of the notification published in the public access area of the INTERPOL website: No.

## 1. IDENTIFICATION DETAILS

 

| | |
|---|---|
| **Surname:** | AKEO |
| **Name:** | Paul K |
| **Sex :** | Male |
| **Date and place of birth:** | September 30, 1966 |
| **Nationality:** | Germany (verified), United States (verified) |
| **Languages spoken:** | English, German, Spanish |
| **Regions/countries where he could move:** | United States, Guatemala, Belize, Germany |

### ID Documents

| | Nationality | Type | Number | Country |
|---|---|---|---|---|
| 1. | United States of America | Passport | 507262571 | United States of America |

## 2. CASE

### Statement of the facts

| City | Country | Date |
|---|---|---|
| Quintana Roo | Mexico | November 21, 2021 |

### Statement of the facts

On November 21, 2021, in the city of Cancún, Quintana Roo, the victim entered into a membership agreement with the accused Paul K. AKEO and another individual. Through this agreement, they would acquire membership status and, in turn, access to the associated membership benefits, in exchange for a financial consideration. The accused were to pay a total of USD $913,900.22, to be paid in 132 monthly installments of USD $6,923.48 each. At the time the contract was signed, a credit card was provided as collateral. Accordingly, 13 payments were made using the credit card, totaling USD $116,587.84. Subsequently, the victims received 13 email notifications from the company supporting the credit card, informing them of the cancellation of 13 transactions that had been reported as unauthorized by the account holder. As a result, through deception, PAUL K. AKEO and the other accused parties benefited from the service and obtained reimbursement of the money; that is, they obtained a benefit through fraudulent means.

## FUGITIVE WANTED FOR CRIMINAL PROCEEDINGS

**ARREST WARRANT OR COURT ORDER 1/1**
**Crime qualification:** Fraud

**References to the provisions of the legislation that punish the crime:** Provided for and sanctioned by articles 152, in correlation with articles 12, 13 section I, 14 second paragraph and 16 section II of the current Criminal Code of the State of Quintana Roo

**Maximum applicable penalty:** Years: 06

seSpanish.com
Southeast Spanish, Inc.
ATA # 264123
Translated/Verified by:
Dan Hickman, PhD
877-374-0095

**Prescription or expiration date of the order of arrest:**      September 9, 2031

**Arrest warrant or equivalent court order**

| Number | Date of issuance | Issued or dictated by | Country |
|---|---|---|---|
| C.A. 214/2024 | March 9 2024 | State Control Judge, acting in the Control Courts and Criminal Oral Trial Courts of First Instance of the Judicial District of Cancun, Quintana Roo | Mexico |

**Signatory (name and surname):** Judge Gina Dianela Canul Solís

Does the Secretary-General have a copy of the arrest warrant in the language of the requesting country? Yes

## 3. MEASURES TO BE TAKEN IN CASE OF LOCATING THIS PERSON

**LOCATE AND ARREST LOOKING TO EXTRADITION:**

Assurances are given that extradition will be requested upon arrest, in accordance with applicable national law and relevant bilateral and multilateral treaties.

**PRE-TRIAL DETENTION:**

This request should be treated as an official request for pre-trial detention. Please proceed to pre-trial detention, in accordance with applicable national legislation and relevant bilateral and multilateral treaties.

Immediately notify the OCN MEXICO Mexico (reference of the OCN: AKEO Paul K of February 27, 2025) and the General Secretariat of the OIPC-INTERPOL in case of locating this person.

seSpanish.com
Southeast Spanish, Inc.
ATA # 264123
Translated/Verified by
Dan Hickman, PhD
877-374-0095

**AKEO Paul K**
Nº de control: A-3033/3-2025

País solicitante: México
Número de expediente: 2025/16600
Fecha de publicación: 3 de marzo de 2025
Última actualización: 3 de marzo de 2025

**INTERPOL**
**NOTIFICACIÓN ROJA**

### PRÓFUGO BUSCADO PARA UN PROCESO PENAL

Distribución a los medios de comunicación (internet inclusive) del extracto de la notificación publicado en la zona de acceso público del sitio web de INTERPOL: No

