# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF FLORIDA, MIAMI DIVISION

PAUL AKEO and CHRISTY AKEO,

        Plaintiffs,

v.

PALACE RESORTS, LLC, a limited liability company; PALACE ELITE, a Mexican corporation; PR GLOBAL RESERVATIONS, LLC, a Florida limited liability company; PALACE ELITE RESORTS S.A. de C.V., a Mexican corporation; JOSÉ GIBRÁN CHAPUR DÁJER, an individual; PALACE COMPANY HOLDINGS,

        Defendants.

Case No.: 1:25-cv-23733-RKA

## DECLARATION OF EDUARDO ROMERO TAGLE

I, Eduardo Romero Tagle, declare as follows:

1. I am a licensed attorney both in Mexico (national license number 7894110) and the U.S. (Texas Bar number 24128488). In Mexico, I have been certified since 2011. I am authorized to practice law in all courts of the country. I worked at the Federal Judiciary for almost 10 years, including 2.5 years as a law clerk in the Supreme Court, 1 year as a staff attorney in a Court of Appeals, and 4 years as a staff attorney for a Supreme Court Justice, for whom I served as Chief of Staff for one year. My current curriculum vitae is attached as Exhibit 1 to this declaration.

2. I have previously submitted a declaration on this matter, which can be found at Dkt. 31-4.

3. I thoroughly examined the "Acuerdo Reparatorio Inmediato" (in English, "Immediate Reparation Agreement") along with the exhibit it incorporates, the "Mutual Release

1

and Non-Disparagement Agreement" (NDA). I also reviewed the April 3, 2025 hearing transcript and video footage, which capture the judge's approval of the Immediate Reparation Agreement and the subsequent conclusion of criminal proceedings against the Akeos.

4.     Under Mexican law, a person or company that believes they are a victim of a crime can file a criminal complaint, formally known as "denuncia" or "querella." For some crimes, the prosecution of a criminal complaint can be dismissed if the alleged victim and accused enter what is known as a "reparation agreement." This is a bilateral agreement between the alleged victim and the accused, in which the accused agrees to terms designed to make the alleged victim whole and to restore the victim to its status before the alleged crime. The alleged victim agrees not to continue to pursue prosecution.

5.     There are several requirements for a reparation agreement to be legal and enforceable under Mexican law. Among other things, the agreement must be proportionate to the harm caused by the alleged crime. Reparation agreements may not include terms that do not serve to remedy the harm allegedly caused by the crime. The parties to the reparation agreement must have negotiated on equal footing. And the parties must not have acted under intimidation, threat, or coercion. *See, e.g.*, National Code of Criminal Procedure Article 190; Thesis with digital registry 2026334, titled "DERECHO HUMANO A LA REPARACIÓN INTEGRAL DEL DAÑO. CONSTITUYE UNA GARANTÍA ESTATAL Y UN ASUNTO DE INTERÉS PÚBLICO, AUN TRATÁNDOSE DE ACUERDOS REPARATORIOS QUE PONEN FIN A LA ACCIÓN PENAL."[1]

---

[1] Under Mexican law, a "tesis" or "thesis" is the point of law extracted from a legal decision that can be applied to similar cases in the future.

6.      Article 32 of the Quintana Roo Criminal Code, the code governing the region where Palace filed its complaint against the Akeos, provides that reparation for a crime may cover three types of "daños y perjuicios," or damages and detriments: (1) the return of an object obtained through the crime or its equivalent monetary value; (2) compensation for material and moral harm, such as medical or psychological care required as a consequence of the crime; and (3) compensatory damages, typically in lost-profits scenarios.

7.      The NDA contains terms that cannot lawfully be imposed as part of a reparation agreement. In particular, it imposes terms that do not constitute reparations. *See, e.g.*, Amparo directo en revisión 1168/2011 (holding that reparations are to restore the situation that would have existed had the alleged act not been committed, and they may not be used to make the victim better or worse off than the status quo before the alleged violation). The NDA's requirements are unnecessary to remedy the damage the Akeos allegedly caused Palace by disputing charges with their credit card company, which is what Palace alleged was their crime. For example, the clauses releasing all claims and promising not to sue are not permissible terms of a reparation agreement. In the absence of the Akeos' alleged fraud, they would have the right to bring civil claims against Palace. These clauses do not restore the status quo. They change it by waiving rights the Akeos would otherwise have. Under the Mexican legal system, such provisions cannot constitute valid reparation, because the waiver would be neither proportional to nor related to the damages suffered.

