**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 25-cv-23733-ALTMAN**

PAUL AKEO and CHRISTY AKEO,

      Plaintiffs,

v.

PR GLOBAL RESERVATIONS, LLC,
PALACE ELITE RESORTS S.A. de C.V., *a Mexican corporation,*
JOSE GIBRAN CHAPUR DAJER, CHDB HOLDINGS, S.A. de
C.V., CONTROLADORA IHC, S.A.P.I de C.V., and
OPERADORA PALACE RESORTS JA LTD.

      Defendants.

_____/

**DEFENDANTS' REPLY IN SUPPORT OF**
<u>**MOTION TO COMPEL ARBITRATION AND STAY**</u>

Plaintiffs' Opposition attempts (unsuccessfully) to recast an extensively negotiated commercial settlement into one in which they were deprived of the ability to exercise their free will.  Not so.  The Akeos negotiated five drafts of the settlement using experienced counsel of their choice, aided by diplomatic support from the U.S. State Department, a member of Congress, and a White House envoy. They altered the text of the agreement in many respects, and importantly, selected the arbitral seat. The record refutes Plaintiffs' duress narrative, and so does the controlling law. The Akeos agreed to arbitrate. An emergency arbitrator has already determined that the arbitration agreement is valid and enforceable.  Nothing in New York or Eleventh Circuit precedent allows Plaintiffs to evade their arbitration agreement. The Court should grant the Motion.

## I.     ARGUMENT

### A. The Arbitrator, Not This Court, Decides the Duress Question and All Questions Concerning Jurisdiction and Arbitrability

The arbitration clause is enforced "according to its terms," because that is what the FAA requires of all contracts. Plaintiffs invoke *Morgan v. Sundance, Inc.*, 596 U.S. 411, 418 (2022), for the proposition that the federal arbitration policy is "about treating arbitration contracts like all others, not about fostering arbitration." (Resp. at 9). That is correct, and irrelevant. *Morgan* addressed the waiver doctrine and the prejudice requirement. It did not displace *Buckeye*, *Rent-A-Center*, *Henry Schein*, or any of the cases governing who decides arbitrability. (Mot. at 11, 13) (citing aforementioned cases).

Plaintiffs also argue that the presumption of arbitrability applies "only where" a "validly formed and enforceable arbitration agreement" exists, citing *Granite Rock Co. v. International Brotherhood of Teamsters*, 561 U.S. 287, 301 (2010). (Resp. at 9). But *Granite Rock* does not help them. The questions of whether an arbitration clause is valid (the merits of Plaintiffs' duress challenge) and whether the parties agreed that the arbitrator would decide that question (delegation) are separate inquiries. *Granite Rock* addressed *only* the former. *Id.* at 296–97. It did not displace *Buckeye*, *Rent-A-Center*, or the Eleventh Circuit's binding rule that incorporation of institutional arbitration rules constitutes clear and unmistakable delegation.

#### i.     The parties delegated arbitrability under controlling precedent

Plaintiffs raise two arbitrability questions: whether (1) the agreement containing the arbitral clause is valid given their claim of duress and (2) all defendants are entitled to invoke the arbitration agreement.  Both should be decided by the arbitral tribunal.  The parties' incorporation of the ICC Rules in Section 15 of the NDA means that they have agreed to arbitrate per the ICC Rules, which delegate *all* arbitrability questions, including the duress and other arbitrability challenges, to the

arbitrator. *See* ICC Rules art. 6(3), 6(4). Of direct relevance here, Article 6(3) provides: "[I]f any party raises one or more pleas **concerning the existence, validity or scope of the arbitration agreement** or concerning whether all of the claims made in the arbitration may be determined together in a single arbitration, **the arbitration shall proceed and any question of jurisdiction or of whether the claims may be determined together in that arbitration shall be decided directly by the arbitral tribunal**."[1]  (emphasis added)

