# EXHIBIT C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 25-cv-23733-ALTMAN

PAUL AKEO, and
CHRISTY AKEO

Plaintiffs,

v.

PALACE ELITE RESORTS S.A. de C.V.,
a Mexican corporation, *et al.*,

Defendants.

_____/

### DECLARATION OF PABLO HERNANDEZ-ROMO VALENCIA

I, **PABLO HERNÁNDEZ-ROMO VALENCIA**, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury under the laws of the United States as follows:

(1)     I submit this declaration in support of Palace Elite Resorts S.A. de C.V., PR Global Reservations, LLC, José Gibrán Chapur Dájer, CHDB Holding, S.A. de C.V., Controladora IHC, S.A.P.I. de C.V., and Operadora Palace Resorts JA LTD's ("Palace Defendants") Reply in Support of Defendants' Motion to Compel Arbitration and Stay.

(2)     Unless otherwise indicated, all facts set forth in this Declaration are based upon: (a) my personal knowledge; (b) my review of relevant documents and legal authorities; and (c) information supplied to me by counsel for the Defendants, including the declarations provided by Mr. Jose Gibrán Chapur Dajer and Mr. Kevin Ramón Salgado Quiroz in this proceeding.

(3)     I have previously submitted a declaration on this matter, which can be found at ECF 40-3.[1]

(4)     It is important to note at the outset, as I stated in my previous declaration (ECF 40-3 at 51-61, 64), in this case there is no "reparation agreement" as such. This is clearly evident from the document signed by the parties which, although titled "Immediate Reparation Agreement" (*Acuerdo Reparatorio Inmediato*), its second and fourth clauses make clear that they subject the victim to a pardon provided two conditions are satisfied: i) the payment of the amount agreed upon, as referenced in the first clause; and ii) the obligation to execute an agreement, commonly known by its acronym "NDA". That is to say, the purpose of the signed document – improperly named "Immediate Reparation Agreement" – was to grant the Akeos a pardon that would only take effect once both conditions had been fulfilled. In the Akeos' criminal case, given that both conditions were satisfied, and both parties informed the Judge that they had reached said agreement, the Judge (after making sure no coercion had taken place) declared criminal liability extinguished and dismissed the case.

(5)     Contrary to what Eduardo Romero Tagle states in his declaration (ECF 64-6 at ¶ 16), the text of the so-called "Immediate Reparation Agreement", particularly its second clause, is clear: "The victim hereby undertakes to grant the victim's pardon at a public hearing" (*"La ofendida se obliga en este acto a otorgar **el perdón del ofendido** en audiencia pública"*). As I set forth in my prior declaration, the victim's pardon (*perdón del ofendido*) constitutes a recognized form of extinction of criminal action under Mexican criminal law, and, in this case, is addressed

---

[1]  In my previous declaration, I stated at ¶ 6 that "*I have lectured and taught courses in law schools across Mexico, Spain, and the United States, including at University of Pennsylvania, Harvard University, and Yale University.*" Upon revisiting that language in preparation to make the present declaration, it occurs to me there may be some potential for confusion, in that ¶ 6 may be understood to say I actively gave lectures at Harvard and Yale Universities. I would like to clarify that I have *only* lectured at the University of Pennsylvania; and conducted research stays at both Harvard and Yale, as enumerated in the *curriculum vitae* attached to the previous declaration.

2

in Article 73 of the Criminal Code for the Free and Sovereign State of Quintana Roo (hereinafter, Criminal Code), Chapter VI, entitled "Victim's Pardon in Crimes Requiring a Complaint (*delitos de querella necesaria*)." Therefore, there is no confusion whatsoever on my part.