## 1. DATOS DE IDENTIFICACIÓN

 

| | |
|---|---|
| Apellidos: | AKEO |
| Nombre: | Paul K |
| Sexo: | Masculino |
| Fecha y lugar de nacimiento: | 30 de septiembre de 1966 |
| Nacionalidad: | Alemania (comprobada), Estados Unidos (comprobada) |
| Idiomas que habla: | inglés, alemán, español |
| Regiones/países a donde pudiera desplazarse: | Estados Unidos, Guatemala, Belice, Alemania |

**Documentos de identidad**

| | Nacionalidad | Tipo | Número | País |
|---|---|---|---|---|
| 1. | Estados Unidos | Pasaporte | 507262571 | Estados Unidos |

## 2. CASO

**Exposición de los hechos**

| Ciudad | País | Fecha |
|---|---|---|
| Quintana Roo | México | 21 de noviembre de 2021 |

**Exposición de los hechos**

El día 21 de noviembre de 2021, en la Ciudad de Cancún, Quintana Roo, la víctima celebró con el imputado Paul K. AKEO y otra persona, un contrato de membresía con lo que se adquiriría la categoría de miembros y a su vez acceso a los beneficios de la membresía, a cambio de una contraprestación económica debiendo pagar los investigados un total de $913,900.22 dólares americanos, mismos que serían pagados en 132 mensualidades, cada una de $6,923.48 dólares americanos, al celebrar el contrato se quedó como garantía una tarjeta de crédito, por lo que se realizaron 13 pagos por medio de la tarjeta de crédito, por una cantidad de $116,587.84 dólares americanos, posteriormente las víctimas reciben vía correo electrónico 13 notificaciones por parte de la empresa que respalda la tarjeta de crédito, en la cuales informaron la cancelación del pago de 13 transacciones que habían sido desconocidas por el titular de la cuenta, por lo mediante el engaño PAUL K AKEO y otra imputada gozaron del servicio y obtuvieron la restitución del dinero, es decir mediante engaños obtuvieron un beneficio.

## PRÓFUGO BUSCADO PARA UN PROCESO PENAL

### ORDEN DE DETENCIÓN O RESOLUCIÓN JUDICIAL 1/1

Calificación del delito: Fraude

Referencias de las disposiciones de la legislación penal que reprimen el delito: Previsto y sancionado por los artículos 152, en correlación con los artículos 12, 13 fracción I, 14 párrafo segundo y 16 fracción II de Código Penal vigente del Estado de Quintana Roo

Pena máxima aplicable: Años: 06

seSpanish.com
Southeast Spanish, Inc.
ATA # 264123
Translated/Verified by:
Dan Hickman, PhD
877-374-0095

**Prescripción o fecha de caducidad de la orden de detención:**          9 de septiembre de 2031

**Orden de detención o resolución judicial equivalente**

| Número | Fecha de expedición | Expedida o dictada por | País |
|---|---|---|---|
| C.A. 214/2024 | 9 de marzo de 2024 | Juez de Control del Estado, actuando en los Juzgados de Control y Tribunales de Juicio Oral Penal de Primera Instancia de Distrito Judicial de Cancún, Quintana Roo | México |

**Firmante (nombre y apellidos):**   Jueza Gina Dianela Canul Solís
¿Dispone la Secretaría General de una copia de la orden de detención en el idioma del país solicitante? Sí

## 3. MEDIDAS QUE SE DEBERÁN TOMAR EN CASO DE LOCALIZAR A ESTA PERSONA

**LOCALIZAR Y DETENER CON MIRAS A SU EXTRADICIÓN:**
Se dan garantías de que se solicitará la extradición al ser detenida la persona, de conformidad con la legislación nacional aplicable y con los tratados bilaterales y multilaterales pertinentes.

**DETENCIÓN PREVENTIVA:**
Esta solicitud debe ser tratada como una solicitud oficial de detención preventiva. Rogamos procedan a la detención preventiva, de conformidad con la legislación nacional aplicable y con los tratados bilaterales y multilaterales pertinentes.

Avísese inmediatamente a la OCN MÉXICO México (referencia de la OCN: AKEO Paul K del 27 de febrero de 2025) y a la Secretaría General de la OIPC-INTERPOL en caso de localizar a esta persona.

seSpanish.com
Southeast
Spanish, Inc.
ATA # 264123
Translated/Verified by:

Dan Hickman, PhD
877-374-0095