8.      The same is true of the non-disparagement clause. It does not compensate Palace for any harm that might have been caused by the Akeos in the past. It forbids the Akeos from saying negative things about Palace in the future.

9.      The arbitration clause and any delegation clause also do not serve to restore Palace to the status quo. It has no relationship at all to the crime that Palace alleged. There is no crime under Mexican law for which an arbitration clause would be lawful reparation.

10.     I have read the declaration of Palace's expert, Pablo Hernández-Romo Valencia, previously submitted in this case in opposition to the motion to remand. Mr. Hernández-Romo asserts that the NDA is not part of the Acuerdo Reparatorio Inmediato. That's incorrect. As I explained in my previous declaration, because the reparation agreement expressly incorporates the NDA, the NDA is part of that agreement. Mexican courts have consistently recognized that exhibits are integral to the main document and must be analyzed as a whole. *See, e.g.*, Thesis with digital registry 255212, from the First Court of Appeals in Administrative Matters for the First Circuit, titled "PRUEBAS. DOCUMENTOS Y SUS ANEXOS."

11.     Mr. Hernández-Romo also asserts that although it is called a reparation agreement, the Acuerdo Reparatorio Inmediato is not actually a reparation agreement at all, but a victim's pardon. Mr. Hernández-Romo is incorrect.

12.     As Mr. Hernández-Romo states, under Mexican law, a victim's pardon is a unilateral act. *See* Quintana Roo Criminal Code, Article 73; Federal Criminal Code, Article 93. The alleged victim simply drops the criminal charges. No requirements are imposed on the accused at all. Mexican courts have made clear that pardons must be granted unconditionally. They cannot impose any requirements on the accused or depend on fulfilling any obligations whatsoever. *See* Thesis with digital registry 257131, from the Court of Appeals for the Sixth Circuit, titled "PERDON DEL OFENDIDO CONDICIONADO, INEFICACIA LEGAL DEL (LEGISLACION DEL ESTADO DE TLAXCALA)" (holding that a victim's pardon shall produce no legal effects if it is contingent upon the fulfillment of any condition by the accused, because a victim's pardon

must be granted without conditions of any kind, not subordinate to the fulfillment of any obligation);  Thesis with digital registry 225886, from the Second Court of Appeals on Criminal Matters for the First Circuit, titled "PERDON DEL OFENDIDO, EN DELITOS DE QUERELLA NECESARIA. REQUISITOS."

13.    The very fact that the Acuerdo Reparatorio Inmediato is a bilateral agreement, entered before the criminal judge, by definition, means that it is not a victim's pardon. *See* Article 186 of the National Code of Criminal Procedure (explaining that a reparation agreement is an agreement reached between the victim and the accused).

14.    The text of the Acuerdo Reparatorio Inmediato also demonstrates that is not a victim's pardon. In addition to its name and its bilaterality, the agreement states that it is entered pursuant to Articles 184 through 190, and 485, of the National Code of Criminal Procedure. Those provisions specifically govern reparation agreements, not victims' pardons. A victim's pardon here would be governed by Article 73 of the Quintana Roo Criminal Code and Article 485, IV, of the National Code of Criminal Procedure.

15.    In addition, in the hearing in which the Akeos' charges were dismissed, the criminal judge invoked the provisions of the National Code of Criminal Procedure that govern reparation agreements, not pardons. Not once did the judge invoke a pardon under Article 73 of the Quintana Roo Criminal Code; rather, he consistently emphasized the reparation agreement that both parties signed, and cited Articles 186 through 190 of the Mexican National Code of Criminal Procedure

16.    Mr. Hernández-Romo seems to have confused the ordinary use of the word "perdón" in the agreement with the distinct legal act that is called a victim's pardon. It is common for reparation agreements to state that if the accused satisfies the terms, the alleged victim will pardon the accused, meaning that they will drop their complaint. The dismissal of the complaint

5

is, after all, the effect of a reparation agreement. But that doesn't transform the reparation agreement into a unilateral victim's pardon. It remains a reparation agreement.