Eleventh Circuit law on this question is binding, recent, and directly on point. In *Various Insurers v. General Electric International, Inc.*, 131 F.4th 1273 (11th Cir. 2025), the court held that incorporation of the ICC Rules creates clear and unmistakable delegation of arbitrability to the arbitrator. *Id.* at 1280. The court explained that "[s]imilar to Rule 8 of the AAA [], ICC Article 6(4) provides that . . . 'the [ICC] Court shall decide whether and to what extent the arbitration shall proceed,'" and concluded that "the parties have agreed that the arbitrator will answer [the arbitrability] question." *Id.*; *see also Nipro Corp. v. Verner*, 2021 WL 8894430, at *13 (S.D. Fla. Jun. 24, 2021).[2]

        ii.        **Even absent delegation, *Prima Paint* and *Buckeye* require the arbitrator to decide the duress challenge**

The Supreme Court's separability doctrine established in *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 403–04 (1967), and reaffirmed in *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 445-46 (2006), requires that challenges (like Plaintiffs') directed at the contract as a whole, rather than the arbitration clause specifically, be decided by the arbitrator. *See Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 70–71 (2010); [ECF 11, at ¶¶ 54, 58, 59, 95; ECF 64, at 4–8].

The Eleventh Circuit applies that rule categorically to coercion claims. In *Coleman v. Prudential Bache Securities, Inc.*, 802 F.2d 1350, 1352 (11th Cir. 1986), the court held that "[c]laims alleging unconscionability, coercion, or confusion in signing the agreement generally should be determined by an arbitrator because those issues go to the formation of the entire contract rather than to the issue of misrepresentation in the signing of the arbitration agreement." That is exactly the Akeos' theory. They claim coercion in the signing of the agreement **as a whole**, not a separate misrepresentation directed at the arbitration clause.[3] In fact, it was not until Defendants raised this defense in the context of the ICC emergency arbitrator proceeding that Plaintiffs alleged duress affecting the arbitration

---

[1]  ICC Rule, Article 6(1) provides: "Where the parties have agreed to submit to arbitration under the Rules, they shall be deemed to have submitted ipso facto to the Rules in effect on the date of commencement of the arbitration . . . "

[2]  The Eleventh Circuit has reached the same result for the AAA's institutional rules. *See, e.g., Attix v. Carrington Mortgage Servs., LLC*, 35 F.4th 1284, 1298-99 (11th Cir. 2022); *JPay, Inc. v. Kobel*, 904 F.3d 923, 937-38 (11th Cir. 2018); *Terminix Intern. Co., LP v. Palmer Ranch Ltd. P'ship*, 432 F.3d 1327, 1331-1332 (11th Cir. 2005).

[3]  [ECF 11, at ¶¶ 54, 58-59, 77-78, 88- 93, 95; ECF 64, at 4–8].

agreement.  Their initial complaint said *nothing* of this.[4]

District courts within this Circuit have consistently applied *Coleman* to dismiss the precise framing the Akeos advance here. In *Healy v. Honorlock Inc.*, 609 F. Supp. 3d 1294, 1298 (S.D. Fla. 2022), for example, the court considered a plaintiff who claimed he "had no choice but to agree to the Terms [of Service]" and held that the challenge attacked the entire agreement, not the arbitration clause, and was therefore for the arbitrator. The Akeos' "sign [the NDA] or stay in prison" framing (Resp. at 6) is the same argument in different clothing. *See also Baxter v. Miscavige*, No. 8:22-cv-986-TPB, 2023 WL 2743144, at *6-7 (M.D. Fla. Mar. 31, 2023) (referring the duress challenges including "imprisonment and threats" to the arbitrator where "there [were] no factual allegations specific to the arbitration provisions themselves.").

Plaintiffs grossly mischaracterize *Coinbase, Inc. v. Suski*, 602 U.S. 143 (2024), as eliminating the requirement that a challenge target the arbitration clause specifically. (Resp. at 19). *Suski* addressed the unique scenario of an arbitration agreement and a later conflicting forum-selection clause, 602 U.S. at 146–47, and did not address, let alone overrule, *Buckeye*, *Rent-A-Center*, or *Prima Paint*. *See Knight v. Fla. Dept. of Corrections*, 936 F.3d 1322, 1336 (11th Cir. 2019) ("[T]he [Supreme] Court has repeatedly instructed us to follow its precedents, even if later decisions appear to undermine them, unless and until the Court itself sets them aside."). To the contrary, *Coinbase* reaffirmed that "where parties have agreed to only one contract, and that contract contains an arbitration clause with a delegation provision, then, absent a successful challenge to the delegation provision, courts must send all arbitrability disputes to arbitration." *Id.* at 152; *see also Baxter v. Miscavige*, 2024 WL 3597120, at *2-3 (M.D. Fla. July 31, 2024) (rejecting same and holding *Suski* "does not constitute an intervening change in the law" and that *Suski* "agrees with the well-established holdings of *Buckeye* and *Prima Paint*.").