(6)     While Mr. Romero Tagle states (at ¶15) that the Control Judge presiding over the Akeos' hearing made reference to the National Criminal Code of Procedure Articles 186-190 governing reparation agreements, as opposed to the Criminal Code Article 73 governing victim's pardons, this is most likely because the Control Judge had not read the actual document signed by the parties, from which it is clear that the intention of the parties was to resolve the dispute by means of the granting of the victim's pardon (*perdón del ofendido*) rather than a reparation pursuant to National Criminal Code of Procedure Articles 186-190. In any event it is clear to me that the Akeos sought the extinction of their criminal action based on their pardon, as if not there would have been no need for their counsel to have listed the extinguishing cause in the reparation agreement as the "pardon of the accused" (perdón de lo ofendido). Inclusion of this reference in the reparation agreement (Acuerdo Reparatorio Inmediato), results in the pardon by Palace Elite being the extinguishing cause of their criminal case. This is further reinforced by what took place during the last hearing. During that hearing, both the public prosecutor and the Control Judge made reference to the *perdón de lo ofendido*, including when the Control Judge was dictating the reasons as to why he was extinguishing the criminal action.  In fact, when requesting the extinction of the criminal action, the public prosecutor relied on and made specific reference to Article 485(4) of the National Criminal Code of Procedure, which references the extinction of certain criminal actions as a consequence of the *perdón de lo ofendido* by the victim. There was no objection to this reference or correction requested by the Akeos or their counsel. While it is true that the Control Judge also referenced Articles 186-190 of the National Criminal Code of Procedure, which deal

3

with Acuerdos Reparatorios, this is likely explained because the agreement contained that title and because all parties and the Court were in a rush to finalize the action so that the Akeos could return to the United States with the diplomatic mission that were in Mexico assisting them with their negotiations and release. The Court's reference to those articles do not change that the extinguishing cause of the criminal case was Palace Elite's pardon.

(7)    Also, contrary to what Mr. Romero Tagle states (at ¶ 12), a victim's pardon may be subject to various conditions, including a prior reparation of harm. One explicit and common example of this in the Criminal Code itself, in Article 169, second paragraph, reads: "**In order for the pardon granted by the victim** or their representative to take effect, **the offender must pay all amounts that he or she failed to provide** as child support (*alimentos*) during the period set forth in Article 167 and throughout the course of the proceedings". Such cases imply a prior negotiation between the parties to arrive at an amount that must be paid to the victim by the accused.

(8)    Likewise, our highest court has issued binding precedent (*jurisprudencia*) that make it clear that a victim's pardon may be granted contingent upon prior reparation of harm or negotiations between the parties. The binding precedent with digital registration number 196940, issued by the First Chamber (*Primera Sala*) of the Mexican Supreme Court, entitled "**VICTIM'S PARDON IN OFFENSES PROSECUTED UPON FORMAL COMPLAINT BY THE AGGRIEVED PARTY (*DELITOS QUE SE PERSIGUEN POR QUERELLA NECESARIA DE PARTE*)**" ("*PERDÓN DEL OFENDIDO EN LOS DELITOS QUE SE PERSIGUEN POR QUERELLA NECESARIA DE PARTE*"), states the following:

> "*In order for it to be deemed that the pardon has been granted by the victim, such pardon must be expressed explicitly, in writing, which must be ratified, or by appearance before the authority having jurisdiction over the offense for which the complaint was filed, and* **the pardon shall not be considered as having been granted merely by virtue of an**

4

*agreement entered into between the perpetrator of the criminal conduct and the victim, in favor of the latter, with respect to the reparation of harm; bearing in mind that, while such agreement does indeed constitute a manifestation of the will of the parties thereto, it nevertheless constitutes an act independent of what must be performed and expressed before said authority, which, on the basis of what has been stated before it, shall resolve whatever is legally appropriate — and therefore the agreement cannot produce the legal effects of a pardon."*

(9) In the ruling that gave rise to this binding precedent, the following was stated:

*"Therefore, the appearance in the case file of an agreement entered into between the parties (in favor of the victim) cannot constitute the manifestation of the victim's will such that they may be deemed to have granted the pardon. . . such consent, should it exist as reflected in the agreement, must be, as already stated, effected in the terms already specified, as this affords the adjudicating authority greater certainty that the will of the person granting the pardon is free from defect."*

(10)  This jurisprudence by the Mexican Supreme Court makes clear that a victim's pardon may take place after the accused has provided reparation to the victim, including through an agreement between the parties.