17.    Mr. Hernández-Romo also says that it is common for victims and the accused to negotiate and come to private agreements outside of the criminal process before the victim formally pardons the accused. I strongly disagree that that is what happened here because the Acuerdo Reparatorio Inmediato is expressly conditioned on the NDA. A private agreement like the one Mr. Hernández-Romo describes would be entirely separate from the criminal process and would not have been submitted to the criminal court, let alone incorporated into the reparation agreement.

18.    Even if the NDA were just a private contract negotiated as a precursor to a unilateral pardon or reparation agreement, the NDA would still be unenforceable under Mexican law. A private contract is unenforceable when it is entered under duress. A contract is entered under duress if physical force or threats create a danger of losing life, honor, liberty, health, or a substantial portion of assets for the contracting party and/or their spouse. *See* Article 1812 of the Mexican Federal Civil Code and Article 207 of the Quintana Roo Civil Code. An agreement entered under pain of continued imprisonment or as a condition of receiving a pardon, meets this standard, especially when it contains terms that exceed what would constitute valid reparation under Mexican law. So, even if the requirements for a reparation agreement do not apply to the NDA, I believe that the NDA is not valid or enforceable under Mexican law.

19.    I have read the declaration testimony of Mr. Gibrán Chapur Dájer, Palace's CEO, that he spoke with the President of the Superior Court of Justice of Quintana Roo and that the President advised him to enter a reparation agreement. This is highly unusual. Although *ex parte* communications are permissible in Mexico, they are for lawyers to provide information to judges,

6

not the other way around. It is not proper for a judge to comment on a matter before their court, let alone give advice.

DATED: April 24, 2026

Respectfully submitted,

By: _____

Eduardo Romero Tagle

# EXHIBIT 1

EDUARDO ROMERO TAGLE
- CURRICULUM VITAE –

1000 Gattis School Rd., Ste. 640, Round Rock, TX 78664 | etagle@taglelawgroup.com | 512-964-0394

## I. PROFESSIONAL LICENSES

- Attorney licensed to practice in Texas. Texas Bar Number: 24128488.
- Admitted at the United States District Court for the Western District of Texas.
- Admitted at the U.S. Court of Appeals for the Second Circuit.
- Admitted at the Supreme Court of the United States.

## II. EDUCATION

- The University of Texas School of Law, LL.M. degree. Austin, Texas. 2021.

## III. PROFESSIONAL EXPERIENCE

- Tagle Law Group, PLLC, Austin.
Founder and Managing Attorney. March 2026-to date
Manager of a law practice specialized in international arbitration, appellate advocacy focused on cases with a transnational or foreign component, cross-border litigation and legal advice, and expert witness on Mexican Law services.
Additional aspects within that role:
  * External consultant for the Mexican Consulates in San Antonio, Austin, and Del Río, Texas, officially designated by the Mexican State Department. The designation requires providing U.S. legal assessment to the Consulates in specific cases and general inquiries that the Consuls and staff may have.
  * External consultant for top litigation boutique law firms in Mexico City and Guadalajara, regarding arbitration and international litigation strategies for their foreign clients, especially in the energy sector and the mining industry.
  * Founder of a U.S. Law Clinic in the ITESO Law School (Guadalajara, Mexico), specialized in amici curiae in U.S. Courts regarding transnational and public interest matters.
- Ellwanger & Henderson LLLP, Austin/Dallas.
Partner. February 2024-February 2026.
Director of the transnational dispute resolution practice, which includes coordination of international litigation and arbitration cases.
- Terrazas PLLC, Austin.
Senior Associate. October 2022-January 2024.
Law firm specialized in commercial and business litigation. Collaboration on all phases of federal and state litigation: motion practice, discovery proceedings, and court hearings, including appellate practice.