Plaintiffs also argue that Defendants' counsel "explicitly and repeatedly conceded that whether [the] arbitration agreement was entered under duress is 'an issue for the court to decide.'" (Resp. at 19). Plaintiffs overread the cited statements. The arbitration transcript shows that Defendants' counsel drew a careful and correct legal distinction, telling the Emergency Arbitrator that a duress challenge to the agreement as a whole "is and must be decided in arbitration," while a duress challenge directed specifically at the arbitration agreement would be heard by the federal judge under the *Rent-A-Center* framework. *See* Creed Decl. [ECF 64-2, Ex. 3, at 21–22]. That distinction is the law under *Rent-A-Center*, 561 U.S. at 70-71 and *Buckeye*, 546 U.S. at 445–46. Even if the statements could be read more

---

[4] *Id.* at [ECF 1-1, at ¶¶ 84–94].

broadly, an attorney's statement of the law cannot bind the Court on a question of law. *United States v. Colston*, 4 F.4th 1179, 1187 (11th Cir. 2021) (a party's concession of an issue of law is not binding on the court); *see also Noel Shows, Inc. v. U.S.*, 721 F.2d 327, 330 (11th Cir. 1983).

Recognizing the threshold delegation problem, Plaintiffs now argue that the arbitration clause was "separately" extracted under duress because their counsel proposed deleting it in one draft and Palace Elite insisted on its reinstatement. (Resp. at 20). The record of negotiation history flatly refutes that claim: the arbitration clause was the subject of substantive back-and-forth. Plaintiffs' counsel objected to Mexico City as the seat. Palace Elite proposed a neutral forum, the United Kingdom. And **Plaintiffs' counsel themselves then selected Vancouver, Canada as the seat, which the parties adopted**. [ECF 52-2, 59, at ¶¶ 32–33]. That is arm's length negotiation and agreement, not duress.

### B.   The Duress Defense Fails on the Merits

*First,* Plaintiffs' corruption narrative collapses without inadmissible hearsay. Plaintiffs' sole evidentiary source that the Quintana Roo prosecutor's office was "under instruction from Palace to prosecute aggressively," that the prosecutor's office had been "bought off," and that the Mexican judge had been "bribed," [ECF 64, at 4–5] is double and triple hearsay from the declaration of Mike Lemke on which the Court cannot rely.[5] *Macuba v. Deboer*, 193 F.3d 1316, 1322 (11th Cir. 1999). Tellingly, no witness with personal knowledge of these supposed events has submitted a declaration.

Plaintiffs' related claim that the criminal complaint "came nowhere close to alleging fraud" under Mexican law rests on the same defective foundation channeled through Lemke from unidentified attorneys.[6] Even if it were admissible hearsay, it would not satisfy Fed. R. Evid. 702 as legal opinion testimony.[7] Plaintiffs lean heavily on Congressman Barrett's text message to John Manly, in which Barrett supposedly wrote that "the only way Paul and Christy can leave is if they sign the NDA under the terms that Palace had demanded." (Resp. at 6, 16). The text is offered through Mr. Manly's declaration as substantive evidence of duress; but the text is classic hearsay. Fed. R. Evid. 801(c). And even if admissible, a layperson's negotiating-posture assessment is not evidence that the terms of the agreement were legally coerced. The Akeos chose to settle on the same day that their pre-trial detention was going to be reconsidered, partly at Palace Elite's request. [ECF No. 40-2 ¶ 21; [Exhibit A, Second Decl. of Kevin Ramón Salgado Quiroz, ¶ 5].

---

[5]   [ECF 64-3, ¶¶ 12, 17, 18].

[6]   [ECF 64, at 23]; [ECF 64-3, ¶ 17].

[7]   By contrast, Defendants' Mexican law expert, with 23 years of experience and over 40 books on Mexican criminal law, has submitted a sworn declaration confirming that the prosecution followed standard Mexican procedure and that probable cause was found by an independent judge. [ECF 40-3, at ¶¶ 18, 20, 31–32, 51].