(11)  In this case, the parties agreed that the victim's pardon (*perdón del ofendido*) would be subject to two conditions, both of which were fulfilled: the payment of a sum of money as reparation of harm, and the execution of the NDA—the Akeos satisfied the conditions necessary for the pardon to be granted, and both parties then appeared before the criminal judge with competence over the case and expressed before the Judge their desire to extinguish criminal liability.  It was only after all of this took place, and after the criminal judge satisfied himself that the Akeos had voluntarily and without duress complied with the necessary conditions, that he extinguished criminal liability and dismissed the case. It must be emphasized that the Judge never read the improperly termed "Reparation Agreement"; he merely asked the parties whether the document had been signed and whether the conditions had been fulfilled. It must also be recalled that it was the Akeos' own defense counsel who modified the document and made reference to the victim's pardon (*perdón del ofendido*) and Palace Elite agreed to it.

5

(12)     Thus, as established by the Mexican Supreme Court's binding precedent, the parties are free to agree upon whatever contracts and conditions they deem appropriate, as well as whatever payments they deem appropriate, prior or in parallel to the granting of the victim's pardon, and this allows for the pardon to be granted and remain valid. The essential requirements for a victim's pardon to be granted under the Criminal Code are that the victim's pardon be expressed and that the accused present no objection; therefore, if there are conditions agreed by the parties for the granting of the pardon, the court must satisfy itself that the conditions have been voluntarily satisfied.

(13)     Contrary to what Mr. Romero Tagle states (at ¶ 17), in my nearly 25 years of practice and experience as a criminal law lawyer in Mexico with many cases in which a victim's pardon has been granted, negotiations concerning economic harm are commonly resolved through negotiations and resulting agreements before the pardon is granted. In my experience, that sequence is not unusual, but rather the preferred method of resolving criminal matters, particularly where the alleged harm is primarily economic.  Indeed, there is no provision whatsoever in the Criminal Code that prohibits the victim's pardon from being subject to any condition, including those present in the Akeos' case.[2]

(14)     On the other hand, throughout those years of practice, I cannot recall ever seeing a true Reparation Agreement make reference to the victim's pardon or to a "pardon" in general. There is no need for such a reference in a Reparation Agreement unless the true intention of the parties is for the granting of a victim's pardon. This reinforces my conclusion that the so-called

---

[2]  This is in accordance with the general principle of law *permissum videtur id omne, quod non prohibitum*, which translates as "everything that is not prohibited is considered permitted"; as well as *quae non sunt prohibitia, permisae intelliguntur*, which translates as "things that are not prohibited are understood to be permitted".

6

Reparation Agreement entered into by the Akeos is in reality a victim's pardon agreement under Mexican law.

(15)    It is also important to note that, pursuant to Article 217, first paragraph, of Mexico's Amparo Law (*Ley de Amparo*), "[t]he binding precedent established by the Supreme Court of Justice of the Nation [*Suprema Corte de Justicia de la Nación*, that is, the Mexican Supreme Court] shall be mandatory for all jurisdictional authorities of the Federation and of the federal entities, with the exception of the Supreme Court itself." This is important because the authority I have cited in my opinion in support of the conclusion that the Akeos were granted a victim's pardon is authority from the Mexican Supreme Court, and this authority is binding precedent in Mexico, which overrules and takes precedence over the authorities cited by Romero Tagle, which are mere *tesis aisladas (las tesis 257131 y 225886)*, not binding precedent on this or any other Court.

(16)    Given Mr. Romero Tagle's stated experience, including his service at the Mexican Supreme Court and his work on judicial opinions involving criminal procedure, I would have expected his declaration to address the Mexican Supreme Court's binding precedent on the legal issues under discussion. In my view, that omission is significant because the precedent bears directly on the fact that a victim's pardon and a separate agreement between the parties can be reached at the same time.

(17)    As noted above and in my first declaration, this case did not involve a "reparation agreement," but rather a victim's pardon where one of the conditions that the Akeos had to satisfy to be granted a pardon was reparation of a portion of the harm claimed by Palace Elite. Although the document was improperly titled "Immediate Reparation Agreement," its operative clauses make clear that the agreement was for a victim's pardon by Palace Elite contingent on two

7

conditions—payment of the agreed amount and execution of an NDA—both of which were satisfied before the pardon was granted.