1

- Ellwanger & Henderson LLLP (previously Ellwanger Law LLLP), Austin/Dallas.
Senior Associate. August 2021-September 2022.
Law firm specialized in federal litigation. Collaboration on all phases of federal litigation: motion practice and discovery proceedings.

## IV. ACADEMIC ACTIVITIES

- Research stay: "The search for consensus on judicial decision making: a comparative analysis of judicial collegiality" (Visiting Fellows Program, Federal Judicial Center, Washington D.C. The research included a set of interviews with judges of the U.S. Court of Appeals for the D.C. Circuit, the U.S. Court of Appeals for the Armed Forces, the D.C. Court of Appeals, and former U.S. Solicitor Generals).
- Guest lecturer in courses regarding constitutional justice and public interest litigation, organized by the United Nations Office of the High Commissioner for Human Rights, and the United Nations Office on Drugs and Crime.
- Frequent lecturer at the SMU-Mission Foods Center in Dallas, Texas, regarding transnational matters, especially concerning the relationship between the USMCA and the legal amendments in Mexico.
- Lecturer at the Mexican Department of State, providing legal training to all the Mexican Protection Consuls in Texas, as well as Department high level officials, concerning the scope and nature of constitutional rights in the U.S. and protection mechanisms in federal courts.

## V. MEXICAN EXPERIENCE

### A. Professional Licenses

- Licensed to practice Law in Mexico (admitted in all federal and state courts).

### B. Education

- Universidad Panamericana Law School, Guadalajara, Mexico. 2011. Graduated with Honors.

### C. Professional Experience

- Mijangos y González, Mexico City. Junior Partner. Director of the appellate federal practice of the Firm. January 2020-December 2020.
Elaboration of legal strategies, drafting motions and appeals for federal courts, particularly at the Supreme Court.
- Mexican Supreme Court of Justice, Mexico City.
Chief of Staff. Chambers of the Justice Medina Mora Icaza. January 2019-December 2019.
Organization of daily dynamics of the Chambers (60 people). Meetings at the Council of Chiefs of Staff for initial discussion of cases. Conduction of the discussion among the Justices and recall the votes during conference.

In that role I was also the co-manager of the project by the Supreme Court and the Embassy of Mexico in the U.S., designed to translate a series of high-profile Mexican opinions to English.

- Mexican Supreme Court of Justice, Mexico City. Staff Attorney. Chambers of the Justice Medina Mora Icaza. January 2016-December 2019.

Drafted opinions to be presented and discussed at the conference (during that period I presented over 150 opinions mostly regarding constitutional interpretation, regulatory and energy law, telecommunications, antitrust and economic competition law). I wrote recommendations to the Justice, regarding how to vote on the proposals of the other Justices (authored over 600). As Staff Attorney I handled a series of high-profile cases interpreting the new telecommunications regulation in Mexico, managed the cases related to the novel oil, gas, and energy scheme in the country, and took care of numerous cases regarding the structure of the Executive branch, the deference to administrative agencies, and helped to design a wide ranging scheme in order for private citizens to sue federal and state officers for their unconstitutional acts.

- Court of Appeals in Telecommunications and Economic Competition Law, Mexico City. Staff Attorney. Chambers of the Judge Mijangos Navarro. January 2015-December 2015.

Draft opinions (during that period I prepared over 30 opinions) as well as dissent and concurrent opinions. Also, I wrote proposals regarding the way I thought the Judge should vote on the other Judges' drafts.

### D. Academic Activities

- Research stay: "Rulings of the European Court of Human Rights and the Spanish law: the relation between international and constitutional jurisdiction" (University Carlos III of Madrid, 2014).

- Adjunct professor at the Escuela Libre de Derecho (Mexico City), in the course: "Comparative constitutional justice" (2013-2019).

- Guest lecturer at Universidad Panamericana Law School, in the course: "Federal courts". - Guest lecturer in courses for federal judges organized by the Mexican Supreme Court, and the Council of the Mexican Federal Judiciary. –

 Book collaboration: Astudillo & J. R. Cossío, Organization and Operation of the Supreme Court of Justice (2020). Chapter: "Coordination of the Justices' chambers" (along with J. Mijangos).

*Prepared in April 2026*