What remains in the admissible record is undisputable: Palace Elite filed a criminal complaint based on the Akeos' fraudulent chargebacks of over $100,000; the Mexican prosecutor conducted a seven-month independent investigation; the prosecutor exercised independent charging discretion; and a Mexican judge made an independent finding of probable cause and ordered pretrial detention based on flight risk. [ECF 40-2, at ¶¶ 7–10]. None of this is corruption. *See also* [Exhibit B, Second Decl. of José Gibrán Chapur Dájer, ¶ 4-9].

*Second*, the "duress by imprisonment" theory does not apply to lawful actions. *See Shephard v. Watrous*, 1805 WL 770 (N.Y. Sup. Ct. 1805) ("It is true, the defendant was under an arrest; but that of itself could not have been enough to avoid his acts …There was only an agreement to submit the matter upon which he was arrested, to arbitration[.]"); 22 N.Y. Jur. 2d Contracts § 131 ("imprisonment under legal process obtained fairly, with no ulterior unworthy purpose in view, is not such duress as will avoid, per se").[8] If Plaintiffs' theory were correct, most all plea bargains would be void, a plainly absurd result. Plaintiffs invoke a 19th-century line of cases, *Brown v. Pierce*, 74 U.S. 205 (1868); *Baker v. Morton*, 79 U.S. 150 (1870); and *Guilleaume v. Rowe*, 94 N.Y. 268 (1883), for the proposition that imprisonment-induced contracts are void *ab initio*. [ECF 64, at 10–11]. Those cases involved private parties or officials who directly imprisoned the contracting party, often without legal process or based on false accusations. Palace did not detain anyone: the Akeos were arrested and detained by Mexican authorities pursuant to Mexican legal process, after a seven-month independent prosecutorial investigation, with a finding of probable cause by a Mexican judge. [ECF 40-2, at ¶¶ 7–10]; [Ex. A, ¶¶ 17-19]. Plaintiffs cite no modern case applying the *Brown* line of cases to these facts.

Plaintiffs further misread New York law: the wrongful-threat element of duress requires a threat which the threatening party had no legal right to make. *United States v. Twenty Miljam-350 IED Jammers*, 669 F.3d 78, 88-89 (2d Cir. 2011); *Avey v. Town of Brant*, 189 N.E. 233, 234 (N.Y. 1934); *Bachorik v. Allied Control Co.*, 34 A.D.2d 940, 942 (1st Dep't 1970).[9] Palace Elite had *every* right to file a criminal complaint based on Plaintiffs' fraudulent chargebacks. Mexican law expressly permits a victim to extinguish criminal liability through a victim's pardon, which are commonly conditioned on negotiated commercial settlements. [ECF 40-3, ¶ 60]; [Exhibit C, (Second Decl. of Pablo Hernández-Romo Valencia), ¶¶ 7-12; 23-24]. That is the valid exercise of legal rights, not duress.

---

[8] Plaintiffs "do not object to applying New York law." (Resp., n. 3).

[9] Not all states have the same rule. *See* 28 Williston on Contracts § 71:38 (recognizing diversity among the states and noting that—with *Avery* as an example—"there are a number of decisions holding that a mere threat of well-founded criminal prosecution is not such duress as to make voidable a transaction induced by the threat"). Plaintiffs' reliance on Massachusetts and Texas law is therefore irrelevant. (Resp. at 13).

Although the cases that Plaintiffs rely on (at 13–14) inconsistently applied New York's duress rule, those are almost exclusively lower court decisions and all involve individuals without counsel. *See Adams v. Irving Nat. Bank*, 116 N.Y. 606, 608, 610 (1889) (no counsel); *Schoener v. Lissauer*, 13 N.E. 741, 742 (1887) (no counsel); *Yoon Jung Kim v. Gahee An*, 55 N.Y.S.3d 210, 211-13 (N.Y. App. Div. 2017) (signed away house, without counsel, at 4 a.m. after several hours of being threatened with prosecution and deportation); *Cushing v. Hughes*, 195 N.Y.S. 200, 202 (N.Y. Sup. Ct. 1922) (executed mortgage on home without counsel while being threatened by lawyer); *Derenoncourt v. Costco Cos., Inc.*, 1998 WL 883305, at *2–3 (S.D.N.Y. Dec. 16, 1998) (no counsel and threatened by police officers); *Gottex Indus., Inc. v. Menczel*, 1995 WL 412419, at *3 (S.D.N.Y. July 12, 1995) (no counsel and "professing illness"). The facts could not be more different here: Plaintiffs executed a settlement agreement—negotiated by counsel on both sides with high-level diplomatic support—during a fully matured criminal proceeding following independent prosecutorial investigation and a judicial finding of probable cause.[10] [Ex. A, ¶¶ 13-14, 17-19].