(18)    Also as stated in my first declaration (ECF 40-3 at ¶ 56), I also understand that the Akeos' attorneys added the term "victim's pardon" to the arrangement signed between the Akeos and Palace Resort. Their current position that the *Acuerdo* did not constitute a victim's pardon is thus difficult to reconcile with their own drafting and use of that term. As I have stated, a reparation agreement and a victim's pardon are distinct forms of relief, and here what we have is a victim's pardon where reparation was but one of the conditions that needed to be satisfied before the pardon would be granted.

(19)    Regarding the *ex parte* communications mentioned in both Mr. Chapur's declaration (ECF 52-1 at ¶ 19) and Mr. Romero Tagle's declaration (ECF 64-6 at ¶ 19), after having spoken with Mr. Chapur, it is my understanding that the communication he had with the President of the Superior Court of Justice of Quintana Roo was the result of a desire to resolve the matter of the Akeos' detention, not to improperly influence the Akeos' judicial proceedings.

(20)    I understand that Mr. Chapur contacted the President of the Court to discuss how to resolve the matter of the Akeos' detention, and the President agreed to meet. In light of the unusual circumstances and external pressure surrounding the case, that meeting was not in my opinion irregular at all, but rather part of an effort to bring a significant controversy to a prompt resolution. It is also important to bear in mind that, while Article 20, Section A, subsection VI of the Mexican Constitution establishes that "no judge may discuss matters subject to proceedings with any of the parties in the absence of the other, respecting at all times the principle of adversarial proceedings (*principio de contradicción*)", said constitutional prohibition in fact refers to the judge presiding over the matter in question under his or her charge; and therefore, the meeting that took place was

8

not prohibited, as the President of the Superior Court was not the presiding judge in the criminal case against the Akeos.

(21)     This is further evidenced by the fact that the President of the Superior Court met separately with the Akeos' representatives, as well.  It is my understanding that the President first met with Mr. Justen Thomas, United States Consul to Mérida, Yucatán before he met with Mr. Chapur; and afterward again met with Mr. Justen Thomas as well as U.S. Congressman Tom Barret (MI) shortly thereafter on April 2, 2025 to discuss the same.

(22)     Finally, in the Plaintiffs' Opposition to Defendant's Motion to Compel Arbitration and Stay (ECF 64 at 15), the Akeos' attorneys said:

*"First, Palace's claim to lawful coercion relies on its assertion that a crime victim may dismiss their complaint if the alleged perpetrator agrees to provide reparation. But as explained above, there was no fraud and Palace was no victim. Palace has identified no Mexican law that allows a company that breaches its contract with its customers to have them arrested for fraud to extort an agreement to never speak about the company, release all claims, and send any disputes to confidential arbitration in a foreign country, with the arbitrator deciding whether any of this is valid."*

(23)     The Akeos thus claim that the agreement was coerced under improper threat, relying on the supposition that there was no valid allegation of criminal fraud. In my opinion, having reviewed the records of the underlying criminal proceedings, Palace did not use the Mexican criminal system to coerce or extort any settlement. Rather, Palace properly pursued criminal charges for criminal fraud, as it was entitled to do under Mexican law, and it later acted within its right to reach a negotiated resolution with the Akeos, which was being sought under significant external pressure from the U.S. government and its representatives. This is evidenced by the actions of the local prosecutor, who investigated Palace Elite's allegations and independently determined to charge the Akeos with criminal fraud, as well as by the actions of the criminal judge overseeing the case against the Akeos, who accepted the criminal charges and later

9

extinguished criminal liability and dismissed the case once the necessary conditions for doing so were satisfied.

(24)    Finally, it is inaccurate to argue that the agreement was *de facto* coerced solely because the Akeos were in pretrial detention (*prisión preventiva*). That circumstance does not, by itself, eliminate the possibility of lawful negotiation or alternative resolution, and I am aware of no legal authority supporting a contrary rule.  It is relatively common for agreements for victim's pardons to be reached between parties where the accused is in pretrial detention.  This does not convert the agreement into one that has been coerced.  Also, here, the Akeos confirmed to the court that they were not under duress or coercion when they entered into the agreements that led to their pardon, which I find instructive.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge and belief.

*Pablo*
_____

Pablo Hernández-Romo Valencia

Executed on May 18, 2026 in Mexico City, Mexico.

10