Plaintiffs argue that they "had no idea what they were being asked" when the Mexican judge confirmed they were not under duress and "said what their lawyers told them to say." [ECF 64, at 17]. That striking concession acknowledges that the Akeos were represented by counsel, that counsel advised them on the record before the court, and that they followed counsel's advice. That is the opposite of duress. In addition, Plaintiffs fail to mention that earlier in the same hearing, their counsel requested to serve as Plaintiffs' translators in place of the official translator and provided translation, belying their claim of ignorance. [ECF 31-3 at 39–40; [Ex. A, ¶¶ 9-11].

*Third*, the Plaintiffs' legal and diplomatic representation and the negotiations refute any claim of coercion. Plaintiffs had two private Mexican criminal lawyers, the U.S. Consul General, a Special Presidential Envoy personally dispatched by President Trump, a sitting Member of Congress who flew to Cancún to negotiate at the table, and U.S. counsel John Manly. Over five drafts spanning nearly two weeks, the parties exchanged proposals and counter-proposals on every material term.[11] These are the hallmarks of arm's-length negotiation, not coercion. *In re Stamell*, 252 B.R. 8, 20 (Bankr. E.D.N.Y. 2000). A party with this level of representation does not lack a "reasonable alternative."

---

[10]   Even if Plaintiffs are right that the accuser's motives should be assessed, they are wrong in arguing that Palace Elite filed a criminal complaint for "private gain." (Resp. at 13). Palace Elite's CEO declared that "the trigger that led to the criminal complaint" was Plaintiffs "instruct[ing] other members on how to commit fraud against Palace Elite[.]" Chapur Decl. ¶ 25.

[11]   [ECF 40-2, at ¶¶ 13–24, 26]. Plaintiffs' counsel deleted the arbitration clause in one draft, then negotiated its reinstatement with a seat they themselves chose. *Id.* ¶ 33. Plaintiffs reduced the reparation payment from millions to $116,587.84. *Id.* ¶¶ 23–24. They obtained mutual releases, a covenant not to sue, and reduced liquidated damages. *Id.* ¶ 26.

Restatement (Second) of Contracts § 175 ("A threat, even if improper, does not amount to duress if the victim has a reasonable alternative to succumbing and fails to take advantage of it.").

*Fourth*, Section 9 of the NDA contains an express representation that each party "is not under duress or undue influence, has read this Agreement thoroughly and had an opportunity to have this Agreement fully explained by independent counsel." [ECF 40-1, § 9]. Plaintiffs confirmed this on the record before the Mexican judge. [ECF 31-3, at 51, 43]; [Ex. A, ¶¶ 8-11]. Plaintiffs' counsel specifically negotiated the terms of this provision, reflecting the parties' considered agreement that the contract was not coerced. [ECF 52-2, at ¶ 33]. New York courts credit such representations where they reflect negotiated terms in a represented transaction. *J.M. v. G.V.*, 225 N.Y.S.3d 859, 875 (N.Y. Sup. Ct. 2025). Plaintiffs' best case for the contrary proposition concerned a wife with no counsel who signed a take-it-or-leave-it separation agreement that the court found unconscionable and performed under duress evidenced by direct threats by the husband outside of "what he had a legal right to do." *Amoia v. Amoia*, 202 N.Y.S.3d 615, 618 (N.Y. App. Div. 4th Dept. 2023).[12]

*Finally*, even if duress could be established, Plaintiffs ratified the NDA by accepting its benefits, performing under it, and waiting nearly four months to repudiate. *VKK Corp. v. Nat'l Football League*, 244 F.3d 114, 122-23 (2d Cir. 2001). The Akeos accepted the central benefit of the NDA, release from civil liability for over $1.4 million in claims and dismissal of the criminal case; and performed by ceasing the disparagement campaign and removing the offending Facebook content. [ECF 52-3, at ¶¶ 5–6]. **Whatever "continuing duress" Plaintiffs invoke ended on April 3, 2025, when they returned to U.S. soil**. *Yoon Jung Kim v. Gahee An*, is inapposite; the plaintiffs in that case remained subject to ongoing threats. 55 N.Y.S.3d at 214. Moreover, Mr. Vladimir Ortiz García, a vice president of The Palace Company, attested (ECF 52-3 ¶¶ 5–6) that the second Facebook group was taken down on April 5, 2025, 2 days ***after*** the signing of the NDA, at the request of the company; and not, as the Plaintiffs argue, because it "had served its purpose, so there was no need to continue it." (Resp. at 18).[13] This signals an end to any alleged duress, as well as performance and ratification of the NDA.

---

[12]   *Lewkowicz v. El Paso Apparel Corp.*, 625 S.W.2d 301 (Tex. 1981) is nonbinding and factually inapposite.  For one, it involves the "compounding" of a crime.  Second, it involves a U.S.-based, parallel civil proceeding that the threatening party was seeking to exploit.

[13]   Defendants are likewise inconsistent as to what constitutes evidence of repudiation versus performance. First, they argue (Resp. at 18) that statements made not by the Akeos, but rather by their adult children, are evidence of the Akeos' intent to disclaim the contract; and in ***the very next paragraph*** argue that their children's and others' actions cannot be attributed to them as performance where "Palace says that the Akeos performed by deleting disparaging online content [but] neither time by either Paul or Christy" (*id.* at 18-19).

Plaintiffs then waited nearly four months, until July 22, 2025, to send a demand letter. [ECF 4-1, at ¶ 27 & Ex. B]. That delay is dispositive. *Twenty Miljam-350 IED Jammers*, 669 F.3d at 91. Plaintiffs argue that *Twenty Miljam* turned on an explicit ratification email rather than the delay alone (Resp. at 18), but the Second Circuit treated delay and email as independently sufficient grounds. The delay here, combined with performance and acceptance of benefits, is more than sufficient under *VKK* and *Twenty Miljam*. *See also Application of Affiliated Coat & Apron Supply Co.*, 153 N.Y.S.2d 970, 971-72 (Sup. Ct. N.Y. 1956) (finding ratification despite claims of duress after less than four months (Oct. 17 – Feb. 9) where the employee performed acts of ratification and did not repudiate "promptly and seasonably after the cessation of the alleged duress").

### C. <u>Every Defendant May Enforce the Arbitration Clause</u>

Plaintiffs' argument that only Palace Elite, as the NDA signatory, may invoke the arbitration clause fails for two reasons. (Resp. at 10). First, the NDA identifies the non-signatory Defendants as intended beneficiaries entitled to the Agreement's protections, including arbitration. Second, Plaintiffs are estopped from avoiding arbitration because their claims against all Defendants are intertwined.

#### i. <u>The non-signatory Defendants are intended beneficiaries of the NDA</u>

Section 1 of the NDA releases claims against Palace Elite "and its affiliates, parent companies, subsidiaries, predecessors, successors, officers, directors, shareholders, employees, agents, and representatives." [ECF 40-1]. Each of the non-signatory Defendants fits within this language: Chapur Dájer is the CEO of The Palace Company and the Chairman of the Board of Directors of Palace Elite's majority shareholder; CHDB Holdings and Controladora IHC are parent or affiliate entities; and PR Global Reservations and Operadora Palace Resorts JA are affiliates. [*See* ECF 11 ¶¶ 4–7; ECF 30]. Plaintiffs acknowledge that Mr. Chapur had a pivotal role in the negotiations. [ECF 64-3 ¶ 34].

Under New York law, third-party beneficiaries may enforce contractual provisions, including arbitration clauses, where the contract clearly manifests an intent to benefit them. *See Peb, Inc. v. Premium Merch. Funding 26, LLC*, 2025 WL 1802996, at *10–11 (S.D.N.Y. July 1, 2025) (holding "clear intent to benefit third party" where arbitration clause applies to party's "employees, agents, directors, officers, shareholders, governors [and] managers"); *Spear, Leeds & Kellogg v. Cent. Life Assur. Co.*, 85 F.3d 21, 26 (2d Cir. 1996); *Bakon v. Rushmore Serv. Ctr., LLC*, 2017 WL 2414639, at *3 (E.D.N.Y. June 2, 2017). That principle extends to affiliated entities, officers, and related corporate actors identified in the agreement. *Bakon*, 2017 WL 2414639, at *3; *Alvarez v. Experian Info. Sols., Inc.*, 661 F. Supp. 3d 18, 27 (E.D.N.Y. 2023); *Hirschfeld Prods., Inc. v. Mirvish*, 88 N.Y.2d 1054, 1056 (1996). That standard is plainly satisfied here. The breadth of the release was one of the central commercial bargains of the

NDA. Plaintiffs received a comprehensive release of all civil claims, and, in exchange, every Palace-related entity received the same protection. The NDA also contains an equally-broad mutual covenant not to sue. [ECF 40-1 at 4] (covering "Palace Elite or its ownership, managers, shareholders, attorneys, employees, agents, directors, officers, servants, subsidiaries, affiliates, related entities, parent corporations, stockholders or stockholding entities . . . on account of the Released Claims.").

Reading Sections 1 and 15 together further confirms that all Defendants may enforce the NDA's arbitration provision. The NDA broadly requires arbitration of "[a]ll disputes arising out of or in connection with this Agreement." [ECF 40-1, at § 15]. Plaintiffs cannot reap the benefits of the NDA from Palace Elite's affiliates and related entities, while simultaneously denying them the contractual mechanism designated for resolving disputes concerning those very rights and obligations. *See Ronnen v. Ajax Elec. Motor Corp.*, 671 N.E.2d 534, 536 (N.Y. 1996) (interpretation should not "render a contractual provision meaningless or without force or effect").

### ii. <u>Equitable estoppel permits the non-signatories to compel arbitration</u>

Under New York law,[14] a signatory is estopped from avoiding arbitration with a non-signatory where "the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed" and the relationship among the parties justifies arbitration. *Reid v. Tandym Group, LLC*, 697 F. Supp. 3d 62, 76 (S.D.N.Y. 2023); *JLM Indus., Inc. v. Stolt-Nielsen SA*, 387 F.3d 163, 177 (2d Cir. 2004). Here, both requirements are met.

*First*, non-signatories (who also are intended beneficiaries of it) are seeking to compel arbitration against Plaintiffs, who are signatories to the NDA containing the arbitration agreement. Plaintiffs' claims are deeply intertwined with the NDA itself because they challenge the validity and enforceability of the entire NDA, allege that all the Defendants induced its execution through improper conduct, and seek relief arising directly from its negotiation, execution, and consequences. The dispute between Plaintiffs and Palace Elite is the same as the dispute between Plaintiffs and the non-signatory Defendants, arising from the same alleged course of conduct. This is precisely the type of "concerted actions" and intertwined conduct that courts hold sufficient to compel arbitration against signatories under estoppel principles. *See Reid*, 697 F. Supp. 3d at 81; *Reiner v. Paneth*, 808 F. Supp. 3d 431, 452 (E.D.N.Y. 2025); *Temple v. Best Rate Holdings LLC*, 360 F. Supp. 3d 1289, 1312 (M.D. Fla. 2018) (holding intertwined prong satisfied under New York law when disputes are the same).

*Second*, in addition to the established relationships between Defendants, Plaintiffs themselves

---

[14] "'[T]raditional principles' of state law allow a contract to be enforced by or against nonparties to the contract through' estoppel." *Reid v. Tandym Group, LLC*, 697 F. Supp. 3d 62, 76 (S.D.N.Y. 2023).

treat "Palace" as a unified enterprise acting collectively with respect to the NDA negotiations. [ECF 11, ¶¶ 62–98]. That embodies the type of close corporate and operational relationship sufficient to justify arbitration under estoppel. *Contec Corp. v. Remote Sol., Co., Ltd.*, 398 F.3d 205, 209 (2d Cir. 2005); *Int'l Eng'g & Constr. S.A. v. Baker Hughes*, 399 F. Supp. 3d 194, 203 (S.D.N.Y. 2019).

Plaintiffs' authorities do not support a different result. *Brettler v. Allianz Life Insurance Co.*, 57 F.4th 57 (2d Cir. 2022) did not involve enforcement of an arbitration provision and does not address equitable estoppel. *Morales-Posada v. Cultural Care, Inc.*, 141 F.4th 301 (1st Cir. 2025) applied federal common law rather than New York law and addressed a materially narrower arbitration provision that bound only the signatory "parties" to arbitrate. And *County of Onondaga v. U.S. Sprint Communications Co.*, 596 N.Y.S.2d 223 (1993) found "nothing in the agreement" indicating that the parties intended to benefit the non-signatory. The case also did not address equitable estoppel at all.

### D.  <u>Plaintiffs Are Not Entitled to a Jury Trial[15]</u>

Plaintiffs' demand for a jury trial under 9 U.S.C. § 4 (Resp. at 8) fails because Defendants' motion is not brought under 9 U.S.C. § 4. [ECF 52 at 1]. It is brought under 9 U.S.C. § 201 and 9 U.S.C. § 3, neither of which contains a jury trial provision. Courts within this Circuit have squarely rejected efforts to import the § 4 jury right into § 3 proceedings. *Kelly v. UHC Mgmt. Co.*, 967 F. Supp. 1240, 1254 (N.D. Ala. 1997) ("While § 4 of the FAA allows for a jury trial on the issue of the making of the arbitration agreement, § 3 does not."); *Southside Internists Grp. v. Janus Cap. Corp.*, 741 F. Supp. 1536, 1538 (N.D. Ala. 1990). There is no constitutional right to a jury trial on the making of an arbitration agreement; any jury-trial right springs from 9 U.S.C. § 4. *Burch v. P.J. Cheese, Inc.*, 861 F.3d 1338, 1349–50 (11th Cir. 2017).

Nor is there a jury trial right under the New York Convention, which this Court held governs the arbitration agreement. The New York Convention provides that: "[a] court having jurisdiction under this chapter may direct that arbitration be held in accordance with the agreement at any place therein provided for, whether that place is within or without the United States." 9 U.S.C. § 206. No court in this Circuit has addressed the question of whether there is a right to a jury trial under 9 U.S.C. § 206 analogous to § 4, as the plain language of the statute does not provide for one.

### II.    <u>CONCLUSION</u>

The Court should compel arbitration as to all Defendants, allow the arbitrators to decide the arbitrability questions, and stay this action pending the outcome of the ICC arbitration.

---

[15]  The record requires resolution as a matter of law. The Court should also deny Plaintiffs' request for arbitration-related discovery (Resp. at 9) (citing *Young v. Experian Info. Sols., Inc.*, 119 F.4th 314 (3d Cir. 2024)) for the same reason.

DATE: May 18, 2026                                        Respectfully submitted,


**QUINN EMANUEL URQUHART &**                    **MARK FERRER & HAYDEN**
**SULLIVAN LLP**                                         80 S.W. 8ᵗʰ Street, Suite 1999
2601 S. Bayshore Drive                                  Miami, Florida 33130
Miami, Florida 33133                                    Telephone: (305) 374-0440
305-402-4880

                                                        By: _s/ Jose M. Ferrer_
By: _/s/ David M. Orta_                                 Jose M. Ferrer, Esq.
David M. Orta                                           Florida Bar No. 173746
Florida Bar No. 35750                                   Desiree Fernandez, Esq.
davidorta@quinnemanuel.com                              Florida Bar No. 119518
                                                        jose@mfh.law
                                                        desiree@mfh.law
_Co-counsel for Defendants_                             eservice@mfh.law

                                                        _Co-counsel for Defendants_


11

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of this document was served via the CM/ECF portal on this 18th day of May 2026 upon all individuals listed on the service list below.

Peter Kaufman
pkaufman@panish.law
Jesse Creed (pro hac vice pending)
jcreed@panish.law
Hunter Norton (pro hac vice pending)
hnorton@panish.law
PANISH I SHEA I RAVIPUDI LLP
11111 Santa Monica Boulevard, Suite 700
Los Angeles, California 90025
310.477.1700

Jennifer D. Bennett
GUPTA WESSLER LLP
235 Mongomery Street, Suite 629
San Francisco, CA 94101
jennifer@guptawessler.com

*/s/ Jose M. Ferrer*
Jose M. Ferrer

12